No. 25-10870

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

MEDENVIOS HEALTHCARE, INC.

*Plaintiff-Appellant,*

v.

ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

*Defendant-Appellee.*

Appeal from the United States District Court for the Southern District of Florida

No. 1:23-cv-20068-RNS

# APPELLANT'S OPENING BRIEF


Stephen D. Bittinger
Polsinelli PC
177 Meeting Street, Suite 400
Charleston, South Carolina 29401
854.223.6210
sbittinger@polsinelli.com

Bennett L. Cohen
Polsinelli PC
1401 Lawrence Street, Suite 2300
Denver, Colorado 80202
720.931.8155
bcohen@polsinelli.com

*Attorneys of Appellant*
MedEnvios Healthcare, Inc.

**NO. 25-10870**
**MEDENVIOS HEALTHCARE, INC. V. ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY, DEPARTMENT OF HEALTH AND HUMAN SERVICES**

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 21.1-3, Plaintiff-Appellant MedEnvios Healthcare, Inc. ("MedEnvios"), by and through its undersigned counsel, hereby discloses the following persons and entities known potentially to have an interest in the outcome of this appeal:

1. Barmore, Cynthia (Counsel for Defendant-Appellee)
2. Bittinger, Stephen, D. (Counsel for MedEnvios)
3. Cohen, Bennett, L. (Counsel for MedEnvios)
4. Garcia, Alexander, R. (Owner of MedEnvios)
5. Garcia, Michael (Owner of MedEnvios)
6. Goodman, Jonathan (Hon.) (U.S. Magistrate Judge)
7. Health Integrity, LLC (Interested Entity)
8. K&L Gates, LLP (Former Counsel of MedEnvios)
9. Kennedy, Robert, F., Jr. (Defendant-Appellee)
10. Lilley, Jaynie (Counsel for Defendant-Appellee)
11. MedEnvios Healthcare, Inc. (Plaintiff-Appellant)

**NO. 25-10870**
**MEDENVIOS HEALTHCARE, INC. V. ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY, DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

12. Polsinelli, PC (Counsel for MedEnvios)

13. Powell, Lindsey (Counsel for Defendant-Appellee)

14. Raurell, Carlos (Counsel for Defendant-Appellee)

15. Safeguard Services, LLC (Interested Entity)

16. Scola, Robert, N. (Hon.) (U.S. District Court Judge)

17. Skora, Joshua, I. (Former Counsel for MedEnvios)

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Eleventh Circuit Rules 28-1(c) and 34-3(c), MedEnvios respectfully requests oral argument because this appeal presents novel constitutional and Administrative Procedure Act ("APA") challenges to the methodology of statistical sampling and extrapolated overpayments performed by the Centers of Medicare and Medicaid Services ("CMS") and its contracted agents. To date, the Eleventh Circuit has not addressed or decided upon the legal issues posed in this appeal. Additionally, these issues are profoundly impacted by the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), which has not yet been applied in this context. Oral argument should aid the Court in addressing these important and novel issues.

# TABLE OF CONTENTS


JURISDICTIONAL STATEMENT ........ 1

INTRODUCTION ........ 1

STATEMENT OF THE ISSUE(S) ........ 4

STATEMENT OF THE CASE ........ 6

I. NATURE OF THE CASE AND APPLICABLE LAW ........ 6

A. The Medicare Auditing Process ........ 6

B. The Administrative Appeals Process ........ 10

II. STATEMENT OF FACTS ........ 11

A. SafeGuard Audit ........ 11

B. Health Integrity Audit ........ 13

C. MedEnvios's Administrative Appeals ........ 14

III. DISTRICT COURT PROCEEDINGS ........ 15

STANDARDS OF REVIEW ........ 19

SUMMARY OF THE ARGUMENT ........ 22

ARGUMENT ........ 24

I. THE DISTRICT COURT ERRED IN RULING THAT THE ADMINISTRATIVE RECORDS WERE COMPLETE ........ 24

A. Legal Standard ........ 24

B. The District Court Improperly Limited Its Scope of Review to Evidence That Was Directly Before the ALJs in Ruling that the Administrative Records Were Complete. ........ 28

C. MedEnvios Submitted Clear Evidence that the Administrative Record Was Missing the Target Universe of Claims for the Health Integrity Audit, which the Medicare Contractors Considered and Relied Upon in Calculating the Extrapolated Overpayment Alleged Against Plaintiff. ....30

D. MedEnvios Submitted Clear Evidence that the Administrative Records were Missing the Recalculation Worksheets, which the Medicare Contractors Considered and Relied Upon in Calculating the Extrapolated Overpayments Alleged Against Plaintiff. ....32

II. THE DISTRICT COURT ERRED IN RULING THAT THE SECRETARY PROVIDED DUE PROCESS BY COMPLYING WITH CERTAIN STATISTICAL SAMPLING AND EXTRAPOLATION PROCEDURES SET FORTH IN STATUTORY, REGULATORY, AND SUB-REGULATORY GUIDANCE. ....33

A. Applicable Legal Standard: The *Mathews* Test ....33

B. MedEnvios Has a Protected Property Interest in Medicare Reimbursements for Services Rendered to Medicare Beneficiaries ....34

C. The Secretary's Failure to Produce the Target Universe of Claims Violated MedEnvios's Due Process Rights and the APA. ....37

D. The Secretary's Failure to Include Zero-Paid Claims in its Statistical Samplings Violated MedEnvios's Due Process Rights and the APA. ....44

III. THE DISTRICT COURT ERRED IN DENYING MEDENVIOS'S MOTION FOR CLARIFICATION. ....53

IV. MEDENVIOS IS LIABLE ONLY FOR THE ACTUAL OVERPAYMENT AMOUNT ON THE SAMPLE CLAIMS AND IS ENTITLED TO A REFUND WITH REGULATORY INTEREST FOR THE MONEY MEDENVIOS PAID ON THE NOW-VACATED EXTRAPOLATED OVERPAYMENT AMOUNTS. ....................55

CONCLUSION....................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpha Home Health Sols., LLC v. HHS*,
340 F.Supp.3d 1291 (M.D.Fla. 2018)....35

*Arriva Med. LLC v. HHS*,
No. 9:19-CV-80685, 2020 WL 5032978 (S.D.Fla. Aug. 25, 2020)....26

*Bailey v. Mut. of Omaha Ins. Co.*,
534 F.Supp.2d 43 (D.D.C. 2008)....34

*Baltimore & O.R. Co. v. United States*,
279 U.S. 781 (1929)....55

*Bar Mk Ranches v. Yuetter*,
994 F.2d 735 (10th Cir. 1993)....29

*Bennett v. Spear*,
520 U.S. 154 (1997)....19

*Bradley v. Sebelius*,
621 F.3d 1330 (11th Cir. 2010)....18

*Califano v. Sanders*,
430 U.S. 99 (1977)....21, 27

*Carey v. Piphus*,
435 U.S. 247 (1978)....54

*Cent. La. Home Health Care, LLC v. Price*,
No. 1:17-CV-00346, 2018 WL 7888523 (W.D. La. Dec. 28, 2018)....45, 50, 56

*Chaves Cnty. Home Health Serv., Inc. v. Sullivan*,
931 F.2d 914 (D.C. Cir. 1991)....44, 45, 46

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)....22, 46

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
No. 2:19-CV-14243, 2020 WL 2732340 (S.D.Fla. May 26, 2020)....26, 27, 29

*D&G Holdings, L.L.C. v. Becerra*,
22 F.4th 470 (5th Cir. 2022) ....................21, 30

*D&G Holdings, LLC v. Burwell*,
156 F.Supp.3d 798 (W.D.La. 2016) .................... 56

*Dickinson v. Zurko*,
527 U.S. 150 (1999)....................26

*Elgin Nursing & Rehab Ctr. v. HHS*,
718 F.3d 488 (5th Cir. 2013) ....................51

*Emerald Shores Health Care Assocs., LLC v. HHS*,
545 F.3d 1292 (11th Cir. 2008) ....................18

*Exxon Corp. v. Dep't of Energy*,
91 F.R.D. 26 (N.D. Tex. 1981)....................29

*F.C.C. v. NextWave Pers. Commc'ns Inc.*,
537 U.S. 293 (2003)....................55

*Fla. v. Buttigieg*,
751 F.Supp.3d 1333 (S.D. Fla. 2024) ....................52

*Friedman v. Sebelius*,
686 F.3d 813 (D.C.Cir. 2012)....................19, 25

*Fuentes v. Shevin*,
407 U.S. 67 (1972)....................38

*Global Home Care, Inc. v. Nat'l Gov't Servs.*,
No. M-11-116, 2011 WL 3668242 (HHS-DAB Jan. 11, 2011)
....................10, 37, 39, 56, 58

*Goose Creek Physical Med., LLC v. Becerra*,
No. 2:22-CV-03932-DCN, 2024 WL 3653639 (D.S.C. Aug. 5, 2024) ....................40

*Goose Creek Physical Med., LLC v. Becerra*,
No. 22-cv-03932, 2024 WL 942918 (D.S.C. Mar 5, 2024) ....................26, 29, 39

*Gray Panthers v. Schweiker*,
652 F.2d 146 (D.C. Cir. 1980)....................34

*Greene v. McElroy*,
360 U.S. 474 (1959)....................................................................................38

*Hammad v. Azar*,
2021 WL 1216383 (N.D.Fla. 1/15/2021) ..........................................................56

*Hicks v. Comm'r of Soc. Sec.*,
909 F.3d 786 (6th Cir. 2018) ....................................................................38, 41

*Himmler v. Califano*,
611 F.2d 137 (6th Cir. 1979) ........................................................................35

*Jeannie S. v. Saul*,
2020 WL 13561582 (N.D.Ga. 3/3/2020)..........................................................42

*Kirk v. Berryhill*,
388 F.Supp.3d 652 (D.S.C. 2019), *aff'd sub nom. Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314 (4th Cir. 2021) ...........................................58

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)....................................................... 5, 20, 21, 22, 28, 47, 52

*Mastro Plastics Corp. v. NLRB*,
350 U.S. 270 (1956)....................................................................................49

*Mathews v. Eldridge*,
424 U.S. 319 (1976).............................. 21, 33, 34, 37, 38, 41, 42, 43, 44, 45, 46

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
463 U.S. 29 (1983)......................................................................................25

*National Labor Relations Board v. ArrMaz Products Inc.*,
123 F.4th 1295 (11th Cir. 2024) ...................................................................19

*Nirvana Health S v. HHS*,
2018 WL 10216474 (M.D.Fla. 12/20/2018).....................................................35

*Pruchniewski v. Leavitt*,
No. 8:04-CV-2200-T-23TBM, 2006 WL 2331071 (M.D.Fla. Aug. 10, 2006) ..................................................................................44, 45

*Richardson v. Perales*,
402 U.S. 389 (1971)....................................................................................38

*Rock River Health Care, LLC v. Eagleson*,
14 F.4th 768 (7th Cir. 2021) .......... 36

*Ron Group, LLC v. Azar*,
2021 WL 5576616 (M.D.Ala. Nov. 29, 2021) .......... 35

*Shalala v. Illinois Council*,
529 U.S. 1 (2000) .......... 21, 25, 27, 57

*Thompson v. Dep't of Labor*,
885 F.2d 551 (9th Cir. 1989) .......... 27, 29

*Vitreo Retinal Consultants of the Palm Beaches, P.A. v. HHS*,
649 F.App'x 684 (11th Cir. 2016) .......... 20

*Watts v. Pinckney*,
752 F.2d 406 (9th Cir. 1985) .......... 55

*Yale-New Haven Hosp. v. Leavitt*,
470 F.3d 71 (2d Cir. 2006) .......... 19, 26

*Zen Group, Inc. v. Agency for Health Care Administration*,
80 F.4th 1319 (11th Cir. 2023) .......... 34

**Statutes**

5 U.S.C. § 559 .......... 19, 26

5 U.S.C. §§ 704, 706 .......... 1

5 U.S.C. § 706 .......... 19, 20, 24

5 U.S.C. § 706(2) .......... 20, 21, 55

5 U.S.C. § 706(2)(B), (D) .......... 52

28 U.S.C. § 1291 .......... 1

31 U.S.C. § 3351(4)(A) .......... 51

42 U.S.C. § 405(g) .......... 1, 4, 11, 19, 20, 21, 25, 26

42 U.S.C. § 1395 .......... 35

42 U.S.C. § 1395ddd ......................................................................9, 47, 48, 49

42 U.S.C. § 1395ddd(b)(1) ..........................................................................48

42 U.S.C. § 1395ddd(f)(2)(B).................................................................36, 58

42 U.S.C. § 1395ddd(h) ........................................................ 5, 8, 9, 16, 47, 48, 52

42 U.S.C. § 1395ddd(h)(1) .....................................................3, 9, 45, 46, 48, 51

42 U.S.C. § 1395ff ........................................................................1, 10, 25

42 U.S.C. § 1395ff(b), (c) .........................................................................10

42 U.S.C. § 1395ff(d)(1) ...........................................................................10

42 U.S.C. § 1395ff(d)(2) ...........................................................................10

42 U.S.C. §§ 1395i(k)(4) .......................................................................7, 47

42 U.S.C. § 1395zz(g)..........................................................................9, 48, 49

Civil Rights Act of 1871 ..........................................................................54

**Other Authorities**

20 C.F.R. § 416.536 .................................................................................8

42 C.F.R. § 405.1110-1134.........................................................................10

42 C.F.R. § 405.1132-1136.........................................................................11

42 C.F.R. § 405.1132(a).............................................................................11

42 C.F.R. § 455.504 ...............................................................................9, 45

42 CFR §§ 405.960-978.............................................................................10

42 CFR §§ 405.1000-1064..........................................................................10

*Black's Law Dictionary* (2nd Ed.), "vacate" .........................................................54

CMS, Pub. 100-8.........................................................................................9

https://www.cms.gov/newsroom/fact-sheets/cms-announces-new-recovery-audit-contractors-help-identify-improper-medicare-payments ........ 8

https://www.cms.gov/newsroom/press-releases/cms-enhances-program-integrity-efforts-fight-fraud-waste-and-abuse-medicare ........ 8

https://www.congress.gov/bill/108th-congress/house-bill/1 ........ 7

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to 42 U.S.C. § 405(g) ("Section 405(g)") as applied to Medicare appeals by 42 U.S.C. § 1395ff, which authorizes judicial review of factual findings in a final agency decision of the Secretary, and pursuant to the APA, codified at 5 U.S.C. §§ 704, 706, which authorizes judicial review of final agency decisions for "all . . . questions of law[.]"

The district court entered final judgment on January 15, 2025. Robert F. Kennedy, Jr., in his official capacity as Secretary, United States Department of Health and Human Services ("Secretary"), filed his Notice of Appeal on March 14, 2025. MedEnvios filed a Notice of Cross-Appeal on March 27, 2025. On June 3, 2025, this Court granted the Secretary's voluntary dismissal of the government's appeal.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from an order and final judgment of a federal district court that disposed of all parties' claims.

## INTRODUCTION

This case is a Medicare appeal dispute that began more than eight years ago with a post-payment audit of reimbursed claims. Prior to ceasing business operations, MedEnvios was a supplier of diabetic equipment to Medicare

beneficiaries. In this reimbursement process, Medicare beneficiaries assigned their right to receive payment for the supplies from the Medicare program to MedEnvios, MedEnvios delivered supplies and submitted claims to CMS for reimbursement on behalf of these beneficiaries, and CMS paid MedEnvios. CMS did this through its "pay and chase" model, where it pays claims up front and then later conducts audits to identify errors, overpayments, and other inaccuracies.

CMS selected MedEnvios for post-payment audits because of alleged non-compliance in their billing practices – not because of fraud concerns. The CMS contractors conducting these audits used a statistical methodology (discussed in detail below) that involved selecting a sample of claims (*i.e.*, a small percentage of the claims paid to MedEnvios) from a designated period of review, auditing those claims to identify inaccuracies, determining an error rate, and then extrapolating the results of the audit onto the larger claims data set from the same period of review to estimate an overpayment amount. That extrapolation process amplifies errors or biases in the auditing procedure by orders of magnitude. These biased errors in CMS's contractors' audits are the subject of this appeal.

The CMS contractors' first error is very simple – they failed to preserve and produce documentation to support the overpayment demands. In one of the two extrapolated overpayments under review in this proceeding, the contractor preserved and produced the foundational document necessary for MedEnvios to recreate the

sampling and extrapolation process. In the other audit, the contractor did not. The district court's denial of MedEnvios's request for the missing foundational document was in error.

The second fundamental error of the district court is also simple – the court effectively held that it was permissible for CMS contractors to select and use biased samples to calculate the extrapolated overpayments. The district court in part improperly deferred to the Secretary's unconstitutional interpretation of 42 U.S.C. § 1395ddd(h)(1). This statute, which authorizes CMS to hire contractors to audit Medicare claims, requires auditors to be objective in the sampling and review process. However, the Secretary's position implies that Congress only intended this objectivity to apply to one type of CMS auditor and not to other CMS auditors authorized under the same statute. That interpretation leads to bias through the exclusion of adjudicated claims issued a final payment of zero dollars ("zero-paid" claims) from the sampling process, which could have excluded claims that were improperly denied by CMS. By excluding the claims with the highest probability of potential error by CMS, the auditors only looked at the potential errors of MedEnvios and stacked the deck in the auditors' favor with the results.

Not only is this process unfair to the supplier, but it also creates statistically invalid extrapolations, as the auditors' sample designs ignore a central tenet of statistics: that a sample must be representative in order for any resultant estimate of

the larger whole to be accurate. Additionally, adopting a statutory interpretation that is unconstitutional is certainly not the "best interpretation" of the law and is invalid. Consequently, the district court's order upholding the Secretary's interpretation should be overruled.

This Court must cut through the statutory, regulatory, and sub-regulatory morass and hold the Secretary to constitutional standards for auditing procedures which, at present, wrongfully deprive suppliers like MedEnvios of the opportunity to meaningfully challenge the taking of constitutionally protected property in the form of extrapolated overpayments and levied penalties. This Court's analysis is critical because this is the first of several similar challenges to reach the circuit court level.

## STATEMENT OF THE ISSUES

1. Whether the district court applied the correct standard of review for questions of law pursuant to Section 405(g) and the APA?
2. Whether a federal district court must review the whole administrative record, to include documents relied on by the Secretary and his contractors, when reviewing constitutional and statutory challenges raised under the APA?
3. Whether MedEnvios has a protected property interest in Medicare reimbursements for services rendered to Medicare beneficiaries?

4. Whether CMS's failure to preserve and produce the target universe of claims in its statistical sampling and extrapolations is a violation of MedEnvios's right to due process under the Fifth Amendment to the U.S. Constitution and the APA, and is a basis for invalidating the extrapolated overpayments?

5. Whether CMS's exclusion of zero-paid claims from the statistical sampling and extrapolations is a violation of MedEnvios's right to due process under the Fifth Amendment to the U.S. Constitution, statutory mandate, and the APA, and is a basis for invalidating the extrapolated overpayments?

6. Whether under *Loper Bright*, the best interpretation of 42 U.S.C. § 1395ddd(h) is that all CMS audit contractors must review both overpayments and underpayments to maintain objectivity and avoid bias, and include zero-paid claims when conducting a statistical sampling and extrapolation to support an overpayment demand?

7. Whether MedEnvios is owed a refund of the extrapolated overpayments for amounts paid to CMS, plus applicable interest, due to violations of MedEnvios's due process rights?

# STATEMENT OF THE CASE

## I. NATURE OF THE CASE AND APPLICABLE LAW

### A. The Medicare Auditing Process

This case concerns judicial review of two final agency decisions regarding extrapolated overpayment demands by the Secretary against MedEnvios following two separate audits of Medicare claims paid to MedEnvios from January 28, 2013, through May 4, 2016. MedEnvios challenges the legality of the statistical sampling methodologies employed by CMS's contractors, and the resultant extrapolated overpayment calculations, on due process grounds based on failure of notice and bias.

Title XVII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, commonly known as the Medicare Act, established a system of governmentally funded health insurance for elderly and disabled persons. Under the Medicare Act, certain healthcare providers and suppliers[1] are eligible for reimbursement by the Department of Health and Human Services ("HHS") for services rendered to Medicare beneficiaries. CMS, which is an agency of HHS, administers the Medicare program and directs its contractors to process the original claims submitted for reimbursement and payments made to suppliers on those claims.

[1] During the time of the audit, MedEnvios was enrolled in the Medicare program as a supplier and billed Medicare for Part B services.

In CMS Ruling 86-1, entitled "Use of Statistical Sampling to Project Overpayments to Medicare Providers and Suppliers" (Feb. 20, 1986), the predecessor to CMS approved the use of statistical sampling and extrapolation for determining and calculating the total amount of any overpayment made to health care suppliers. Pursuant to Rule 86-1 and the Medicare Integrity Program through the Health Insurance Portability and Accountability Act of 1996, Congress authorized CMS to engage contract auditors to use extrapolation to estimate overpayment amounts to be recovered. *See* 42 U.S.C. §§ 1395i(k)(4); 1395ddd(f)(3)(A).

In 2003, the Medicare Prescription Drug Improvement and Modernization Act, commonly referred to as the Medicare Modernization Act ("MMA"), included a provision that required CMS to demonstrate the applicability of audit contractors to identify overpayments and underpayments, and recoup overpayments made by the Medicare program. *See* MMA, Sec. 306.[2] Specifically, the MMA required the Secretary to conduct a project to demonstrate the use of recovery audit contractors ("RACs") under the Medicare Integrity Program in identifying underpayments and overpayments and recouping overpayments under the Medicare program for services for which payment is made under Medicare Part A or Part B. *Id*.

[2] https://www.congress.gov/bill/108th-congress/house-bill/1.

In 2006, Congress amended the Tax Relief and Healthcare Act to add a new subsection—42 U.S.C. § 1395ddd(h)—that expressly requires program integrity contractors to identify underpayments as well as overpayments. *See* Pub. L. 109-432, Div. B, Title III, § 302(a), 120 Stat. 2991 (codified at 42 U.S.C. § 1395ddd(h)). "Underpayments" refer to non-payments where an applicable law requires payment by CMS to a supplier or to payments of less than the amount owed by CMS to a supplier according to applicable law. 20 C.F.R. § 416.536.

In 2008, CMS awarded contracts to four permanent RACs tasked with identifying improper Medicare payments and fighting fraud, waste, and abuse.[3] That same year, CMS also created Zone Program Integrity Contractors ("ZPICs") to "consolidate the work of previous contractors and ensure the integrity of all Medicare-related claims under Parts A and B (hospital, skilled nursing, home health, provider and durable medical equipment claims), Part C (Medicare Advantage health plans), Part D (prescription drug plans) and coordination of Medicare-Medicaid data matches (Medi-Medi)."[4] In 2016, CMS began transitioning these

[3] https://www.cms.gov/newsroom/fact-sheets/cms-announces-new-recovery-audit-contractors-help-identify-improper-medicare-payments. CMS's stated "goal of the recovery audit program is to identify improper payments made on claims of health care services provided to Medicare beneficiaries." *Id*. "Improper payments may be overpayments or underpayments." *Id*.

[4] https://www.cms.gov/newsroom/press-releases/cms-enhances-program-integrity-efforts-fight-fraud-waste-and-abuse-medicare.

same duties from ZPICs to Unified Program Integrity Contractors ("UPICs"). Neither RACs, ZPICs, nor UPICs are expressly authorized by name under 42 U.S.C. § 1395ddd, and the only defined term used is "medicare contractor," as defined under 42 U.S.C. § 1395zz(g), which encompasses all types of contractors under the Medicare Program Integrity Program.

Under 42 U.S.C. § 1395ddd(h), Medicare contractors are statutorily required to identify overpayments and underpayments made to suppliers through audits. 42 U.S.C. § 1395ddd(h)(1); 42 C.F.R. § 455.504. These contractors can use statistical sampling and extrapolation during the audit to estimate overpayments based on an individual review of a sample set of claims. CMS has produced guidance in Chapter 8, Section 4, of the Medicare Program Integrity Manual ("MPIM") that provides detailed requirements for CMS contractors to follow in developing an audit plan and executing the sampling and extrapolation process. CMS, Pub. 100-8, MPIM § 8.[5]

When a contractor seeks to recover an overpayment from a supplier, the contractor is required to include information and supporting documentation for the review and statistical sampling methodology that was used to support the overpayment demand letter. *See* MPIM §§ 8.4.7.1; 8.4.4.4. A failure to do so can

[5] Unless otherwise specified, all citations to the MPIM are made to the effective version at the time of the audits underlying this appeal.

render a statistical sampling and extrapolated overpayment demand invalid. *See Global Home Care, Inc. v. Nat'l Gov't Servs.*, 2011 WL 3668242, at *3 (HHS-DAB Jan. 11, 2011).

### B. The Administrative Appeals Process

If a supplier chooses to appeal an overpayment demand, they generally must exhaust their administrative remedies through several levels of agency review before judicial review of a Medicare denial is permitted. *See* 42 U.S.C. § 1395ff and 42 C.F.R. Subpart I. CMS contracts with Medicare Administrative Contractors ("MACs") to process the original claims, payments, and handle first-level redetermination appeals submitted by Medicare providers or suppliers.

For the second level of appeal, CMS contracts with qualified independent contractors ("QICs") to conduct reconsiderations of redetermination decisions. 42 U.S.C. § 1395ff(b), (c); 42 CFR §§ 405.960-978.

The Office of Medicare Hearings and Appeals ("OMHA") is the third level of the appeal process where the appellant supplier may request a hearing before an administrative law judge ("ALJ") to challenge the decision of the QIC. 42 U.S.C. § 1395ff(d)(1); 42 CFR §§ 405.1000-1064.

A supplier can challenge an ALJ's decision by appealing to the Medicare Appeals Council ("Council"). 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. § 405.1110-

1134. Council is part of the Departmental Appeals Board ("DAB") of HHS and provides the fourth level of administrative review.

The fifth level of appeal is judicial review in a federal district court. 42 U.S.C. § 405(g); 42 C.F.R. § 405.1132-1136. If Council does not complete its review within the regulatory timeframe, a party can escalate the appeal to district court prior to receiving a decision from Council. *See* 42 C.F.R. § 405.1132(a). The fifth level of appeal involves *de novo* review of the agency's final decision on all issues of law and substantial evidence review on all issues of fact.

## II. STATEMENT OF FACTS

This matter arises from MedEnvios's appeal of two post-payment audits conducted by two different ZPICs: SafeGuard Services, LLC ("SafeGuard") and Health Integrity, LLC ("Heath Integrity") and the two extrapolated overpayment demands that resulted from these audits. Neither audit resulted in a finding of fraud that required the ZPIC to refer the matters to Health and Human Services, Office of Inspector General ("HHS-OIG") or the Department of Justice, as the audits only identified billing compliance errors.

### A. SafeGuard Audit

On March 17, 2017, SafeGuard sent MedEnvios an Initial Determination Letter and compact disc with results from its audit, asserting an actual overpayment

amount of $40,868.09 and an extrapolated overpayment amount of $2,229,067.16. Doc. 93, at 3; Doc. 21, at 40.

On April 6, 2017, CGS Administrators, LLC ("CGS"), the MAC in this case, sent an overpayment demand letter to MedEnvios, requesting $2,229,067.16 for alleged payment errors stemming from SafeGuard's audit. *Id.*

On April 25, 2017, MedEnvios sent SafeGuard a certified letter requesting missing documentation to challenge the extrapolation and statistical sampling. The letter was received by SafeGuard on April 26, 2017. Doc. 93, at 3.

On May 4, 2017, MedEnvios sent CGS its Request for Redetermination based on the Initial Determination Letter and the Initial Demand Letter. *Id.*

On May 16, 2017, SafeGuard sent MedEnvios a superseding notice of findings that decreased the alleged overpayment amount by approximately $164,000.00, to $2,065,799.71, while continuing to deny 100% of claims (the "Revised Determination Letter"). A second CD was included with the Revised Determination Letter. Doc. 93, at 4.

This second CD contained several documents including a Statistical Methodology Report and a document entitled "Universe." *Id.*; App. at A007-A011.

The defined universe identified by SafeGuard included 3,436 claims and 3,436 claim lines (which are subcomponents of claims). Doc. 93, at 4; App. A011. Of the 3,436 claims, 280 claims reflected a paid amount of $0.00. *Id.*

SafeGuard then constructed the sampling frame, comprised of 3,097 claims and 3,097 claim lines. App. at A011. Of the 3,097 claims in the frame, none of them had a paid amount of $0.00; rather, the claims had payments with values ranging from $453.53 to $2,756.04. *Id*. From this sampling frame, SafeGuard used simple stratified random sampling to arrive at the overpayment estimation. *Id.*

### B. Health Integrity Audit

On May 16, 2017, Health Integrity sent MedEnvios an Initial Determination Letter and CD with results from its audit, asserting an actual overpayment amount of $18,441.85 and an extrapolated overpayment amount of $947,843.11. Doc. 97, at 3; Doc. 27, at 40.

This CD contained several documents including a Statistical Methodology Report and a document entitled "Universe." App. at A016-A021.

In defining the universe, Health Integrity applied several limiting criteria, including the limitation of using "only paid claims and the associated paid claim lines" with a paid amount greater than $0.00. Doc. 97, at 3; App. at A016. The defined universe identified by Health Integrity included 3,171 claims. App. at A021. Of the 3,171 claims, none of them had a paid amount of $0.00. *Id*.

According to Health Integrity's audit documentation, every claim (the defined sampling unit compromised of one or more claim lines) in the universe had a paid amount greater than $0.00, with values ranging from $0.91 to $780.08. Doc. 97, at

4; App. at A021. Health Integrity then constructed the sampling frame, comprised of 2,035 claims, which had total amounts ranging from $81.02 to $2,135.49. *Id*. From this sampling frame, Health Integrity used simple stratified random sampling to arrive at the overpayment estimation. Doc. 97, at 4; App. at A016-A018.

On June 9, 2017, CGS sent a demand letter to MedEnvios, requesting $947,843.11 in an extrapolated overpayment based on the Health Integrity audit. Doc. 97, at 4; Doc. 27, at 41.

### C. MedEnvios's Administrative Appeals

MedEnvios timely submitted requests for Redetermination of both audits to the MAC; however, CGS returned wholly unfavorable decisions for both audits. Doc. 93, at 5; Doc. 97, at 4.

MedEnvios then submitted requests for Reconsideration to the QIC, C2C Innovation Solutions, Inc. ("C2C'), which included a request for missing statistical sampling documents from Health Integrity. Doc. 93, at 5; Doc. 97, at 4; Doc. 56, at 2-3. C2C issued partially favorable Reconsideration Decisions in both audits. Doc. 93, at 5; Doc. 97, at 5. In doing so, C2C overturned the denial of several individual claims but upheld the statistical sampling methodologies. *Id.* As a result of these partially favorable decisions, CGS issued a Recalculated Overpayment Demand of $1,823,002.20 in the SafeGuard audit and a Recalculated Overpayment Demand of $778,237.11 in the Health Integrity audit. Doc. 93, at 6; Doc. 97, at 5.

MedEnvios subsequently filed requests for an ALJ Hearing, appealing both of C2C's reconsideration decisions. Doc. 93, at 6; Doc. 97 at 5. MedEnvios again received partially favorable decisions, reducing the Overpayment Demands to $1,574,366.37 and $730,636.11. Doc. 93, at 7; Doc. 97, at 7. Both decisions upheld the statistical samplings and extrapolation methodologies. Doc. 1-1, at 25 (23-20065); Doc. 1-1, at 21 (23-20068). Neither SafeGuard nor Health Integrity produced the requested missing information for the statistical samplings and extrapolations. Doc. 56, at 2-3.

MedEnvios requested Council review of both ALJ decisions. Doc. 60, at 5. Because Council did not issue a decision, dismissal, or remand within 90 days of MedEnvios's requests, MedEnvios properly and timely filed requests to bypass Council and escalated both cases to federal district court. *Id*.

## III. DISTRICT COURT PROCEEDINGS

On January 6, 2023, MedEnvios filed two Complaints in the district court seeking judicial review of the Secretary's final decisions. 1:23-cv-20065 - Doc. 1; 1:23-cv-20068 - Doc. 1. The Secretary submitted an answer and Administrative Record in response to each complaint. 1:23-cv-20065– Doc. 21; 1:23-cv-20068 – Doc. 27. Thereafter, United States District Judge Robert N. Scola, Jr. consolidated the cases and administratively closed Case No. 1:23-cv-20065. Doc. 29.

After a hearing on MedEnvios's request to complete the administrative record, the magistrate judge issued an order requiring MedEnvios to file a notice detailing every instance (both in the administrative record and outside the administrative record) where MedEnvios requested the auditors or other contractors to provide additional information reflecting how the Universe was constructed. Doc. 52, at 2. In response to MedEnvios's filing (Doc. 56), the Secretary submitted a supplemental statement, producing copies of the missing recalculation documents that were not a part of the administrative records. Doc. 59-1. The magistrate judge nonetheless denied MedEnvios's motion to complete the administrative records. Doc. 60. On February 12, 2024, the district court adopted and affirmed the magistrate judge's order over MedEnvios's objections. Doc. 79.

The parties then filed a round of cross-motions for summary judgment on two consolidated legal issues: (1) whether the Secretary's failure to include zero-paid claims in the statistical sampling and extrapolation process was a violation of 42 USC § 1395ddd(h), APA, and due process; and (2) whether the Secretary's failure to produce documentation to support the recalculated overpayment demands violated due process. On March 25, 2024, the district court ruled that MedEnvios has a "protected property interest in the funds subject to the extrapolated overpayment demands[,]" as "the extrapolated portions reflect amounts over and

above the actual overpayments confirmed in claim sampling, therefore implicating MedEnvios's own money." Doc. 84, at 4 ("*MedEnvios I*").

While the district court held that the Secretary's failure to include zero-paid claims in the statistical sampling and extrapolation process did not violate MedEnvios's right to due process, it held that the Secretary's failure to produce documentation to support the recalculated overpayment demands was a due process violation. It ruled that without the ability to verify the contractor's calculations, "a provider does not have the information and data necessary to mount a due process challenge to the statistical validity of the sample, as is its right[.]" *Id*. at 7. The district court vacated each of the extrapolated overpayment demands at issue based on this due process violation. *Id*. at 9. On July 1, 2024, the district court denied the Secretary's motion to reconsider that part of the summary judgment order. Doc. 91.

The parties then filed a second round of cross-motions on the remaining issues, which included: (1) whether the Secretary failed to produce the target universe of claims in its statistical sampling for the Health Integrity audit, thereby violating MedEnvios's right to due process; (2) whether the ALJ's delay led to an improper accumulation of interest in violation of MedEnvios's right to due process; (3) whether the Secretary improperly recouped funds in violation of the Social Security Act and MedEnvios's right to due process; and (4) whether the Secretary improperly accounted for payments made by MedEnvios, thereby depriving

MedEnvios of its property and right to due process. On November 25, 2024, the district court ruled that MedEnvios's due process rights were not violated when Health Integrity failed to preserve and produce the target universe of claims; however, the court determined MedEnvios was entitled to an accounting as agreed to by the parties at the hearing. Doc. 117 ("*MedEnvios II*").

On January 14, 2025, the district court granted MedEnvios's motion for clarification, ruling that MedEnvios's procedural due process rights were violated to the extent that the Secretary failed to provide MedEnvios with "an accounting that reflects those debts and credits [associated with the alleged overpayments.]" Doc. 122, at 1. The district court then entered final judgment.

The Secretary timely appealed and MedEnvios cross-appealed. Doc. 134. Thereafter, the Secretary filed a Notice of Compliance (Doc. 129) with the final judgment, which prompted MedEnvios to file a second motion for clarification. Doc. 142. The district court then addressed MedEnvios's second motion for clarification, ruling that "rather than entitling the Plaintiff to a refund of the recalculated overpayments, the Defendant's procedural due process violation entitles the Plaintiff to challenge those overpayments with the proper documentation." *Id*. at 2. The Secretary then voluntarily dismissed its appeal.

## STANDARDS OF REVIEW

This Court reviews *de novo* the conclusions of law by the Secretary and district court. *See Emerald Shores Health Care Assocs., LLC v. HHS*, 545 F.3d 1292, 1296 (11th Cir. 2008); *Bradley v. Sebelius*, 621 F.3d 1330, 1335 (11th Cir. 2010). Under the APA and Section 405(g), courts will review agency action only after a final agency decision. 5 U.S.C. § 706. Agency action is final when two conditions are met: (1) the agency action marks the "consummation of the agency's decisionmaking process," and (2) the action is one by "which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations and quotation marks omitted); *National Labor Relations Board v. ArrMaz Products Inc.*, 123 F.4th 1295, 1303 (11th Cir. 2024).

Section 405(g) is limited to providing the procedure and standard of review by which a provider or supplier can challenge a "final decision" by the Secretary as to the findings of fact made by the agency. *Id*. (providing that the "findings of the [Secretary] as to any fact, if supported by substantial evidence, shall be conclusive); *but see Friedman v. Sebelius*, 686 F.3d 813, 827 (D.C.Cir. 2012) (noting that "section 405(g)…is silent regarding the standard of review except with regard to questions of fact[.]").

Where Section 405(g) is silent, the APA's default rules for judicial review of agency decisions apply. *See* 5 U.S.C. § 559 (which states that a "[s]ubsequent statute may not be held to supersede or modify … [the APA] … except to the extent that it does so expressly."); *see also Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 78 (2d Cir. 2006) (stating the court reviews Secretary actions pursuant to the specific provisions of Section 405(g), but "where no provision of [Section] 405(g) is on point, we apply the judicial review provisions of the APA"); *Vitreo Retinal Consultants of the Palm Beaches, P.A. v. HHS*, 649 F.App'x 684, 689 (11th Cir. 2016) (noting that Section 405(g) supplies the standard by which to review Secretary's findings of fact, but "as for legal conclusions, the [APA]" applies).

Where the issues presented on appeal are questions of law, courts apply their own judgment using the APA as the exclusive standard of review. *Loper Bright*, 603 U.S. at 369 ("[The APA] specifies that courts, not agencies, will decide 'all relevant questions of law' arising on review of agency action[.]" (quoting 5 U.S.C. § 706)).

Section 706 of the APA provides the relevant standards of review and scope of judicial authority, stating that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."

Moreover, section 706(2) mandates that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be — (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law[.]" 5 U.S.C. § 706(2).

This mandate includes deciding the meaning of ambiguous laws and setting aside any agency action inconsistent with the law as the court interprets it. *Loper Bright*, 603 U.S. at 392.

Additionally, the Supreme Court in *Shalala v. Illinois Council*, 529 U.S. 1 (2000) held that a federal court reviewing an agency decision under Section 405(g) "has adequate authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide … including, where necessary, the authority to develop an evidentiary record." *Id*. at 23-24. *See also Califano v. Sanders*, 430 U.S. 99, 109 (1977) (finding that "[c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures . . ."). The court's authority to review constitutional issues exists even if these issues are raised for the first time in district court. *See D&G Holdings, L.L.C. v. Becerra*, 22 F.4th 470, 475 (5th Cir. 2022) (citing *Illinois Council* and noting that the "Supreme Court has identified circumstances in which a particular contention that was not strictly presented or

exhausted through the administrative process was reviewable under [Section] 405(g)"); *see also Mathews v. Eldridge*, 424 U.S. 319, 332-35 n.10 (1976) (holding that if a plaintiff exhausts "the full set of available administrative review procedures, failure to have raised [a] constitutional claim would not bar [the plaintiff] from asserting it later in a district court").

## SUMMARY OF THE ARGUMENT

In overruling *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984) in *Loper Bright*, the Supreme Court clarified two pivotal points that underpin this appeal: (1) it confirmed MedEnvios's position that the standard of review outlined in the APA governs the Court's review of the legal issues in this appeal; and (2) it held that the Secretary and CMS are afforded no deference in their interpretation of constitutional or statutory provisions. *Loper Bright*, 603 U.S. at 392. The district court's reliance on the wrong standard of review coupled with its deference to statutory interpretations that raise serious constitutional concerns led to several erroneous rulings.

The district court scuttled its own ability to conduct the required *de novo* review of the legal issues when it erroneously denied MedEnvios's motions for completion of the administrative records. A fundamental misunderstanding of the scope of an administrative record and the scope of agency decision-makers led to that erroneous conclusion.

The legal questions presented to the district court were grounded in due process. In order to have a viable due process claim, there must be a protected, cognizable property interest. MedEnvios has a protected property interest in the funds subject to extrapolated overpayment demands in addition to the Medicare reimbursements for services rendered to Medicare beneficiaries.

When a Medicare contractor conducts a statistical sampling and extrapolation for a post-payment review of claims submitted by suppliers for reimbursement, it must do so in a way that comports with due process. This requires the contractor to draw a representative sample— evaluating CMS's potential overpayments and underpayments—to reach an objective finding. To only examine potential overpayments creates bias and stacks the deck against suppliers.

Due process also requires the Secretary to afford a supplier the right to be heard at a meaningful time and in a meaningful manner. That is the bedrock of due process. MedEnvios was not afforded that right when it was not provided with the foundational document it needed to recreate the statistical methodology in the Health Integrity audit to challenge the *initial* overpayment determination. However, the district court did correctly rule that the Secretary violated MedEnvios's right to due process when it failed to produce documentation necessary to challenge the *recalculated* overpayment determinations.

To remedy that due process violation, the district court vacated the extrapolated overpayment demands. This should have led the district court to set aside the extrapolated overpayment demands pursuant to its authority under the APA and hold MedEnvios liable for the actual overpayments on the individual sample claims and not the extrapolated portion of the overpayment demands.

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN RULING THAT THE ADMINISTRATIVE RECORDS WERE COMPLETE.

MedEnvios moved the district court to order the Secretary to complete the administrative record with two specific types of documents missing from the administrative record as lodged by the Secretary: (1) the universe of claims used in the statistical sampling and extrapolation for the Health Integrity audit; and (2) documents to support the multiple recalculated overpayment demands following partially favorable agency decisions in both audits. For the reasons below, the district court erred in upholding the magistrate judge's ruling that the administrative records were complete and in failing to order that those missing documents be included in the records.

#### A. Legal Standard

The APA provides for judicial review of agency action based on the adversarial review of the "whole" administrative record. 5 U.S.C. § 706. A whole administrative record is imperative because without it the court cannot decide

whether the agency "failed to consider an important aspect of the problem," or failed to "explain the evidence which is available." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43, 52 (1983).

Separately, Section 405(g), as applied to Medicare appeals by 42 U.S.C. § 1395ff, authorizes judicial review of "any final decision" of the Secretary. Although Section 405(g) specifies the procedure through which a supplier can challenge a "final decision" by the Secretary,[6] and provides the standard of review as to findings of fact made by the agency, the statute is silent as to the standard of review for ***legal*** challenges to agency decisions. *See, e.g., Friedman*, 686 F.3d at 827 (noting that "section 405(g)…is silent regarding the standard of review except with regard to questions of fact").

Similarly, while Section 405(g) requires the Secretary to "file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based" and details a mechanism for the Court to order

[6] Notably, the Supreme Court has held that an action "arising under the Medicare Act…must be channeled through the agency[,]" and a supplier must exhaust its remedies under the administrative appeals process before an agency determination can be reviewed in district court. *Illinois Council*, 529 U.S. at 23. However, after the action has been so channeled, and an agency has issued its "final decision" (as defined in the statute), the district court then has jurisdiction review this agency decision, as well as the separate "authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide[.]" *Id*.

the Secretary to consider ***new*** evidence (emphasis added), courts have acknowledged that Section 405(g) provides no express mechanism or legal standard for completing the Administrative Record when relevant evidence has been omitted from this record.

To the extent that Section 405(g) also offers no direct guidance on this issue, the law dictates that the standards set forth in the APA apply. *See* 5 U.S.C. § 559 (which states that a "[s]ubsequent statute may not be held to supersede or modify ... [the APA] ... except to the extent that it does so expressly.") *See also Yale-New Haven Hosp.*, 470 F.3d at 78 (citing 5 U.S.C. § 559 and *Dickinson v. Zurko*, 527 U.S. 150, 154-55 (1999) and noting that the "judicial review provisions of the APA" apply "where no provision of [Section] 405(g) is on point").

Several courts, including lower courts in this Circuit, have applied APA standards to motions made by plaintiffs to complete the administrative record. *Goose Creek Physical Med., LLC v. Becerra*, No. 22-cv-03932, 2024 WL 942918, at *4 (D.S.C. 3/5/2024); *see also Arriva Med. LLC v. HHS*, 2020 WL 5032978, at *3 (S.D.Fla. 8/25/2020), *report and recommendation adopted*, 2020 WL 5757084 (9/28/2020) (applying APA standards in a Section 405(g) appeal of an HHS Departmental Appeals Board decision). Lower courts in this Circuit have defined the whole administrative record to include "all documents and materials directly or indirectly considered by agency decision-makers." *Ctr. for Biological Diversity v.*

*U.S. Fish & Wildlife Serv.*, 2020 WL 2732340, at *2 (S.D.Fla. 5/26/2020) (quoting *Thompson v. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989)).

"While the designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity[,]" "an agency may not unilaterally determine what constitutes the Administrative Record." *Id.* at *3; *see also Thompson,* 885 F.2d at 555 ("The whole administrative record, however, is not necessarily those documents that the agency has compiled and submitted as 'the' administrative record.") (citation and internal quotation marks omitted).

When an administrative appeal involves constitutional or statutory legal challenges, a reviewing court also has the authority to develop the evidentiary record as necessary to decide those issues. As the Supreme Court has noted, "[c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures." *Illinois Council*, 529 U.S. at 23-24, quoting *Califano v. Sanders*, 430 U.S. at 109. Consequently, when a Court is "reviewing an agency determination under [Section] 405(g)" the Court "has adequate authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide…including, where necessary, the authority to develop an evidentiary record" for that purpose. *Id.*

### B. The District Court Improperly Limited Its Scope of Review to Evidence That Was Directly Before the ALJs in Ruling that the Administrative Records Were Complete

The district court's error in ruling that the administrative records were complete stemmed from its incorrect legal conclusion that the court's scope of review was limited to "reviewing only whether substantial evidence supported the final agency decision in concluding that the administrative record is complete." Doc. 79, at 5. Applying this incorrect legal standard, the district court erroneously concluded that the administrative records are limited to materials that were submitted to the ALJs. Doc. 79, at 5-7.

In reaching this conclusion, the district court ignored the clear mandate of the APA and the Supreme Court's recent decision in *Loper Bright* for the court to also resolve all questions of law in its judicial review of any agency decision. *See Loper Bright*, 603 U.S. at 392 ("[The APA] specifies that courts, not agencies, will decide 'all relevant questions of law' arising on review of agency action[.]") Because MedEnvios's claims involve due process challenges to the Secretary's failure, through its contractors, to: (1) provide the target universe needed to recreate the extrapolated overpayment; (2) include zero-paid claims in the statistical sampling process; and (3) provide the worksheets needed to verify the calculations for the recalculated extrapolated overpayment, all of which relate to the agency's decision to issue an extrapolated overpayment demand, an inquiry as to the completeness of

the administrative record necessitates a review of the materials that were before each agency decision-maker at the time of these decisions. *Ctr. for Biological Diversity*, 2020 WL 2732340, at *2 (noting that the whole administrative record includes "all documents and materials directly or indirectly considered by agency **decision-makers**") (emphasis added) (quoting *Thompson*, 885 F.2d at 555; *see also Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 32-33 (N.D.Tex. 1981) (noting that the whole administrative record consists of "all the evidence that was before the decision-making body," and "consists of **all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position**.") (emphasis added); *Bar Mk Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993) ("The 'whole record' in this case consists of all documents and materials considered by the Forest Supervisor…in making his initial decision, as well as all documents and materials contained in the agency appeal record as developed throughout the [three-stage] agency review process.").

CMS contractors who made the determinations that were appealed to the ALJ are agency decision-makers. *See Goose Creek Physical Med., LLC*, No. 22-cv-03932, 2024 WL 942918 *4. Moreover, if a favorable ALJ decision impacts the agency's calculation of its original overpayment demand, CMS contractors (rather than the ALJ) effectuate this decision and recalculate this overpayment demand. The very fact that the ALJ does not effectuate its own decisions to recalculate the

extrapolated overpayment amount is evidence there are other pertinent agency decision-makers. *See, e.g., D&G Holdings L.L.C.*, 22 F.4th at 476 (holding that "'effectuations' are inextricably intertwined with the initial exhausted agency action" and therefore reviewable by a federal court).

Thus, it was reversible error for the district court to conclude that an administrative record should only contain materials reviewed by an ALJ when determining a legal question and failed to complete the records with foundational evidence and data needed to evaluate the Secretary's overpayment demands.

### C. MedEnvios Submitted Clear Evidence that the Administrative Record Was Missing the Target Universe of Claims for the Health Integrity Audit, which the Medicare Contractors Considered and Relied Upon in Calculating the Extrapolated Overpayment Alleged Against Plaintiff.

In the Health Integrity audit, Health Integrity pulled a complete set of all claims data billed and adjudicated by Medicare during the period of review, which is also known as the "target universe" of claims. App. at A016-A021. After pulling this claims data, Health Integrity applied limiting terms to this universe of claims, deliberately excluding adjudicated claims that were issued a payment of $0 (the zero-paid claims) and filtered that data set down to the sampling frame. *Id*. From the sampling frame, Health Integrity randomly selected the sample set for review that makes up the actual overpayment that was then extrapolated back across the sampling frame to produce the alleged overpayment demand. *Id*.

Thus, the universe of claims is the foundational evidence and data that CMS and Health Integrity relied upon to assert the extrapolated overpayment demand.[7] Health Integrity was required to provide MedEnvios with a copy of the complete target universe of claims, which included all "claims submitted by the supplier for the period selected for review and for the sampling units to be reviewed." MPIM Ch. 8, § 8.4.3.2.1.

However, MedEnvios never received the target universe of claims relied upon for the Health Integrity audit. Instead, Health Integrity provided a file called the "universe," which only contained the claims for the sampling frame that Health Integrity created for its statistical extrapolation (excluding zero-paid claims) rather than all the claims for the review period from which the sampling frame had been created (which included zero-paid claims). App. at A021.

In contrast, MedEnvios *did* receive the target universe of claims in the Safeguard matter, which was included in the Administrative Record. App. at A011. Despite this fact, the lower court erroneously found that the Administrative Record was complete because the ALJ refused to include this evidence in the Administrative

---

[7] For this reason, it was disingenuous for the lower court to suggest that seeking to complete the record with this data amounted to an assertion that "the administrative record must contain every document created by an agency and its contractors at any point during the course of the matters on appeal" and that allowing its inclusion would amount to "sanction[ing] a [f]ishing expedition by Plaintiff." Doc.79, at 6.

Record over MedEnvios's objection. Doc. 1-1, at 12 (23-20068); Doc. 79, at 4. Because the target universe was relied upon by Health Integrity in creating the statistical sampling for the overpayment estimation, it was clear error for the district court to exclude this evidence from the administrative record.

### D. MedEnvios Submitted Clear Evidence that the Administrative Records Were Missing the Recalculation Worksheets, which the Medicare Contractors Considered and Relied Upon in Calculating the Extrapolated Overpayments Alleged Against Plaintiff

Following partially favorable decisions at the reconsideration and ALJ levels of appeal, the agency recalculated the alleged overpayment demands against MedEnvios based on reduced error rates in each of the audit samples. However, the agency failed to include three of the four recalculation worksheets in the Administrative Records, even though they possessed these worksheets and subsequently produced them to MedEnvios through a district court filing on Nov. 2, 2023. Doc. 59-1. These worksheets are documents created by the agency that explain how the overpayment amounts were recalculated following the partially favorable rulings. Despite the fact that one of the four recalculation worksheets supporting the recalculated overpayment demands was included in the Health Integrity Administrative Record (App. at A022), and also despite its subsequent ruling that the failure to timely produce this documentation is a due process violation (Doc. 84, at 8), the district court ruled that these documents need not be included in the Administrative Records. Doc. 79. This, too, was clear error.

## II. THE DISTRICT COURT ERRED IN RULING THAT THE SECRETARY PROVIDED DUE PROCESS BY COMPLYING WITH CERTAIN STATISTICAL SAMPLING AND EXTRAPOLATION PROCEDURES SET FORTH IN STATUTORY, REGULATORY, AND SUB-REGULATORY GUIDANCE.

The Secretary violated mandatory procedural safeguards, thereby violating MedEnvios's due process rights, by: (1) preventing MedEnvios from having the necessary information to meaningfully challenge the statistical validity of the sample; and (2) injecting bias into the statistical sample when it excluded zero-paid claims from the sampling frame. The district court failed to adequately remedy those due process violations. Thus, for the reasons discussed below, the district court erred, and its decisions must be reversed.

### A. Applicable Legal Standard: The *Mathews* Test

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews*, 424 U.S. at 332. To demonstrate a procedural due process violation, a plaintiff must show: (1) a cognizable liberty or property interest; and (2) that the administrative procedures provided to the plaintiff violated mandatory procedural safeguards or were otherwise constitutionally inadequate. *Id.* at 332-35.

In assessing the second element for a procedural due process claim, courts generally consider three factors: (1) the private interest affected by the state action;

(2) the risk of an erroneous deprivation of that interest given the procedures used, as well as the probable value of additional or substitute safeguards; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews*, 424 U.S. at 335 (the "*Mathews* test"). All factors weigh in favor of finding the Secretary violated MedEnvios's due process rights.

**B. MedEnvios Has a Protected Property Interest in Medicare Reimbursements for Services Rendered to Medicare Beneficiaries.**

Relying on this Court's previous decision in *Zen Group, Inc. v. Agency for Health Care Administration*, 80 F.4th 1319, 1326 (11th Cir. 2023), the district court correctly ruled that MedEnvios has "a protected property interest in the funds subject to the extrapolated overpayment demands" at issue because the extrapolated overpayments, like monetary fines, "reflect amounts over and above the actual overpayments confirmed in claim sampling, therefore implicating MedEnvios's own money." Doc. 84, at 4. However, neither the district court nor the Eleventh Circuit has squarely addressed whether Medicare suppliers have a protected property interest in Medicare reimbursements for services rendered to Medicare beneficiaries.

Several circuit courts have expressly recognized that "Medicare Part B beneficiaries have a protected due process 'property interest' in 'receiving the medical insurance benefits for which they paid a monthly premium.'" *Bailey v. Mut. of Omaha Ins. Co.*, 534 F.Supp.2d 43, 53-54 (D.D.C. 2008) (quoting *Gray Panthers*

*v. Schweiker*, 652 F.2d 146, 148 n.2 (D.C. Cir. 1980)); *see also Himmler v. Califano*, 611 F.2d 137, 145 (6th Cir. 1979). Suppliers become parties in interest as "assignees" of the beneficiaries. *See* Medicare Claims Processing Manual, CMS Pub. 100-04, Ch.29 §110. Suppliers then submit claims for reimbursement based on a beneficiary's assignment of their property interest to the supplier. *See* CMS Form 1500. Medicare suppliers become subrogated to the statutory entitlement of reimbursement for services rendered to Medicare Part B beneficiaries. 42 U.S.C. § 1395.

Without a binding Eleventh Circuit decision on this issue of whether suppliers have a protected property interest in Medicare reimbursements for services rendered, district courts in this Circuit are divided. The Middle District of Florida has stated that Medicare suppliers do not have a property interest in Medicare payments that may be subject to a recoupment due to the "contingent nature" of the Medicare payment system. *See Alpha Home Health Sols., LLC v. HHS*, 340 F.Supp.3d 1291, 1303 (M.D.Fla. 2018) and *Nirvana Health S v. HHS*, 2018 WL 10216474, at *2 (M.D.Fla. Dec. 20, 2018). However, the Middle District of Alabama has found that suppliers have a protected property interest in receiving full reimbursements for clean claims for services rendered to Medicaid patients. *See Ron Group, LLC v. Azar*, 2021 WL 5576616, at *3 (M.D.Ala. 11/29/2021).

Courts in other circuits have adopted positions similar to the Middle District of Alabama, holding that the contingent nature of the Medicare Payment system does not negate a supplier's property interest in payment, contrary to the Middle District of Florida's position. For example, the Seventh circuit has determined that health suppliers have a property interest in reimbursement at the rate established by law. *Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 774-76 (7th Cir. 2021). There, the Court stated that the "characterization of an entitlement as a contingent interest does not defeat the claim of a property interest . . . An interest that gives rise to an entitlement is always a conditional interest, because if the plaintiff possessed an absolute right there would be no need for a hearing as there would be no issue to resolve." *Id*. at 774-75.

Medicare's statutory scheme, including 42 U.S.C. § 1395ddd(f)(2)(B), further demonstrates Congress's intent that suppliers have a protected property interest in these funds. ("Insofar as such determination against the provider of services or supplier is later reversed, the Secretary shall provide for repayment of the amount recouped plus interest at the same rate as would apply under the previous sentence for the period in which the amount was recouped.").

The Court should affirm the district court's finding that MedEnvios has a protected property interest in its own money, including the funds subject to the extrapolated overpayment demands. The Court should also resolve the split among

the district courts in this Circuit and find that MedEnvios has a cognizable property interest in receiving payment for services provided, irrespective of the fact this entitlement is a contingent interest.

### C. The Secretary's Failure to Produce the Target Universe of Claims Violated MedEnvios's Due Process Rights and the APA.

There is a fundamental due process right to be heard "at a meaningful time and in meaningful manner." *Mathews*, 424 U.S. at 333 (internal citation and quotations omitted). The Secretary deprived MedEnvios of that right when it failed to produce the target universe of claims in the statistical sampling for the Health Integrity Audit. Without having received the target universe of claims, MedEnvios was unable to recreate the statistical sampling methodology, which is necessary to meaningfully challenge it. This due process failure renders the statistical sampling and extrapolation used to support the overpayment demand invalid. Because the district court failed to recognize this due process violation, the court's decision on this issue must be reversed.

The district court's prior decision in *MedEnvios I* confirms that the Secretary's (and its contractor's) failure to produce the target universe of claims resulted in a violation of MedEnvios's right to due process when it held that "without the ability to verify the contractor's calculations, 'a provider does not have the information and data necessary to mount a due process challenge to the statistical validity of the sample, as is its right[.]'" Doc. 84, at 7 (quoting *Global Home Care, Inc.*, 2011 WL

3668242, at *3). While that decision related to sufficient documentation to support the recalculated overpayment demands, the district court's reasoning extends to documentation to support an initial overpayment demand. Without the target universe of claims, MedEnvios could not recreate the statistical sampling process, nor verify the contractor's calculations and the statistical validity of the sample from the onset.

The right to be heard is intended to protect the "use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property . . . " *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972). It has been held "immutable" that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to provide the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496 (1959). These "long-standing principles of procedural due process" predate the *Mathews* test and a violation of them is a clear deprivation of due process that renders the *Mathews* test unnecessary. *See Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 797-99 (6th Cir. 2018) (finding certain procedural due process violations by the Social Security Administration).

These fundamental due process requirements extend to adjudicative proceedings conducted by administrative agencies. *Richardson v. Perales*, 402 U.S.

389, 401 (1971). In the context of a Medicare overpayment audit, due process affords a supplier the right to examine audit results in order to mount a proper challenge in the appeals process. *See Global Home Care*, 2011 WL 3668242, at *3.

MedEnvios has a due process right to examine the evidence the Secretary and its contractor relied upon to produce audit results. MedEnvios was deprived of those rights when Health Integrity failed to preserve and produce the target universe of claims in the statistical sampling and extrapolation. The "target universe" of claims "consists of all claims submitted by the provider within the chosen time period, which typically covers all relevant claims or line items for the period under review." *Goose Creek Physical Med., LLC*, No. 22-cv-03932, 2024 WL 942918, at *2. The MPIM further requires that the contractor: (1) "shall document all steps taken in the random selection process exactly as done to ensure that the necessary information is available for anyone attempting to replicate the sample selection[;]" (2) must make, in writing, "[a]n explicit statement of how the universe is defined and elements included[;]" and (3), must keep "[s]ufficient documentation…so that the sampling frame can be re-created should the methodology be challenged." MPIM §§ 8.4.4.2; 8.4.4.4.1 (emphasis added).

Many courts have failed to understand the distinction between **replicating the sample** as opposed to **recreating the sampling frame**. Replicating the sample is possible without possessing the target universe of claims, as this merely requires

mathematic repetition, even if the equation was incorrect from the beginning. However, procedural due process and CMS Ruling 86-1 grant a plaintiff the right to challenge the statistical validity of the sampling process, which necessitates more than just replication of the sample. To challenge the statistical validity of the extrapolated overpayment, the plaintiff must be able to recreate the entire statistical sampling and extrapolation process to ensure that it was performed fairly and correctly. Since MedEnvios never received the actual target universe of claims in the Health Integrity audit, MedEnvios was never able to recreate the sampling frame and verify Health Integrity's filtering process to ensure it was performed fairly and correctly. *See* MPIM § 8.4.4.4.1.

Importantly, MedEnvios's target universe argument (asserting the failure to provide a meaningful opportunity to be heard) is separate and distinct from its zero-paid argument (asserting bias). Consequently, a court's ruling that zero-paid claims can be properly excluded from the sampling frame does not negate the fact that MedEnvios has a due process right to receive and analyze the foundational claims data (i.e., the target universe) the Secretary's contractors relied on to create the sampling frame. *See, e.g., Goose Creek Physical Med., LLC v. Becerra*, No. 2:22-CV-03932-DCN, 2024 WL 3653639, at *7 (D.S.C. 8/5/2024), *reconsideration denied*, No. 2:22-CV-03932-DCN, 2024 WL 3992721 (D.S.C. 8/29/2024) (finding that plaintiff could not "recreate the sampling frame and sampling process" without the target

universe and therefore could not "verify the [CMS] contractor's calculations to test the statistical validity of the sample and subsequent extrapolation," which led the court to find that the Secretary's failure to preserve and produce the target universe prejudiced plaintiff throughout the underlying appeals process).

Despite this fact, the district court deferred to the agency's definition of the "universe" in sub-regulatory guidance (citing MPIM § 8.4.3.2.1.B) to assert that the Secretary satisfied due process, instead of analyzing whether the Secretary's failure to produce the complete set of adjudicated claims from the audit review period prejudiced MedEnvios by not allowing it to mount a meaningful challenge to Health Integrity's statistical sampling methodology and resultant extrapolation. Doc. 117, at 6-7. Contrary to the district court's assertion, MedEnvios's due process challenge is not rooted in mere "disapprov[al] of how the target universe is defined" (*id.*), but rather an assertion that it lacks the foundational claims data set to meaningfully challenge the extrapolated overpayment.

The Secretary's failure to produce this information violates "long-standing principles of procedural due process." *Hicks*, 909 F.3d at 797-99. Additionally, even under the *Mathews* test, MedEnvios prevails in its due process challenge. The significance of MedEnvios's private interest, the risk of erroneous deprivation, and the limited administrative burden of producing the target universe outweighs any

Government interest in not producing the target universe. *See Mathews*, 424 U.S. at 335; Doc. 84, at 3.

As the district court correctly held, MedEnvios has a significant property interest "in the funds subject to the extrapolated overpayment demands." Doc. 84, at 4. Additionally, there is a substantial risk of erroneous deprivation of MedEnvios's property when a Medicare contractor fails to produce documentation necessary to recreate a sampling frame, thereby depriving MedEnvios of its opportunity to challenge the statistical validity of the extrapolated overpayment and be heard "in a meaningful manner." *Mathews*, 424 U.S. at 333; Doc. 84, at 4.

The government has no interest in failing to preserve and declining to produce the target universe of claims given: (1) the MPIM's requirement in § 8.4.4.4.1 to do so; (2) the Secretary's reliance on this evidence to support its demand against MedEnvios; and (3) the Secretary's admission that it had possession of the target universe when it removed zero-paid claims to create the sampling frame. App. at A013; A016. The burden to preserve and produce the target universe is minimal. *See Jeannie S. v. Saul*, 2020 WL 13561582, at *6-7 (N.D.Ga. 3/3/2020) (upholding a due process challenge to the Social Security Administration's procedures despite the agency's arguments regarding "substantial costs and burdens to the [a]gency."). This minimal burden is evidenced by the fact that SafeGuard produced the target universe, but Health Integrity did not.

The district court's balancing of the third *Mathews* factor in the district court's first MSJ ruling related to recalculation documentation provides helpful guidance again:

> [U]nder the third *Mathews* factor, the prejudice to MedEnvios in having to mount appeals without reviewing the contractor's effectuation work easily outweighs any administrative difficulty of timely providing the worksheets. Provision of this information should be a **negligible burden on the Department** and its contractors. The MPIM already instructs that "[d]ocumentation shall be kept in sufficient detail so that the sampling frame can be re-created should the methodology be challenged. The contractor shall keep an electronic copy of the sampling frame." MPIM § 8.4.4.4.1. Thus, the contractors are already required to maintain this information, and the added burden of providing the information on request would be minimal.

Doc. 84, at 8. For the same reasons that the district court found the failure to timely produce recalculation documentation to be a violation of MedEnvios's due process rights in *MedEnvios I*, application of the *Mathews* test here supports the conclusion that the Secretary and its contractor ran afoul of MedEnvios's due process rights by failing to provide the target universe of claims in the Health Integrity audit. *Id.* Pursuant to the Court's authority under the APA, this Court should reverse the district court's decision and remedy the Secretary's unconstitutional action of failing to include the target universe for the Health Integrity audit by invalidating the statistical sampling and extrapolation and vacating the extrapolated portion of the overpayment demand.

### D. The Secretary's Failure to Include Zero-Paid Claims in its Statistical Samplings Violated MedEnvios's Due Process Rights and the APA.

Although courts have held that the use of statistical sampling and extrapolation to estimate Medicare reimbursement overpayments will generally meet the requirements of due process, this conclusion rests on the presumption that the "extrapolation is made from a representative sample and is statistically significant." *See Pruchniewski v. Leavitt*, 2006 WL 2331071, at *9-10 (M.D.Fla. /10/2006), quoting *Chaves Cnty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 922 (D.C.Cir. 1991). However, when a Medicare contractor fails to include zero-paid claims in the sampling frame, the contractor is conducting its statistical sampling with a non-representative sample—skewed toward only errors made by the supplier—thereby infusing bias into the process and dramatically increasing the risk of erroneous deprivation of the supplier's property, and thus depriving the supplier of its right to due process. *Id.* (finding that "the low risk of error" only exists if the extrapolation "is made from a representative sample…").

The district court ignored this central tenet of statistics in failing to find a due process violation in the contractors' exclusion of zero-paid claims from both audits. Doc. 84, at 6. Instead of properly performing a due process analysis under *Mathews*, the district court deferred to the Secretary's flawed interpretation of 42 U.S.C. § 1395ddd(h)(1), 42 C.F.R. § 455.504, and the MPIM, to conclude that "[s]ome

contractors in some audits may include what MedEnvios refers to as 'zero-paid claims' in their samples, but not all contractors are required to do so regardless of the purpose of the audit." *Id*.

Although statistical sampling and extrapolation can satisfy due process and be useful when performed correctly, the empirical value and validity of statistical sampling and extrapolation are tied to the neutrality of the process. *See Pruchniewski*, 2006 WL 2331071, at *9-10. When a Medicare contractor fails to objectively conduct the statistical sampling and extrapolation process with a representative sample, the risk of erroneous property deprivation rises and outweighs the government interest that would otherwise predominate. *Id*.; *see also Cent. La. Home Health Care, LLC v. Price,* 2018 WL 7888523, at *16-20 (W.D.La. 12/28/2018) ("The DHHS interpretation of the MPIM regulations to exclude all [zero-paid] claims clearly results in a substantially higher overpayment calculation.").

In applying the *Mathews* test for constitutional adequacy, the D.C. circuit's analysis in *Chaves*, 931 F.2d at 922 is instructive. There, the court held that that the government interest in minimizing administrative burdens by employing statistical sampling and extrapolation usually "predominates" over private interests, but specifically "in light of the fairly low risk of error so long as the extrapolation is made from a representative sample and is statistically significant[.]" *Id*.

Health Integrity and Safeguard excluded zero-paid claims from the sampling frames, which created non-representative samples and statistically biased extrapolations in violation of statutory mandate and MedEnvios's right to due process. App. at A009; A016. Applying the second *Mathews* factor, what could have been a "fairly low risk of error" if the contractors had used a representative sample became exponentially higher due to their failure to include zero-paid claims. *Chaves*, 931 F.2d at 922. Conversely, applying the third *Mathews* factor, the fiscal and administrative burdens of including zero-paid claims in the sample would be slight because it is data that is available to all audit contractors at the time they construct the scope of their audits and sampling methodology for review. Applying the *Mathews* test, this Court should hold that the Secretary and its contractors ran afoul of MedEnvios's due process rights by failing to include zero-paid claims in the sampling frame, and invalidate the extrapolated overpayment demands on that basis.

The conclusion that zero-paid claims should be included in the sampling frames is likewise supported by statute. Although the district court improperly deferred to the Secretary's flawed interpretation of 42 U.S.C. § 1395ddd(h)(1) to conclude that program integrity contractors such as ZPICs are not required to include zero-paid claims, since the court issued its ruling, the Supreme Court overturned *Chevron*; consequently, the Secretary's statutory interpretations are now afforded no deference. *See Loper Bright*, 603 U.S. at 412-13. Rather, this Court must reach the

best interpretation of the law "after applying all relevant interpretive tools." *Id*. at 400.

Considering the plain language of 42 U.S.C. § 1395ddd, principles of statutory construction, congressional intent underlying the Medicare program, and due process requirements, this Court should conclude that the district court erred in deferring to the Secretary's narrow interpretation of 42 U.S.C. § 1395ddd, which implies that only certain contractors are required to be unbiased in their audits of suppliers. Rather, the best interpretation of 42 U.S.C. § 1395ddd(h) requires all CMS contractors to review both overpayments and underpayments, including zero-paid claims, when conducting their statistical sampling and extrapolation.

As laid out in greater detail above (*see* supra at 6-9), Congress has repeatedly expressed its intent that Medicare audit contractors should perform impartial, unbiased audits that focus on identifying both overpayments and underpayments. In 1996, Congress established the Medicare Integrity Program, and authorized CMS to engage contract auditors to use extrapolation to estimate overpayment amounts to be recovered. *See* 42 U.S.C. §§ 1395i(k)(4); 1395ddd(f)(3)(A). In 2003, Congress passed the MMA, which under the authorizing statute of the Medicare Integrity Program, instituted the use of RACs for the first time, and charged them with identifying both underpayments and overpayments. MMA, Sec. 306.

In 2006, Congress added a new subsection to this authorizing statute—42 U.S.C. § 1395ddd(h)—that expressly requires all Medicare audit contractors to identify underpayments as well as overpayments. In 2008, once again relying on the same authorizing statute and general definition of "medicare contractor,"[8] CMS created a new category of Medicare audit contractors known as ZPICs. *See* supra, N.4.

Section 1395ddd tasks program integrity contractors with "medical . . .and fraud review" of suppliers. 42 U.S.C. § 1395ddd(b)(1). 42 U.S.C. § 1395ddd(h)(1) tasks recovery audit contractors with "identifying underpayments and overpayments." Notably, section 1395ddd is silent as to how those reviews are to be conducted by program integrity contractors. While section 13955ddd(h)(1) expressly applies to "recovery audit contractors" and does not expressly mention CMS's sub-regulatorily-defined program integrity contractors (such as ZPICs or UPICs), it is the closest express statutory standard for how these contractors must conduct these reviews. The argument that Congress would intend one auditor to be objective and another auditor biased when both are authorized by the same statute is illogical and unconstitutional.

---

[8] 42 U.S.C. § 1395zz(g).

Further, there is no other conflicting authority expressly delineated to program integrity contractors that would suggest such contractors should handle reviews differently than recovery audit contractors. *See Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285 (1956) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.") (internal quotations omitted). Rather, section 13955ddd(h)(1), when interpreted within the broader context of section 1395ddd as a whole, reflects Congress's intent for all "medicare contractors"[9] to be objective in conducting reviews by accounting for underpayments.

This Congressional directive that all audit contractors examine overpayments and underpayments to determine a net overpayment is supported by sub-regulatory guidance. CMS has mandated procedural safeguards for statistical sampling and overpayment estimation in the MPIM to "ensure that a statistically valid sample is drawn and that statistically valid methods are used to project an overpayment where the results of the review indicate that overpayments have been made." MPIM § 8.4.1.1. Both RACs and ZPICs/UPICs are required to follow the exact same guidance of the MPIM § 8.4, Use of Statistical Sampling for Overpayment Estimation ("This section applies to UPICs, RACs, the SMRC, and MACs…"), and

[9] 42 U.S.C. § 1395zz(g).

failure to adhere to several or all of the procedural safeguards in the MPIM should eliminate a presumption that the statistical analysis is valid. *See Cent. La. Home Health Care,* 2018 WL 7888523, at *16-20 (recommending reversal of Council's award of overpayment due to invalidity of statistical analysis and extrapolation based on non-sampling errors), *report and recommendation adopted*, 2019 WL 1388773 (W.D.La. 3/27/2019).

The district court's decision on the zero-paid claims issue also warrants reversal because its decision failed to account for the factual and legal distinction between "unpaid" and "zero-paid" claims. The MPIM permits the removal of "unpaid" claims from the sampling frame when filtering down the universe of claims to the sampling frame. However, factually and legally, an "unpaid" claim is not the equivalent of an *adjudicated* claim with a payment amount of zero (*i.e.*, a zero-paid claim). Unpaid claims have been submitted to Medicare for payment but have not yet been adjudicated, *i.e.*, Medicare has not decided whether to pay the claim or deny the claim. Zero-paid claims, by contrast, are claims that Medicare has adjudicated and determined the payment amount to be zero.

Unpaid claims are not underpayments. Zero-paid claims, by contrast, are potential underpayments. Medicare contractors are not required to identify unpaid claims, but they do have a duty to identify underpaid claims, including zero-paid claims. The MPIM requires audit contractors to ultimately find the **net** overpayment

to be asserted against the supplier. *See* MPIM § 8.4.1.3; 8.4.4.4.3; 8.4.5.2. When read this way, the procedural safeguards in the MPIM harmonize with the relevant statute—42 U.S.C. § 1395ddd(h)(1)—in that they both instruct Medicare auditors to consider both overpaid and underpaid claims when conducting post-payment reviews. To the extent the Secretary disagrees with that interpretation of the MPIM, his interpretation is entitled to no deference. *See Elgin Nursing & Rehab Ctr. v. HHS*, 718 F.3d 488, 494 (5th Cir. 2013) (declining to afford any deference to HHS's interpretation of guidance in a manual).

In further understanding Congress's intent and in further support of MedEnvios's interpretation, the Payment Integrity Information Act ("PIIA") of 2019 is instructive. The PIIA, which applies to payment integrity contractors under the Medicare Program, defines "improper payment" to include "any payment that should not have been made or that was made in an incorrect amount, including an overpayment or underpayment[.]" 31 U.S.C. § 3351(4)(A). The PIIA's statutory predecessors define "improper payment" similarly. *See* Improper Payments Information Act of 2002, P.L. 107-300, § 2(d)(2)(A); Improper Payments Elimination and Recovery Improvement Act of 2012, P.L. 112-248, § 2(2). Thus, Congress has continually defined improper payments in a manner demonstrating its intent that Medicare auditing must be objective and account for both overpayments and underpayments.

Taking all of this into account, the best interpretation of 42 U.S.C. § 1395ddd(h) (and related MPIM guidelines) is that all CMS auditors must review claims objectively, without bias, by including potential underpayments (zero-paid claims) in their statistical samples and extrapolations. The Secretary's reading of 42 U.S.C. § 1395ddd(h) (and related MPIM guidelines) permits some audit contractors to exclude zero-paid claims from the sample but requires others to remain objective by reviewing underpayments. That reading leads to a constitutionally impermissible result. *See Fla. v. Buttigieg*, 751 F.Supp.3d 1333, 1349-50 (S.D.Fla. 2024) (noting that "one of the most notable canons of statutory construction that courts apply when reviewing agency action is to avoid, where reasonably possible, statutory constructions that raise serious constitutional concerns") (internal quotations omitted).

The APA exists, however, to "serve as the fundamental charter of the administrative state" and act "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright*, 603 U.S. at 391-392. It requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be … (B) contrary to constitutional right, power, privilege, or immunity [or] (D) without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(B), (D).

Pursuant to the Court's authority under the APA, this Court should reverse the district court's decision and remedy the Secretary's unconstitutional action of excluding zero-paid claims by invalidating the statistical sampling and extrapolations and vacating the extrapolated overpayments supported by the flawed procedure.

## III. THE DISTRICT COURT ERRED IN DENYING MEDENVIOS'S MOTION FOR CLARIFICATION

The district court's order denying MedEnvios's motion for clarification must be reversed because rather than clarifying its prior order vacating both extrapolated overpayment demands, the district court improperly altered and amended its prior order. In its *MedEnvios I* decision, granting in part MedEnvios's motion for summary judgment, the district court held that the Secretary "violated MedEnvios's due process rights by failing to timely provide the documents showing how the revised overpayment demands were calculated. The extrapolated overpayment demands implementing the ALJ decisions are therefore vacated." Doc. 84, at 8. In its April 22, 2025, order denying MedEnvios's motion to clarify, the district court erroneously nullified its *MedEnvios I* decision by effectively reinstating the extrapolated overpayment demands while offering MedEnvios a second opportunity to challenge them with the information it should have had but for the due process violation. Doc. 142.

The district court's order denying the motion for clarification is fatally flawed because it mischaracterized the nature of MedEnvios's property interest. The Secretary unconstitutionally deprived MedEnvios of property in which it had a protected interest. MedEnvios sought to regain possession of its property. It did not seek compensatory damages. Improperly relying on case law analyzing the Civil Rights Act of 1871, the district court ruled that because MedEnvios never sought compensatory damages, the injury MedEnvios sought to remedy was not properly before the court. *Id*. at 2, n.2 *(citing Carey v. Piphus*, 435 U.S. 247 (1978) and stating that a party must show actual compensable injury to recover more than nominal damages for a procedural due process violation). This case law is wholly inapplicable in the Medicare appeals context.

Black's Law Dictionary defines "vacate" as "[t]o annul; to cancel or rescind; to render an act void; as, to vacate an entry of record, or a judgment." *Black's Law Dictionary* (2nd Ed.), https://thelawdictionary.org/vacate/. The district court analogized extrapolated overpayments to monetary penalties when it found MedEnvios had a protected property interest in these amounts. Doc. 84, at 4. The district court then vacated those extrapolated overpayment demands. *Id*. at 8. In essence, the district court cancelled and voided a monetary penalty because of a due process violation. The Secretary should return MedEnvios's property.

Because the Secretary had already recouped the extrapolated overpayment amounts before this Court vacated them on due process grounds, MedEnvios is entitled to regain possession of its protected property. "The right to recover what one has lost by the enforcement of a judgment subsequently reversed is well established." *Baltimore & O.R. Co. v. United States*, 279 U.S. 781, 786 (1929); *see Watts v. Pinckney*, 752 F.2d 406, 410 (9th Cir. 1985) (affirming district court's order of restitution of funds paid in satisfaction of judgment where district court properly vacated judgment as void). Therefore, the district court's order denying MedEnvios's motion for clarification must be reversed.

## IV. MEDENVIOS IS LIABLE ONLY FOR THE ACTUAL OVERPAYMENT AMOUNT ON THE SAMPLE CLAIMS AND IS ENTITLED TO A REFUND WITH REGULATORY INTEREST FOR THE MONEY MEDENVIOS PAID ON THE NOW-VACATED EXTRAPOLATED OVERPAYMENT AMOUNTS.

Pursuant to the APA, federal courts must set aside federal agency action that is not in accordance with the law, "which means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original); *see* 5 U.S.C. § 706(2). A failure to adhere to the procedural safeguards in the MPIM serves as a ground to set aside agency action and invalidate the sample. *See* 5 U.S.C. § 706(2) (stating that reviewing courts must hold unlawful and set aside agency action and agency conclusions found to be "without observance of procedure required by

law."). When the Secretary and CMS disregard those procedural safeguards, the validity of the statistical analysis cannot be verified. *See Cent. La. Home Health Care*, 2018 WL 7888523, at *19.

Procedural and non-sampling errors can be a basis for invalidating an extrapolated overpayment. *See id.,* 2018 WL 7888523, at *21, 25. The district court correctly held that procedural errors were fatal to the methodology used to calculate the estimated extrapolated overpayment demands, and that these errors were a basis for vacating them both. Doc. 84, at 7-8. Therefore, the statistical samplings and extrapolations should be invalidated. *See Global Home Care*, 2011 WL 3668242, at *3 (upholding the ALJ's invalidation of an extrapolated overpayment after finding that the records lacked "complete documentation to support the use of statistical sampling and the extrapolation to calculate Medicare's overpayment to the appellant.").

When the "statistical sampling and overpayment estimation methodology are found to be invalid on appeal, the provider may be liable for the actual overpayment identified in the sample but not the extrapolated amount." *Hammad v. Azar*, 2021 WL 1216383, at *2 (N.D.Fla. 1/15/2021), *report and recommendation adopted* 2021 WL 1209853 (N.D.Fla. 3/21/2016). In *D&G Holdings, LLC v. Burwell*, 156 F.Supp.3d 798, 815 (W.D.La. 2016), the Secretary agreed that recouped Medicare payments must be returned to a supplier with interest if the supplier successfully

appeals an overpayment determination. HHS-OIG agrees: "[i]f a statistical estimate of an overpayment (an extrapolated amount) is overturned during the administrative appeals process, then the provider is liable for the overpayment identified in the sample but not the extrapolated amount." HHS, OIG, "Medicare Contractors Were Not Consistent in How They Reviewed Extrapolated Overpayments in the Provider Appeals Process, A-05-18-00024, at 4 (August 2020).

Because a reviewing court has the authority to set aside unconstitutional agency action pursuant to the APA, remand to the agency is not required to invalidate the statistical samples and extrapolated overpayment demands. The Secretary never moved the district court for a remand, and the district court did not initially order a remand. Further, remand is inappropriate when agency action has been set aside due to a constitutional violation. *See Illinois Council*, 529 U.S. at 23 (holding that a federal court reviewing an agency decision has "adequate authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide…").

Remand to the agency in this matter is also inadequate. As the district court explicitly recognized in *MedEnvios I*, timeliness is important Doc. 84, at 8. The harm caused by the Secretary extends far beyond the limitation on MedEnvios's ability to challenge the effectuation of the ALJ decisions. A failure to comply with the MPIM mandate to carefully document, preserve, and produce a statistical sampling and extrapolation from start to finish for a recalculated overpayment demand denies a

supplier the due process right to recreate the process to fairly challenge the statistical validity of the estimated overpayment. *Id*., at 7 (citing *Global Home Care*, 2011 WL 3668242, at *3).

MedEnvios should be liable only for the actual overpayment amount from the sample claims actually reviewed, and the Secretary should refund any money collected in excess of the actual overpayment amounts (i.e., the extrapolated overpayment demands), plus applicable interest. *See* 42 U.S.C. § 1395ddd(f)(2)(B) ("Insofar as such determination against the provider of services or supplier is later reversed, the Secretary shall provide for repayment of the amount recouped plus interest at the same rate as would apply under the previous sentence for the period in which the amount was recouped."). After all, "[i]f a process cannot be trusted, neither can its result. And a process that violates due process…cannot be trusted. Its results therefore cannot stand." *Kirk v. Berryhill*, 388 F.Supp.3d 652, 665 (D.S.C. 2019), *aff'd sub nom. Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314 (4th Cir. 2021).

## CONCLUSION

The Secretary and its contractors failed to produce complete administrative records and violated MedEnvios's due process rights when it failed to preserve and produce the target universe of claims and when it failed to include zero-paid claims in the sample. Each due process and APA violation is an independent basis to

invalidate the statistical samplings and extrapolated overpayment demands. The appropriate remedy due to MedEnvios is to invalidate and vacate both statistical samplings and extrapolated overpayments and hold MedEnvios liable for the actual overpayment only because: (1) of the due process violations mentioned above; and (2) MedEnvios already successfully challenged the extrapolated overpayments at issue when the district court vacated them as a result of a separate due process violation. Consequently, MedEnvios is owed a refund of the extrapolated overpayments, plus applicable regulatory interest.

Respectfully submitted,

Dated: August 13, 2025.

By _*/s/ Stephen D. Bittinger*_
POLSINELLI PC
Stephen D. Bittinger, # 104550
177 Meeting Street, Suite 400
Charleston, SC 29401
Telephone: (854) 223-6200
sbittinger@polsinelli.com

Bennett L. Cohen, CO #26511
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Telephone: (720) 931-8155
bcohen@polsinelli.com

Attorneys for Appellant
MedEnvios Healthcare, Inc.

## Certificate of Compliance

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. FRAP 32(a)(7)(B), because this brief contains 12,996 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of 32(a)(5) and the type-style requirements of FRAP 32(a)(6), because it has been prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally-spaced typeface.

/s/Stephen D. Bittinger
Stephen D. Bittinger

## Certificate of Service

I hereby certify that on August 13, 2025, foregoing Brief of Appellant MedEnvios Healthcare, Inc. was electronically filed with the Clerk of Court by using the appellate CM/ECF system, and a copy of the brief was served on all counsel of record by operation of the CM/ECF system on the same date.

/s/Stephen D. Bittinger
Stephen D. Bittinger