**No. 25-10870**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

MEDENVIOS HEALTHCARE, INC.,

Plaintiff-Appellant,

v.

SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Southern District of Florida

---

# BRIEF FOR APPELLEE

---

BRETT A. SHUMATE
*Assistant Attorney General*

JASON A. REDING QUIÑONES
*United States Attorney*

THOMAS PULHAM
CYNTHIA BARMORE
*Attorneys, Appellate Staff*
*Civil Division, Room 7541*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

**AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendant-Appellee Secretary, U.S. Department of Health and Human Services, certify that the following have an interest in the outcome of this appeal:

Barmore, Cynthia

Becerra, Xavier

Bernstein, Michelle Genet

Bittinger, Stephen Daniel

Bloom, Hon. Beth

Cohen, Bennett L.

Cooney, Mallory Meagan

Davis, Michael

Garcia, Michael

Goodman, Hon. Jonathan

Health Integrity, LLC

K & L Gates, LLP

Kennedy, Robert, F., Jr.

Lilley, Jaynie Randall

Matzkin, Daniel

MedEnvios Healthcare, Inc.

O'Byrne, Hayden P.

Polsinelli Law Firm

Powell, Lindsey

Pulham, Thomas

Raurell, Carlos Javier

Safeguard Services, LLC

Scola, Jr., Hon. Robert N.

Secretary, U.S. Department of Health and Human Services

Shumate, Brett A.

Skora, Joshua, I.

Yates, Melissa M.

## STATEMENT REGARDING ORAL ARGUMENT

The district court's decision should be affirmed for the reasons stated by the district court. Although the government does not believe that oral argument is necessary, it stands ready to present oral argument if the Court would find it useful.

## TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 3

STATEMENT OF THE ISSUE .......... 3

STATEMENT OF THE CASE .......... 4

A. Statutory and Regulatory Background .......... 4

B. Factual Background .......... 10

C. Prior Proceedings .......... 17

D. Standard of Review .......... 22

SUMMARY OF ARGUMENT .......... 23

ARGUMENT .......... 29

I. MedEnvios's Post-Payment Audits Complied With Due Process. .......... 29

A. The Audits Were Not Unconstitutionally Biased. .......... 30

B. MedEnvios Has Adequate Information To Meaningfully Challenge The Audits. .......... 37

C. MedEnvios's Remaining Arguments Are Unavailing. .......... 40

1. Excluding Zero-Paid Claims Complies With The Medicare Act. .......... 41

2. Excluding Zero-Paid Claims Complies With The Medicare Program Integrity Manual. .......... 43

II. MedEnvios's Remaining Challenges Likewise Fail. .......... 51

A. The Administrative Record Is Complete. .......... 51

B. MedEnvios Is Not Entitled To A Refund..........................................54

CONCLUSION ........................................................................................... 57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*A1 Diabetes & Med. Supply v. Azar*,
937 F.3d 613 (6th Cir. 2019)........................................5, 35

*American Sec. Ass'n, Citadel Sec. LLC v. SEC*,
147 F.4th 1264 (11th Cir. 2025) ........................................56

*Armstrong v. Manzo*,
380 U.S. 545 (1965) ........................................39

*Ashli Healthcare, Inc. v. Kennedy*,
2025 WL 1125127 (E.D. Cal. Apr. 16, 2025)........................................36, 46

*Bar MK Ranches v. Yuetter*,
994 F.2d 735 (10th Cir. 1993)........................................ 51-52

*Barwick v. Governor of Florida*,
66 F.4th 896 (11th Cir. 2023) (per curiam) ........................................28, 55, 56

*Bayou Shores SNF, LLC, In re*,
828 F.3d 1297 (11th Cir. 2016)........................................22, 51

*Bethlehem Steel v. EPA*,
638 F.2d 994 (7th Cir. 1980)........................................52

*Border Ambulance Serv., LLC*,
2010 WL 7209455 (Medicare App. Council Nov. 10, 2010) ........................................36

*Carey v. Piphus*,
435 U.S. 247 (1978) ........................................55

**FDIC v. Morley*,
915 F.2d 1517 (11th Cir. 1990)........................................2, 25, 34

*Florida Med. Ctr. of Clearwater, Inc. v. Sebelius*,
614 F.3d 1276 (11th Cir. 2010)........................................4

*Goldberg v. Kelly*,
397 U.S. 254 (1970) ........................................23, 29



*Authorities upon which we chiefly rely are marked by asterisks.

*Gulfcoast Med. Supply, Inc. v. Secretary, Dep't of Health & Hum. Servs.*,
468 F.3d 1347 (11th Cir. 2006) (per curiam)....................................................23

*Heckler v. Ringer*,
466 U.S. 602 (1984) ............................................................................ 22-23, 51

*Hopkins v. Saunders*,
199 F.3d 968 (8th Cir. 1999)..........................................................................55

*Infinity Healthcare Servs., Inc. v. Azar*,
349 F. Supp. 3d 587 (S.D. Tex. 2018) ..................................................................5

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ............................................................................................45

**Mackey v. Montrym*,
443 U.S. 1 (1979) ...........................................................................................26, 39

**Mathews v. Eldridge*,
424 U.S. 319 (1976) ................................. 2, 19, 23, 24, 32, 33, 34, 37, 38, 39, 41

*McDaniel v. Harris*,
639 F.2d 1386 (5th Cir. Unit A Mar. 1981).......................................................23

*Mesa Valderrama v. United States*,
417 F.3d 1189 (11th Cir. 2005)..........................................................................19

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*,
498 U.S. 211 (1991) ............................................................................................30

*Palm Valley Health Care, Inc. v. Azar*,
947 F.3d 321 (5th Cir. 2020)...........................................................26, 33, 37, 41

*Palomar Med. Ctr. v. Sebelius*,
693 F.3d 1151 (9th Cir. 2012)...........................................................................4, 5, 8

*PDK Lab'ys Inc. v. DEA*,
362 F.3d 786 (D.C. Cir. 2004) ...........................................................................30

*Ratanasen v. California Dep't of Health Servs.*,
11 F.3d 1467 (9th Cir. 1993)...............................................................................37

*Shinseki v. Sanders*,
556 U.S. 396 (2009) ....................................................................................53

**Star Wireless, LLC v. FCC*,
522 F.3d 469 (D.C. Cir. 2008) ...........................................................24, 30

*Steven Kalter, M.D.*,
2011 WL 7007019 (Medicare App. Council Aug. 11, 2011) ..............................43

*United States v. Bergman*,
852 F.3d 1046 (11th Cir. 2017)..........................................................................4

*United States v. Guthrie*,
50 F.3d 936 (11th Cir. 1995)............................................................................53

*United States v. Moss*,
34 F.4th 1176 (11th Cir. 2022) .........................................................................4

**Worthy v. City of Phenix City*,
930 F.3d 1206 (11th Cir. 2019)................................ 23, 24, 29, 32, 33, 35, 37, 38

*Wright & Filippis*,
2011 WL 7145309 (Medicare App. Council Sept. 29, 2011)..............................53

*Zen Grp., Inc. v. Agency for Health Care Admin.*,
80 F.4th 1319 (11th Cir. 2023) .......................................................................30

**U.S. Constitution:**

Amend. V ...........................................................................................................29

**Statutes:**

28 U.S.C. § 1291 .................................................................................................3

42 U.S.C. § 405(g) ...........................................................3, 18, 22, 23, 28, 51

42 U.S.C. § 1395 *et seq*...........................................................................................4

42 U.S.C. § 1395u...............................................................................................4

42 U.S.C. § 1395ff ....................................................................................3

42 U.S.C. § 1395ff(a)(1)(A)-(C) ...........................................................................8

42 U.S.C. § 1395ff(a)(3) ....................................................................................20

42 U.S.C. § 1395ff(a)(3)(C)(i) ...................................................................8, 9, 34

42 U.S.C. § 1395ff(b)(1) ...............................................................................23, 51

42 U.S.C. § 1395ff(b)(1)(A) ................................................................................9

42 U.S.C. § 1395ff(b)(1)(D)(i)..............................................................................9

42 U.S.C. § 1395ff(d)(1) ......................................................................................9

42 U.S.C. § 1395ff(d)(2) ......................................................................................9

42 U.S.C. § 1395ff(d)(2)(A) ..............................................................................16

42 U.S.C. § 1395ff(d)(3)(B) ...........................................................................9, 16

42 U.S.C. § 1395ddd ............................................................................................4

42 U.S.C. § 1395ddd(a) ........................................................................................5

42 U.S.C. § 1395ddd(b)(1)............................................................................5, 26, 41

42 U.S.C. § 1395ddd(f) ...............................................................................5, 26, 41

42 U.S.C. § 1395ddd(f)(3)(A)................................................................................6

42 U.S.C. § 1395ddd(f)(7) ..................................................................................26, 41

42 U.S.C. § 1395ddd(f)(8) ......................................................................................42

42 U.S.C. § 1395ddd(h) ........................................................................................5

42 U.S.C. § 1395ddd(h)(1) ..........................................................................26, 42, 43

42 U.S.C. § 1395ddd(h)(1)(B) ...............................................................................5

**Regulations:**

42 C.F.R. § 405.371(a)(3) ....... 8

42 C.F.R. § 405.373 ....... 8

42 C.F.R. § 405.904(a)(2) ....... 8, 34

42 C.F.R. § 405.929 ....... 8

42 C.F.R. § 405.942 ....... 8

42 C.F.R. § 405.968(a)(1) ....... 9

42 C.F.R. § 405.980 ....... 8

42 C.F.R. § 405.984(f) ....... 8, 9

42 C.F.R. § 405.1000 ....... 9

42 C.F.R. § 405.1100(a) ....... 9

42 C.F.R. § 405.1132 ....... 16

42 C.F.R. § 421.5(b) ....... 4

75 Fed. Reg. 12,119 (Mar. 15, 2010) ....... 31

79 Fed. Reg. 66,770 (Nov. 10, 2014) ....... 5

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ....... 3

**Other Authorities:**

CMS, *Medicare Claims Processing Manual*,
ch. 34, § 10 (Rev. 4219, Jan. 25, 2019), https://perma.cc/MZ8A-CCEG ....... 8

CMS, *Medicare Program Integrity Manual*,
ch. 8 (Rev. 13110, Apr. 11, 2025), https://perma.cc/K7QE-BUFB ....... 5-6
§ 8.2 ....... 7, 45

§ 8.2.1 .......... 45
§ 8.2.1.1.A .......... 45
§ 8.2.2 .......... 6, 8, 46
§ 8.2.3.1 .......... 8
§ 8.3.1.2 .......... 45
§ 8.3.1.4 .......... 45
§ 8.3.2.3.1.B .......... 45
§ 8.3.2.5 .......... 45
§ 8.3.3.1 .......... 45
§ 8.3.3.2 .......... 45
§ 8.4.1.1 .......... 6, 27, 46
§ 8.4.1.2 .......... 6
§ 8.4.1.3 .......... 6
§ 8.4.3.1 .......... 6
§ 8.4.3.2 .......... 6, 7
§ 8.4.3.2.1 .......... 15, 16
§ 8.4.3.2.1.B .......... 6, 7, 21, 27, 43, 46
§ 8.4.3.2.3 .......... 7
§ 8.4.4.1 .......... 7
§ 8.4.4.2 .......... 7
§ 8.4.4.4.4 .......... 16
§ 8.4.5 .......... 7, 33, 43
§ 8.4.5.2 .......... 16
§ 8.4.6.1 .......... 7
§ 8.4.7.1 .......... 8

Off. of Inspector Gen., HHS, *Medicare's Program Safeguard Contractors: Activities to Detect and Deter Fraud and Abuse* (July 2007), https://perma.cc/63WZ-8PUY .......... 5

Off. of Inspector Gen., HHS, *UPICs Hold Promise to Enhance Program Integrity Across Medicare and Medicaid, But Challenges Remain* (Sept. 2022), https://perma.cc/7JW2-VCM3 .......... 5

*Paid*, Merriam-Webster Dictionary Online, https://perma.cc/JH35-P6LT .......... 44

## INTRODUCTION

This case challenges the government's procedures to audit Medicare claims for overpayment. Under this system, a Medicare supplier submits claims for payment, and the government typically pays those claims with little oversight. Later, contractors audit paid claims to determine whether and how much the supplier was overpaid. The government then recoups that amount from the supplier. The purpose of these audits is to root out waste and abuse, addressing risks inherent in a program that relies on the honor system.

The few Medicare claims that are denied at the outset (and thus are never paid by the government) are handled separately. Suppliers may appeal the denial of such claims within 120 days, and at the end of that process the denial is final. Such denials are not included in later post-payment audits. Because the purpose of those audits is to find overpayments and ensure Medicare's fiscal integrity, auditors do not reexamine denied claims at that time; by definition, claims that were not paid at all cannot have been overpaid.

Plaintiff MedEnvios Healthcare, Inc., is a Medicare supplier. In 2017, two audits found that MedEnvios was overpaid about $3 million between 2013 and 2016. MedEnvios challenged those audits on various grounds, principally claiming that the audits did not comport with the Due Process Clause because they did not reexamine denied claims (what MedEnvios refers to as "zero-paid" claims).

The district court correctly rejected that claim. It is black letter administrative law that agencies may address one problem at a time, and post-payment audits are aimed at the problem of waste and abuse. Post-payment audits examine paid claims because those are the types of claims that may involve waste or abuse. Denied claims implicate entirely different problems, namely, proper compensation to providers.

The Due Process Clause provides no basis to depart from this ordinary rule and compel auditors to address all these issues at the same time. Due process requires only an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). MedEnvios received this opportunity several times over: For claims that were revisited in the post-payment audits, MedEnvios received multiple levels of administrative review. And for claims that were denied at the outset, MedEnvios had a right to immediately pursue those same levels of review—a right that MedEnvios chose not to exercise. MedEnvios might prefer for auditors to proactively reopen denied claims and examine them for underpayment, but due process does not entitle MedEnvios to "choose the precise process they desire." *FDIC v. Morley*, 915 F.2d 1517, 1522 (11th Cir. 1990).

## STATEMENT OF JURISDICTION

MedEnvios invoked the district court's jurisdiction under 42 U.S.C. § 405(g) as applied to Medicare appeals by 42 U.S.C. § 1395ff. Doc. 1, at 3, App. 182.[1] The district court issued a partial summary judgment order on March 25, 2024. Doc. 84, App. 439. The district court resolved the remaining claims in a second summary judgment order on November 25, 2024, Doc. 117, App. 474, and entered final judgment on January 15, 2025, Doc. 125, App. 488. The government filed a timely notice of appeal on March 14, 2025. Doc. 128; *see* Fed. R. App. P. 4(a)(1)(B). MedEnvios filed a timely notice of cross-appeal on March 27, 2025. Doc. 134, App. 497. This Court dismissed the government's appeal pursuant to a joint stipulation on June 3, 2025, leaving only MedEnvios's cross-appeal. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether two audits of Medicare payments violated MedEnvios's constitutional right to procedural due process.

---

[1] Parallel citations to the Appendix and Supplemental Appendix are included for the Court's convenience. Because plaintiff's Appendix does not include page numbers, citations are to the page number of the pdf compilation of all three volumes. For citations to the administrative record, there is a separate record for each audit. This brief cites the volume and page number of each record, along with the district court docket number to distinguish between them; "20065" is the SafeGuard audit, while "20068" is the Health Integrity audit.

## STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

**1.** The Medicare Act, 42 U.S.C. § 1395 *et seq.*, establishes a program of health insurance for the elderly and disabled administered by the Secretary of Health and Human Services (HHS), through the Centers for Medicare & Medicaid Services (CMS). CMS processes more than a billion Medicare claims per year. *See Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1156 (9th Cir. 2012). Because of this volume, CMS is unable to review most claims when they are first submitted. *See United States v. Bergman*, 852 F.3d 1046, 1054 (11th Cir. 2017). Instead, Medicare "work[s] on the honor system," and CMS initially approves most claims as long as they do not contain glaring issues. *See United States v. Moss*, 34 F.4th 1176, 1181 (11th Cir. 2022). CMS generally acts through private contractors, which CMS relies on to administer the Medicare program. *See Florida Med. Ctr. of Clearwater, Inc. v. Sebelius*, 614 F.3d 1276, 1279 n.3 (11th Cir. 2010) (first citing 42 U.S.C. § 1395u; and then citing 42 C.F.R. § 421.5(b)).

Understanding the potential for overbilling inherent in this system, Congress created the Medicare Integrity Program in 1996. *See* 42 U.S.C. § 1395ddd; *Palomar Med. Ctr.*, 693 F.3d at 1156 (noting that "improper payments for Medicare" account for "more than ten percent" of "all payment errors in federal programs"). The program authorizes CMS to partner with contractors to carry out

various activities to "promote the integrity of the [M]edicare program." 42 U.S.C. § 1395ddd(a). One such activity is to audit prior payments for overpayment. *See id.* § 1395ddd(b)(1), (f). This post-payment review is Medicare's main check on overpayments. *See A1 Diabetes & Med. Supply v. Azar*, 937 F.3d 613, 615 (6th Cir. 2019). Multiple types of contractors conduct post-payment audits, including, among others, Unified Program Integrity Contractors (UPICs) and Recovery Audit Contractors (RACs). *See* 79 Fed. Reg. 66,770, 66,905 (Nov. 10, 2014).[2]

CMS publishes a Medicare Program Integrity Manual that provides guidance for contractors on how to conduct post-payment audits. *See* CMS, *Medicare Program Integrity Manual* ch. 8 (Rev. 13110, Apr. 11, 2025),

[2] These contractors perform similar functions but are subject to distinct statutory and regulatory provisions, reflecting their different origins. UPICs "integrate the functions previously performed by the Zone Program Integrity Contractors (ZPICs), Program Safeguard Contractors (PSCs), and Medicaid Integrity Contractors." Off. of Inspector Gen., HHS, *UPICs Hold Promise to Enhance Program Integrity Across Medicare and Medicaid, But Challenges Remain* 2 (Sept. 2022), https://perma.cc/7JW2-VCM3. These are longstanding functions; for example, PSCs had been "detecting and deterring fraud and abuse" since 1999. Off. of Inspector Gen., HHS, *Medicare's Program Safeguard Contractors: Activities to Detect and Deter Fraud and Abuse* i (July 2007), https://perma.cc/63WZ-8PUY. In 2003, "Congress enacted the RAC program" to "supplement CMS's efforts to protect the fiscal integrity of the Medicare program." *Palomar Med. Ctr.*, 693 F.3d at 1156. When Congress created the RAC program, it enacted provisions that apply only to RACs. *See* 42 U.S.C. § 1395ddd(h). RACs also report to a different component within CMS, *see* 79 Fed. Reg. at 66,905, and receive different compensation, *see* 42 U.S.C. § 1395ddd(h)(1)(B); *Infinity Healthcare Servs., Inc. v. Azar*, 349 F. Supp. 3d 587, 598 n.16 (S.D. Tex. 2018).

https://perma.cc/K7QE-BUFB (MPIM or Manual). These audits often rely on statistical extrapolation, which allows an auditor to examine only a subset of claims and then estimate the supplier's total overpayment based on that sample. MPIM § 8.4.1.2. Contractors may use statistical extrapolation if a supplier's claims show a "sustained or high level of payment error." *Id.*; 42 U.S.C. § 1395ddd(f)(3)(A). Contractors are directed to "follow instructions in section 8.4" of the Manual for such calculations, MPIM § 8.2.2, but failure to follow these instructions "does not necessarily affect the validity of the statistical sampling" or "the projection of the overpayment," MPIM § 8.4.1.1.

The first step in this process is to identify the supplier and time period for claims to be audited. MPIM §§ 8.4.1.3, 8.4.3.1. The contractor then defines the "universe" of claims to be examined. MPIM § 8.4.3.2. The universe is the "target population that contains all claims/claim lines potentially under review." *Id.* As relevant here, the Manual provides that "[t]he universe shall consist of all fully and partially paid claims submitted by the provider/supplier for the period selected for review and for the sampling units to be reviewed." MPIM § 8.4.3.2.1.B.[3]

[3] The Manual explains that the universe "is used to construct the sampling frame," which "lists all sampling units which may be selected by the statistical sampling software." MPIM § 8.4.3.2. The difference between the universe and frame is illustrated by the methodology of the SafeGuard audit described below. There, the universe included all claims potentially under review, while the frame used the beneficiaries (some of whom had multiple claims) as the sampling unit.

*Continued on next page.*

Next, the contractor determines the appropriate methodology for examining the claims in the universe. MPIM § 8.4.4.1. This typically involves taking a random sample of claims from the universe, examining those claims to determine whether they were properly paid, and using that information to estimate the supplier's total projected overpayment. MPIM §§ 8.4.4.2, 8.4.5. For example, as illustrated by the audits in this case, the contractor may calculate a single average overpayment from the sample and apply that average to the universe, or it may divide the universe into multiple groups and sample or otherwise examine those groups separately. *See infra* pp. 10-14. Finally, the contractor revises the total projected overpayment downward to account for uncertainty inherent in statistical sampling, ensuring that the final total overpayment gives suppliers the benefit of the doubt. MPIM § 8.4.5.

The contractor then notifies the supplier of the results of the audit and requests recovery of the overpayment. MPIM §§ 8.2, 8.4.6.1. The contractor ultimately refers the case to overpayment staff at the Medicare administrative

---

*See id.* (explaining that the frame "may be … a list of beneficiaries" and "the universe corresponding to the sampling frame" may include "the matching claims"); MPIM § 8.4.3.2.3 (similar). This brief refers only to the universe for simplicity. The difference between the universe and frame is not relevant here; the Manual directs zero-paid claims to be excluded from the frame as well. *See* MPIM § 8.4.3.2.1.B ("Sampling units with no final payment made at the time of [the] sample selection should not be included in the sampling frame."); MPIM § 8.4.3.2.3 ("As examples, the frame may be a list of all beneficiaries" or "claims" with "fully or partially favorable" determinations).

contractor for collection. MPIM §§ 8.2.2, 8.2.3.1, 8.4.7.1. In appropriate cases, the government may withhold payment on other claims in order to recoup the overpayment amount. 42 C.F.R. §§ 405.371(a)(3), 405.373.

**2.** There is a detailed administrative process for suppliers to appeal the denial of claims, whether the claim is denied when first submitted for payment or only after an audit.

*Claims denied at the outset*. If CMS denies a supplier's claim, the supplier may appeal that decision immediately. *See Palomar Med. Ctr.*, 693 F.3d at 1155; 42 U.S.C. § 1395ff(a)(1)(A)-(C); 42 C.F.R. § 405.904(a)(2). There is a 120-day statutory deadline to administratively challenge such decisions, after which the denial is final. 42 U.S.C. § 1395ff(a)(3)(C)(i).

*Claims denied after an audit*. "In certain circumstances, an otherwise final determination or decision may be reopened." *Palomar Med. Ctr.*, 693 F.3d at 1155 (citing 42 C.F.R. § 405.980). If CMS reopens a supplier's claim and issues a new decision, the supplier likewise may appeal that decision. As relevant here, if a claim was initially approved but later revised by a post-payment audit, the audit reopens the initial determination of the claim, and the supplier may appeal the new decision within 120 days. 42 C.F.R. §§ 405.929, 405.942, 405.984(f); CMS, *Medicare Claims Processing Manual* ch. 34, § 10 (Rev. 4219, Jan. 25, 2019), https://perma.cc/MZ8A-CCEG. Only claims that are revised during the audit are

subject to a new 120-day appeal window. *See* 42 C.F.R. § 405.984(f). If a claim is not altered by the audit, the initial decision has not been reopened, and the supplier's window to appeal that claim remains limited to the 120 days following the initial decision.

Both types of determinations are subject to the same four levels of administrative review: *First*, a supplier may appeal the decision by requesting a "redetermination" from the appeals department of the Medicare administrative contractor. 42 U.S.C. § 1395ff(a)(3)(C)(i). *Second*, the supplier then may request "reconsideration" by a different contractor, called a qualified independent contractor, who may consider new or existing evidence. *Id.* § 1395ff(b)(1)(D)(i); 42 C.F.R. § 405.968(a)(1). *Third*, the supplier may request a hearing with an administrative law judge (ALJ) from the Office of Medicare Hearings and Appeals. 42 U.S.C. § 1395ff(d)(1); 42 C.F.R. § 405.1000. *Finally*, the supplier may appeal the ALJ's determination to the Medicare Appeals Council. 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. § 405.1100(a). The Council's decision is the final agency decision subject to review in district court. 42 U.S.C. § 1395ff(b)(1)(A). If the Council does not issue a decision within 90 days, the ALJ's decision becomes the final agency decision, and the supplier may challenge that decision in district court. *Id.* § 1395ff(d)(3)(B).

### B. Factual Background

MedEnvios supplies medical equipment to Medicare beneficiaries. Doc. 84, at 2, App. 440. This case concerns two post-payment audits that found MedEnvios received about $3 million in improper Medicare payments.

**1.** The first audit took place in early 2017. A contractor named SafeGuard Services, LLC, found that Medicare overpaid MedEnvios about $2 million, accounting for 100% of examined payments. AR Vol. 2, at 5787-88 (20065), App. 505-06. At the time, SafeGuard was a ZPIC, a type of contractor whose functions are currently performed by UPICs. *See id.*; *supra* p. 5 n.2.

To reach that total, the contractor first constructed the universe of claims at issue. AR Vol. 2, at 5794 (20065), App. 513. The universe consisted of claims that had (1) certain payment dates between 2014 and 2016; (2) one of two procedure codes; and (3) payment by Medicare. *Id.* This third requirement excluded 280 zero-paid claims (for 243 beneficiaries) that satisfied the other requirements of the universe. *See* Doc. 93, at 4, App. 457; AR Vol. 3, at 487884_Other_ 1654805931991033562_3-6648675676 00009 (20065). The universe thus included 2,444 beneficiaries with 3,097 claims. AR Vol. 2, at 5794 (20065), App. 513.

The contractor then selected a random sample from the universe. The sample included 45 beneficiaries with 55 paid claims. AR Vol. 2, at 5794 (20065),

App. 513. The contractor examined these claims to determine whether they were properly paid and found that 100% were not, resulting in an overpayment of $40,868.09. AR Vol. 2, at 5800 (20065), Supp. App. 4. The contractor then divided this overpayment amount by 45 to identify the average overpayment in the sample ($908.18). *Id.* Next, the contractor multiplied this average by the number of beneficiaries in the universe, calculating a total projected overpayment of $2,219,591.38. *Id.* The following tables summarize these calculations:

| SafeGuard Audit: Average Overpayment in the Sample | | | | | |
|---|---|---|---|---|---|
| | Overpayment Amount | | Sample Size | | Average Overpayment |
| Sample | $40,868.09 | ÷ | 45 | = | $908.18 |

| SafeGuard Audit: Total Overpayment in the Universe | | | | | |
|---|---|---|---|---|---|
| | Average Overpayment | | Universe Size | | Total Projected Overpayment |
| Universe | $908.18 | x | 2,444 | = | $2,219,591.38 |

Finally, the contractor used statistical methods to account for the mathematical uncertainty inherent in extrapolation. The contractor constructed a 90% confidence interval to reduce the overpayment estimate. This statistical

calculation reflects 90% confidence that the calculated overpayment amount is *lower* than MedEnvios's true overpayment amount. Using these methods, the contractor calculated MedEnvios's total overpayment to be $2,065,799.71. AR Vol. 2, at 5800 (20065), Supp. App. 4.

**2.** The second audit took place in May 2017. A contractor named Health Integrity, LLC, found that Medicare overpaid MedEnvios by about $948,000, accounting for 85% of examined payments. AR Vol. 1, at 781-82, (20068), App. 518-19; AR Vol. 1, at 3714 (20068), Supp. App. 1. Like the first contractor, Health Integrity was also a ZPIC at the time of the audit. *Id.*

As in the first audit, the contractor began by constructing the universe of claims at issue. AR Vol. 1, at 3714 (20068), Supp. App. 1. The universe totaled 2,035 claims, including claims with (1) certain dates of service between 2013 and 2016; (2) one of six procedure codes; and (3) payment by Medicare, with additional exclusions for certain Railroad and previously adjusted claims. AR Vol. 1, at 354-56 (20068), App. 523-25. The universe thus excluded zero-paid claims, but the record does not indicate how many were excluded.

Unlike the first audit, the contractor then separated the universe into two groups. This approach accounted for outliers to ensure that the final calculation accurately reflected the universe. Group 1 was for claims paid between $.01 and $1,600, and Group 2 was for claims paid more than $1,600. AR Vol. 1, at 356

(20068), App. 525; AR Vol. 1, at 3714 (20068), Supp. App. 1. The contractor randomly sampled 35 claims from Group 1 and included all two claims from Group 2. AR Vol. 1, at 356 (20068), App. 525. The contractor then examined these 37 claims to determine whether they were properly paid. AR Vol. 1, at 3714 (20068), Supp. App. 1. The contractor determined that the vast majority (85% of payments) were not. *Id.*

For Group 1, the contractor then determined the average overpayment per claim by adding the amount each claim was overpaid (totaling $18,441.85) and dividing that total by 35. AR Vol. 1, at 3714 (20068), Supp. App. 1. The contractor then multiplied this average overpayment ($526.91) by the number of claims in the universe from Group 1 (2,033) to calculate the total overpayment amount for Group 1 ($1,071,208). *Id.* No such calculations were necessary for Group 2; only two claims in the universe fell within that group, so the contractor examined both to determine with certainty the total overpayment for Group 2. *Id.* The contractor then added together the total overpayment for each group to calculate a total projected overpayment of $1,073,610.11. *Id.* The following tables summarize these calculations:

| Health Integrity Audit: Average Overpayment in the Sample | | | | | |
|---|---|---|---|---|---|
| | Overpayment Amount | | Sample Size | | Average Overpayment |
| Group 1 (between $0 and $1,600) | $18,441.85 | ÷ | 35 | = | $526.91 |

| Health Integrity Audit: Total Overpayment in the Universe | | | | | |
|---|---|---|---|---|---|
| | Average Overpayment | | Universe Size | | Total Projected Overpayment |
| Group 1 (between $0 and $1,600) | $526.91 | x | 2,033 | = | $1,071,208 |
| Group 2 (more than $1,600) | | | | + | $2,402 |
| Total | | | | = | $1,073,610 |

Finally, the contractor constructed a 90% confidence interval and calculated MedEnvios's total overpayment to be $947,843.11. AR Vol. 1, at 3715 (20068), Supp. App. 2.

**3.** MedEnvios administratively appealed the results of both audits. MedEnvios first sought redetermination and in both cases was unsuccessful. AR Vol. 1, at 1589 (20065); AR Vol. 1, at 748 (20068).

MedEnvios next sought reconsideration. This time, MedEnvios was partially successful. A qualified independent contractor reversed the denials of

some individual claims in the sample but upheld the sampling methodology. *See* AR Vol. 1, at 360 (20065); AR Vol. 1, at 8431 (20068). In each appeal, the contractor explained that excluding zero-paid claims from the universe "is entirely consistent" with the Medicare Program Integrity Manual, which states in relevant part that "[t]he universe shall consist of all fully and partially paid claims submitted by the supplier for the period selected for review and for the sampling units to be reviewed." AR Vol. 1, at 374 (20065); AR Vol. 1, at 8444 (20068). The contractor thus concluded that there "is no requirement that previously denied claims be included in the universe from which sampling is done." *Id.*

MedEnvios appealed for a third time and again was partially successful. *See* AR Vol. 1, at 135-62 (20065), App. 82-106; AR Vol. 1, at 68-89 (20068), App. 239-60. After hearings in both cases, two separate ALJs issued decisions, both of which upheld the validity of the sampling methodology while overturning the denial of some individual claims. In the first case, Judge DiCarlo concluded that the "exclusion of unpaid claims is in accordance with CMS guidance." AR Vol. 1, at 161 (20065), App. 105. Like the previous contractor, he reasoned that the Manual "includes requirements for the composition of the universe" and provides that the universe "shall consist of all fully and partially paid claims." *Id.* (citing MPIM § 8.4.3.2.1). He acknowledged that a separate manual provision requires "[u]nderpayments identified during reviews" to be "documented" but reasoned that

this provision "does not support the inclusion of zero paid claims in the universe." *Id.* (citing MPIM § 8.4.4.4.4). Instead, it indicates that "underpayments that were identified during the review are to be considered in calculating the net overpayment." *Id.*

Judge Mendelson reached the same conclusion in the second case. She likewise relied on the Manual, which "make[s] clear that only fully and partially paid claims need to be included in the initial universe and sampling frame." AR Vol. 1, at 79 (20068), App. 250 (citing MPIM § 8.4.3.2.1). Later provisions clarify that, if the auditor finds "sampling units that are determined to be underpayments, in whole or in part, '[those underpayments] are then recorded as negative overpayments and shall also be used in calculating the estimated overpayment.'" *Id.* (citing MPIM § 8.4.5.2). Those provisions "allow for the possibility that, once medical review has been completed, if some of the reviewed claims actually turn out to be underpayments, that those underpayments can then be reconciled into the calculation of a final 'net overpayment.'" *Id.*

MedEnvios requested that the Medicare Appeals Council review both decisions. The Council did not issue a decision within 90 days, and the ALJ decisions became the final decisions of the agency subject to judicial review. AR Vol. 1, at 6 (20065); AR Vol. 1, at 2-3 (20068); *see* 42 U.S.C. § 1395ff(d)(2)(A), (3)(B); 42 C.F.R. § 405.1132.

### C. Prior Proceedings

**1.** On January 6, 2023, MedEnvios filed a complaint in district court, asserting six due process claims. Doc. 1, at 48-54, App. 227-33.[4] MedEnvios claimed that the agency violated due process by (1) not providing the true claims universe including zero-paid claims; (2) excluding zero-paid claims from the sampling methodology; (3) not providing documentation to support the recalculation of overpaid claims; (4) delaying administrative proceedings and thereby accumulating undue interest; (5) improperly recouping payments; and (6) not accounting for particular payments.

After the government provided the administrative record, MedEnvios moved to complete the record, arguing that the record improperly excluded (1) information about zero-paid claims excluded from the Health Integrity audit, and (2) worksheets used to recalculate MedEnvios's liability following partially favorable ALJ decisions. Doc. 34. A magistrate judge denied the motion after a hearing, Doc. 60, App. 399, and the district court affirmed, Doc. 79, App. 431. The court held that "the administrative record *is* complete," explaining that its "limited role" is to ask "only whether substantial evidence supported the final

[4] This complaint is directed at the Health Integrity audit. MedEnvios filed a separate complaint raising similar claims challenging the SafeGuard audit. Case No. 23-20065, Doc. 1, App. 26. On May 12, 2023, the district court consolidated the cases and closed the SafeGuard docket. Case No. 23-20068, Doc. 29, at 1, App. 374.

agency decision" based on a record that includes "the evidence upon which the findings and decision complained of are based." Doc. 79, at 4-7, App. 434-37 (quoting 42 U.S.C. § 405(g)). Thus, "documents that were never even part of the universe of evidence offered to the ALJ do not need to be included in the record for it to be considered complete." Doc. 79, at 6, App. 436. The court emphasized that the record does not "contain every document created by an agency and its contractors at any point during the course of the matters on appeal, regardless of whether they were part of the record on which the final agency decision was made." *Id.*; *see also* Doc. 60, at 26-30, App. 424-28 (explaining that MedEnvios sought "to obtain materials never reviewed by the ALJs" and noting that the government provided certain worksheets to MedEnvios even though not required).

**2. a.** On March 25, 2024, the district court resolved two of MedEnvios's due process claims, granting summary judgment in part to the government and in part to MedEnvios. Doc. 84, App. 439. The court rejected MedEnvios's principal claim, holding that the government "has not violated MedEnvios's procedural due process rights by excluding 'zero-paid claims' from the sampling universe in the two relevant post-payment audits." *Id.* at 7, App. 445.

The court began by summarizing the governing framework for due process claims: "[I]ndividuals whose property interests are at stake due to government actions are entitled to notice of the proceedings and an opportunity to be heard"

"'at a meaningful time and in a meaningful manner.'" Doc. 84, at 3, App. 441 (first quoting *Mesa Valderrama v. United States*, 417 F.3d 1189, 1196 (11th Cir. 2005); and then quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). This inquiry turns on three factors, including "the private interest that will be affected by the official action," "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* (quoting *Mathews*, 424 U.S. at 335).

While the court determined that MedEnvios has "a protected property interest in the funds subject to the extrapolated overpayment demands," it held that the government provided adequate process to protect that interest. Doc. 84, at 4-7, App. 442-45. The court rejected MedEnvios's contention that excluding zero-paid claims from the audits "violated MedEnvios's due process rights because the Department was required to include them by" the Medicare Act and Manual. *Id.* at 4, App. 442. The court observed that excluding zero-paid claims "is consistent with the relevant Medicare contractors' mission" to audit waste, which "demonstrates that the contractor's principal concern was to audit fully and partially paid claims—not claims that the Department never paid and by definition

could not have resulted in overpayment." *Id.* at 6, App. 444. The court also emphasized the availability of "a separate process for suppliers to challenge determinations that incorrectly result in 'zero-paid' claims" through administrative appeals. *Id.* (citing 42 U.S.C. § 1395ff(a)(3)). Because "the party with the greatest interest in vindicating claims that the Department should have reimbursed has a clear recourse, separate and apart from the Department's own investigation and recoupment of its potentially wasteful spending," the Department "need not account for [such claims] again in post-payment audits." *Id.* at 7, App. 445.

Separately, the district court granted summary judgment in part to MedEnvios, holding that MedEnvios had a due process right to receive the recalculation worksheets at issue in its previous request to complete the record. Doc. 84, at 7-8, App. 445-46. The court acknowledged that the government had already provided some of those worksheets to MedEnvios, but the court faulted the government for not providing them "contemporaneously with the revised overpayment demands" to enable MedEnvios to "recreat[e] the recalculations to verify the revised extrapolated amounts." *Id.* at 8, App. 446. The court thus vacated the overpayment demands. *Id.*

The government moved for reconsideration, Doc. 85, and the court denied the government's motion, Doc. 91, App. 449. The government subsequently provided all of the relevant worksheets and advised MedEnvios that it could

"challenge the computation or effectuation performed in light of the partially favorable ALJ decisions in 2022," regardless of "any regulatory timeframe that may otherwise have lapsed." Doc. 129, at 2, App. 494.

**b.** On November 25, 2024, the district court resolved the remaining four claims, granting summary judgment in part to the government and in part to MedEnvios. Doc. 117, App. 474. As relevant here, the court rejected MedEnvios's claim that the government violated due process by not providing it with information about the zero-paid claims excluded from the Health Integrity audit. *Id.* at 5-6, App. 478-79. The court reasoned that this claim "comes down to whether [MedEnvios] received the target 'universe' of claims" subject to the post-payment audit. *Id.* at 6, App. 479. Based on the Manual, it "is clear that the universe consists of those 'fully and partially paid claims'" submitted by the supplier "for the period selected for review and for the sampling units to be reviewed." *Id.* at 6-7, App. 479-80 (quoting MPIM § 8.4.3.2.1.B). "Because MedEnvios received the target universe as defined by [agency] guidance," the government "provided MedEnvios with the target universe of claims." *Id.* at 7, App. 480. "And as this Court has previously explained, excluding 'zero-paid' claims from the universe does not violate MedEnvios's procedural due process rights." *Id.*

**3.** The government appealed, Doc. 128, and MedEnvios cross-appealed, Doc. 134, App. 497. Shortly thereafter, on April 22, 2025, the district court clarified the scope of its summary judgment orders. Doc. 142, App. 500. MedEnvios had interpreted those orders to entitle it "to a refund of the recalculated overpayments" rather than merely an opportunity "to challenge those overpayments with the proper documentation." *Id.* at 2, App. 501. The court rejected that interpretation, clarifying that the government's "procedural due process violation"—namely, failure to provide the recalculation worksheets—was remedied by placing MedEnvios "in the same position as if it had the correct documentation in the first place—*i.e.*, having the benefit of the documentation showing how the ALJ decisions were effectuated" so that MedEnvios "may challenge the implementation of the ALJ decisions as it sees fit." *Id.* (quotation marks omitted).

On June 3, 2025, this Court dismissed the government's appeal pursuant to the parties' joint stipulation. That dismissal did not affect MedEnvios's cross-appeal.

### D. Standard of Review

Congress has provided that 42 U.S.C. § 405(g) "is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act." *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1309 (11th Cir. 2016) (quoting *Heckler v.*

*Ringer*, 466 U.S. 602, 615 (1984)); *see* 42 U.S.C. § 1395ff(b)(1) (incorporating 42 U.S.C. § 405(g)). Under § 405(g), "the district court is required to treat findings of fact as conclusive if supported by substantial evidence" and decides legal questions de novo. *See Mathews*, 424 U.S. at 332-49, 339 n.21. "When an appeal is taken from a summary judgment granted in favor of the Secretary, the review functions" of this Court are "virtually the same as those performed by the district court." *McDaniel v. Harris*, 639 F.2d 1386, 1388 (5th Cir. Unit A Mar. 1981); *Gulfcoast Med. Supply, Inc. v. Secretary, Dep't of Health & Hum. Servs.*, 468 F.3d 1347, 1350 & n.3 (11th Cir. 2006) (per curiam).

## SUMMARY OF ARGUMENT

**I.** The district court correctly held that MedEnvios's post-payment audits complied with due process. Due process requires only an "opportunity to be heard," "at a meaningful time and in a meaningful manner." *Worthy v. City of Phenix City*, 930 F.3d 1206, 1224 (11th Cir. 2019) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)). MedEnvios received that opportunity several times over, including with respect to its zero-paid claims.

**A.** MedEnvios principally challenges its post-payment audits as biased, but an audit is not biased simply because it focuses on rooting out waste and abuse in Medicare. The challenged audits examined claims that the government paid in whole or in part, because those are the only types of claims that can involve waste

or abuse and thereby undermine Medicare's fiscal integrity. The audits did not examine zero-paid claims, because those types of claims present wholly different issues, namely, adequate compensation to suppliers. It is black letter administrative law that an agency "need not address all problems at once" and instead "may solve first those problems it prioritizes." *Star Wireless, LLC v. FCC*, 522 F.3d 469, 475 (D.C. Cir. 2008). That is what CMS did here in excluding zero-paid claims from the challenged audits and focusing its efforts on the specific problem of waste and abuse.

The Due Process Clause provides no basis to conclude otherwise. "[T]o determine the requirements of due process in a particular situation," this Court applies "the balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976)." *Worthy*, 930 F.3d at 1223. That test demonstrates that excluding zero-paid claims from the challenged audits complies with due process: *First*, MedEnvios has a negligible interest in including zero-paid claims. CMS regulations permitted MedEnvios to appeal the denial of those claims within 120 days, and MedEnvios chose not to exercise that right, suggesting it has minimal interest in further review of these claims. *Second*, in light of those "substitute procedural safeguards," "the risk of an erroneous deprivation" of MedEnvios's interest is also minimal. *Id.* (quoting *Mathews*, 424 U.S. at 335). Although MedEnvios would prefer for the challenged audits to examine zero-paid claims,

due process does not entitle parties to "choose the precise process they desire." *FDIC v. Morley*, 915 F.2d 1517, 1522 (11th Cir. 1990). *Finally*, the government's interest is significant. Including zero-paid claims would decrease efficiency and divert limited audit resources from efforts to ensure Medicare's fiscal integrity.

**B.** MedEnvios also asserts that it was deprived of adequate information to meaningfully challenge the Health Integrity audit because it was not given information about the excluded zero-paid claims, but this due process claim likewise fails. Under the first *Mathews* factor, MedEnvios has a minimal interest in receiving a list of zero-paid claims excluded from the Health Integrity audit. Even without that information, MedEnvios has all the information it needs to verify and challenge the auditor's actual sampling and calculations. *Second*, the risk of erroneous deprivation is slight. Even if this information were relevant to MedEnvios's ability to challenge the audit, MedEnvios has records of its own Medicare claims and knows which claims were denied. *Finally*, requiring the government to provide this information would threaten to lengthen procedures that are already extensive and could pose a significant administrative burden. MedEnvios argues that it needs this information to determine whether the contractor's "filtering process" was "performed fairly and correctly," but due process "simply does not mandate that all governmental decisionmaking comply

with standards that assure perfect, error-free determinations." *Mackey v. Montrym*, 443 U.S. 1, 13 (1979).

**C.** MedEnvios attempts to shore up its due process claims by asserting violations of the Medicare Act and Manual, but even if proven, such violations would not "automatically mean a lack of due process; the Constitution, not statutes, determine the minimum procedures that due process requires." *Palm Valley Health Care, Inc. v. Azar*, 947 F.3d 321, 326 (5th Cir. 2020). Regardless, the audits fully complied with the Medicare Act and Manual.

The Medicare Act authorizes the agency to partner with contractors to "review" the activities of Medicare suppliers, including by conducting "medical and utilization review and fraud review." 42 U.S.C. § 1395ddd(b)(1). Congress thus authorized "post-payment audit[s]," *id.* § 1395ddd(f)(7), and the "[r]ecovery of overpayments" found in such audits, *id.* § 1395ddd(f). The audits here complied with these provisions: They reviewed the activities of a Medicare supplier for the purpose of identifying and recovering overpayments. MedEnvios argues otherwise by invoking 42 U.S.C. § 1395ddd(h)(1), but that provision applies to a different type of contractor and has no relevance here. Regardless, § 1395ddd(h)(1) merely requires the Secretary to "enter into contracts with recovery audit contractors … for the purpose of identifying underpayments and overpayments and recouping overpayments." It does not require those contractors to examine every possible

type of underpayment. It would be fully consistent with this provision for a recovery audit contractor to conduct a post-payment audit that excludes zero-paid claims but incorporates any uncovered underpayments (such as from partial payments) in the final calculation.

The challenged audits likewise complied with the Manual. MedEnvios's argument hinges on whether the Manual requires the "universe" of an audit to include zero-paid claims. The Manual states that "[t]he universe shall consist of all fully and partially paid claims submitted by the provider/supplier for the period selected for review and for the sampling units to be reviewed." MPIM § 8.4.3.2.1.B. Because zero-paid claims are neither "fully" nor "partially" paid, the Manual does not include them in the universe. MedEnvios argues that "fully and partially paid claims" is a term of art that refers to "adjudicated" claims, but this interpretation is at odds with the ordinary meaning of "paid" and is unnatural in context. Furthermore, the Manual provides that a challenge like this "must demonstrate actual error in the methodology that affects the overpayment amount," *id.* § 8.4.1.1, and MedEnvios has not made that showing. To the contrary, the mechanics of the challenged audits illustrate that incorporating zero-paid claims easily could result in the same or higher liability.

**II. A.** MedEnvios's remaining challenges likewise fail. MedEnvios claims that the administrative record is incomplete because it does not include information

about the zero-paid claims excluded from the Health Integrity audit, but the district court correctly held otherwise. Under 42 U.S.C. § 405(g), a court reviews the agency's decision for "substantial evidence," based on "the record including the evidence upon which the findings and decision complained of are based." Here, the agency's findings are not "based" on evidence concerning MedEnvios's zero-paid claims. Because the challenged audits did not consider or rely on zero-paid claims, information about those claims is not part of the record.

MedEnvios also argues that the record includes certain worksheets showing how the contractors recalculated the overpayment amounts following partially favorable ALJ decisions. That information likewise was not before the agency at the time of the decisions on review and thus is not part of the record. Regardless, the government has given these worksheets to MedEnvios, and it is unclear what it seeks to gain by including them in the record.

**B.** Finally, MedEnvios errs in claiming that it is entitled to a refund for claims not specifically examined as part of the sample. MedEnvios first argues that it is entitled to this sweeping remedy because the district court held that MedEnvios had a procedural due process right to receive the recalculation worksheets just discussed. But the proper remedy when a due process violation has been identified is to provide "constitutionally adequate process." *Barwick v. Governor of Florida*, 66 F.4th 896, 901 (11th Cir. 2023) (per curiam). Here, any

due process violation from withholding those worksheets is fully remedied by allowing MedEnvios to raise a challenge based on them, as it can now do. Relatedly, MedEnvios argues that it is entitled to a broad remedy because of the other asserted due process violations in this case, but as discussed, there were none. Regardless, any such violation would entitle MedEnvios only to a remedy that redresses its injury, which at most would mean recalculating MedEnvios's liability using a methodology that incorporates zero-paid claims.

## ARGUMENT

### I. MedEnvios's Post-Payment Audits Complied With Due Process.

The district court correctly held that MedEnvios's post-payment audits complied with due process. The Fifth Amendment guarantees that "[n]o person shall be … deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Due process requires only an "opportunity to be heard," "at a meaningful time and in a meaningful manner." *Worthy v. City of Phenix City*, 930 F.3d 1206, 1224 (11th Cir. 2019) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)). MedEnvios received this opportunity several times over.[5]

[5] For purposes of this appeal, the government assumes that the district court correctly held that MedEnvios has "a protected property interest in the funds subject to the extrapolated overpayment demands," because regardless, MedEnvios received adequate process to protect that interest. Doc. 84, at 4, App. 442; *see* Opening Br. 34-37. In similar circumstances, this Court has declined to "decide whether [a Medicaid provider] had a property interest in … disputed overpayments

*Continued on next page.*

**A. The Audits Were Not Unconstitutionally Biased.**

MedEnvios principally argues (at 3, 44-53) that excluding zero-paid claims "biased" the audits and "stacked the deck" against MedEnvios. What it means is that the audits were designed to serve the government's interests and not those of MedEnvios. But this is not bias, nor is it unconstitutional.

**1.** The government's efforts to root out waste and abuse in Medicare are not biased simply because CMS conducts audits that focus on that specific problem. It is black letter administrative law that an agency "need not address all problems at once" and instead "may solve first those problems it prioritizes." *Star Wireless, LLC v. FCC*, 522 F.3d 469, 475 (D.C. Cir. 2008); *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 231 (1991) ("[A]n agency need not solve every problem before it in the same proceeding."). CMS audits Medicare payments for a specific purpose, to find waste and abuse and thereby protect the fiscal integrity of the program. Paid claims are the only claims that present those problems; by definition, claims that have not been paid cannot involve improper government spending. CMS is free to conduct audits to address those problems without also, simultaneously, reexamining denied claims to ensure that suppliers

---

subject to recoupment" when the provider's claims failed on other grounds. *Zen Grp., Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1326 (11th Cir. 2023). *See generally PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment) ("[I]f it is not necessary to decide more, it is necessary not to decide more … .").

receive adequate compensation. It is entirely commonplace for agencies to conduct investigations that focus on protecting the public fisc; those investigations are not biased just because they address the discrete problem of recouping improper payments. *See, e.g.*, 75 Fed. Reg. 12,119, 12,119 (Mar. 15, 2010) (authorizing "Payment Recapture Audits" to identify "improper payments paid to contractors" by federal agencies).

Similarly, post-payment audits do not rely on "non-representative" samples simply because the samples are drawn from a universe that excludes zero-paid claims. Opening Br. 44. Such samples are perfectly "representative" of the types of claims being examined for the purpose of addressing the specific problem of waste and abuse; as noted, claims involving some payment by the government are the only claims that present a risk of waste or abuse. Put another way, the audits here were also limited to claims with specific procedure codes, such as diabetic supplies. The sample that was drawn from a universe of claims for diabetic supplies is likewise representative of claims concerning diabetic supplies; such a sample is not "biased" or "non-representative" merely because it does not include claims for knee replacements or entirely other things. *See* AR Vol. 1, at 143 (20065), App. 87; AR Vol. 1, at 46 (20068), App. 245. The universe was similarly restricted to claims with certain dates of service, such as claims from 2012 to 2015;

the sample is not "biased" or "non-representative" just because it has no claims from 2010.

**2.** The Due Process Clause provides no basis to depart from this commonsense conclusion. MedEnvios received adequate process to challenge all the agency's decisions—including with respect to zero-paid claims that were excluded from the audits. "[T]o determine the requirements of due process in a particular situation," this Court applies "the balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976)." *Worthy*, 930 F.3d at 1223. "That balancing test requires consideration of three factors," including "the private interest that will be affected by the official action," "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* (quoting *Mathews*, 424 U.S. at 335). Those factors demonstrate that the challenged audits satisfy due process.

Under the first factor, "the private interest here is slight." *Worthy*, 930 F.3d at 1223. While this Court may assume that MedEnvios has an interest in the overpayment determinations as a whole, *see supra* p. 29 n.5, MedEnvios has not demonstrated a significant interest in the zero-paid claims that it wishes to include in the challenged audits. MedEnvios indicates (at 12) that 280 zero-paid claims

were excluded from the SafeGuard audit, but MedEnvios provides no reason to think that they or any other zero-paid claims were improperly denied. Further, MedEnvios chose not to challenge the denial of these claims through the separate administrative process for such appeals, and as a result, all of those claims are administratively final (and judicially unreviewable). Through its own actions, MedEnvios abandoned any interest it had in the zero-paid claims, and it cannot resurrect that interest by attempting to smuggle review of those claims into post-payment audits.

Turning to the second factor, "the risk of an erroneous deprivation here is also slight." *Worthy*, 930 F.3d at 1223. Layers of process protect MedEnvios from the risk of erroneous deprivation, illustrating the minimal "value … of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. MedEnvios received three levels of administrative review of both audits, presenting its arguments to two Medicare contractors and an ALJ before challenging the decisions in district court. The audits also employed supplier-friendly overpayment methodologies, using the lower limit of a one-sided 90% confidence interval to ensure that the "demand amount for recovery" is "very likely less than the true amount of overpayment." MPIM § 8.4.5; *see Palm Valley Health Care, Inc. v. Azar*, 947 F.3d 321, 330 (5th Cir. 2020) ("If anything, the [Medicare program's] extrapolation methodology is provider friendly.").

"[S]ubstitute procedural safeguards" further underscore that the audits pose little risk of erroneous deprivation. *Mathews*, 424 U.S. at 333. As noted, there is a separate process to challenge zero-paid claims: Suppliers may appeal the denial of their claims immediately, within 120 days of the denial. 42 U.S.C. § 1395ff(a)(3)(C)(i); 42 C.F.R. § 405.904(a)(2). It does not offend due process or increase risk of error to have separate administrative procedures to review different types of claims decisions. Although MedEnvios might prefer that all administrative review be consolidated into a single audit process without any requirement for affirmative action by a supplier, due process does not entitle parties to "choose the precise process they desire." *FDIC v. Morley*, 915 F.2d 1517, 1522 (11th Cir. 1990).

MedEnvios asserts (at 46) that excluding zero-paid claims from the audits creates an "exponentially higher" risk of erroneous deprivation, but it does not explain why, nor does it attempt to reconcile that assertion with its own choice not to appeal. MedEnvios has offered no argument or evidence to demonstrate that any of its zero-paid claims were improperly denied. To the contrary, its own actions suggest that it does not believe that further review of these claims would result in any benefit; otherwise it would have administratively appealed the denials when they occurred. If all the zero-paid claims were correctly adjudicated, then including them in the challenged audits would not reduce the risk of error. Nor has

MedEnvios offered any reason to think that including them in the audits would decrease MedEnvios's ultimate liability; as discussed below, it is entirely possible that including zero-paid claims would *increase* MedEnvios's total projected overpayment. *See infra* pp. 46-50. And even if some of those claims might not have been correctly determined, MedEnvios is not entitled to a second avenue for review of zero-paid claims simply because it chose not to use the available appeals process. The Due Process Clause does not save sophisticated parties from the consequences of their own actions.

As to the final factor, the government "undeniably has an interest in the efficient resolution" of Medicare audits. *Worthy*, 930 F.3d at 1224. CMS devotes its limited resources to auditing paid claims that may undermine the Medicare program's fiscal integrity. Requiring contractors to audit zero-paid claims during post-payment audits would take away resources from that effort, requiring contractors to spend time analyzing claims that, by definition, do not involve government payments and do not threaten the public fisc. *See A1 Diabetes & Med. Supply v. Azar*, 937 F.3d 613, 619-20 (6th Cir. 2019). CMS thus has a clear interest in placing the burden on suppliers to proactively appeal the denial of claims, if they believe those denials were incorrect; doing so keeps CMS's audit resources where they belong, while allowing motivated suppliers to appeal the erroneous denial of proper claims. MedEnvios asserts (at 46) that this burden

"would be slight" because auditors already have data about zero-paid claims, but that ignores the effort required to conduct an audit. MedEnvios seeks to have contractors include zero-paid claims in the universe and then, if those claims are sampled, examine them to determine if they were properly denied. Making that determination would require time and effort, just as it requires time and effort to evaluate paid claims and determine whether they were properly paid.

MedEnvios's preferred administrative scheme also would undermine the efficiency of the administrative review of denied claims. At its core, MedEnvios's claims are an improper attempt to collaterally attack those separate final agency decisions. Requiring the government to reexamine denied claims at this juncture would circumvent the 120-day statutory deadline to appeal those denials, and it would ignore administrative exhaustion requirements by providing judicial relief regarding claims that have not been properly challenged before the agency.

In rejecting MedEnvios's challenge, the district court joined the Medicare Appeals Council and numerous other district courts that have uniformly rejected similar due process claims. *See, e.g.*, *Border Ambulance Serv., LLC*, 2010 WL 7209455, at *7 (Medicare App. Council Nov. 10, 2010) ("[The auditor's] exclusion of unpaid claims from the universe did not affect the appellant's due process rights."); *Ashli Healthcare, Inc. v. Kennedy*, 2025 WL 1125127, *6-9 (E.D. Cal. Apr. 16, 2025) (similar, citing cases). These decisions reflect a broad acceptance

of Medicare's audit processes, including "the use of sampling and extrapolation as part of audits in connection with Medicare and other similar programs." *See, e.g.*, *Ratanasen v. California Dep't of Health Servs.*, 11 F.3d 1467, 1471-72 (9th Cir. 1993) (rejecting due process challenge to sample's construction where provider had the opportunity to present his arguments to the court); *Palm Valley*, 947 F.3d at 325-26 (similar). MedEnvios's audits likewise satisfy due process.

**B. MedEnvios Has Adequate Information To Meaningfully Challenge The Audits.**

MedEnvios also claims (at 37-43) that, because it was not provided with information about the zero-paid claims excluded from the Health Integrity audit, it "was unable to recreate the statistical sampling methodology" and therefore was unable to "meaningfully challenge it." This due process claim fails for many of the same reasons as its claim of bias.

**1.** Under the first *Mathews* factor, "the private interest here is slight." *Worthy*, 930 F.3d at 1223. The only purportedly missing information is a list of zero-paid claims excluded from the Health Integrity audit. MedEnvios recognizes—and challenges—the auditor's decision not to include those claims in the universe from which it created a representative sample. Thus, even without information about zero-paid claims, MedEnvios has everything it needs to verify and challenge the auditor's actual sampling and calculations. MedEnvios does not need details about specific zero-paid claims that were excluded from the universe,

in the same way that it does not need information about claims with unrelated procedure codes or dates of service that likewise were excluded. That data would not provide any relevant information that MedEnvios could use to review and challenge the actual calculations performed by the contractor.

Similarly, under the second *Mathews* factor, "the risk of an erroneous deprivation here is also slight." *Worthy*, 930 F.3d at 1223. Even if this information were relevant, MedEnvios has records of its own Medicare claims; it knows which claims were denied. MedEnvios therefore has all the information it needs to ascertain which zero-paid claims meet the other parameters of the target universe. There is thus little "value" from requiring "additional or substitute procedural safeguards" by requiring the government to provide this information. *Mathews*, 424 U.S. at 335.

Finally, under the third *Mathews* factor, requiring the government to provide the requested information would threaten to lengthen procedures that are already extensive. It may not significantly burden the government to produce the list of zero-paid claims in this case, but any such requirement may be invoked across Medicare audits, and MedEnvios's position would not necessarily be limited to information about zero-paid claims. On the same theory, contractors may be asked to produce extensive information about other types of claims that they excluded from the universe for concerning unrelated procedures or falling outside the

relevant date range. Providing such information across Medicare audits could pose a significant burden.

At bottom, this claim is largely derivative of MedEnvios's core claim of bias. MedEnvios claims (at 40) that they are "separate and distinct," but they both ultimately rest on the validity of excluding zero-paid claims from the universe. If the auditor was not required to include zero-paid claims in the universe, then nothing was missing from the information sent to MedEnvios, and MedEnvios had all the information necessary to challenge the audit that was actually (and properly) performed. The district court thus correctly concluded that this claim "comes down to whether [MedEnvios] received the target 'universe' of claims" subject to the post-payment audit, which it did, consistent with due process. Doc. 117, at 6-7, App. 479-80.

**2.** MedEnvios's contrary arguments are unavailing. MedEnvios argues (at 40) that it needs information about zero-paid claims to determine whether the contractor's "filtering process" was "performed fairly and correctly," but due process "simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations." *Mackey v. Montrym*, 443 U.S. 1, 13 (1979). Once again, due process guarantees only "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). As

discussed, MedEnvios's interest in this information is slight, given that it played no role in the auditor's calculations; the risk of erroneous deprivation is low, given that MedEnvios already has this information; and the burden to the government could prove substantial. MedEnvios does not require access to reams of data about the endless variety of claims that fall outside the audit's universe for one reason or another in order to receive a meaningful hearing on the actual subject of the audit.

MedEnvios also emphasizes (at 37) the district court's conclusion that MedEnvios was entitled to receive the worksheets showing how the overpayment amounts were recalculated following its partially successful appeals, but that information concerned how actual calculations were performed. The court thus considered that information relevant to MedEnvios's ability to verify that those calculations were performed correctly. Here, in contrast, MedEnvios offers no explanation (at 38) for why it cannot "recreate the statistical sampling process" or "verify the contractor's calculations" unless it is given information that was not used to calculate MedEnvios's liability and that is already in MedEnvios's possession.

### C. MedEnvios's Remaining Arguments Are Unavailing.

MedEnvios also asserts (at 46-53) that excluding zero-paid claims from the audits violates the Medicare Act and Medicare Program Integrity Manual, but these are not constitutional claims and were not asserted in its complaint, *see* Doc.

1, at 48-54, App. 227-33. Even if the audits violated a statute or regulation (which they did not), due process does not mandate perfect adherence to every rule. *See, e.g.*, *Palm Valley*, 947 F.3d at 326 (rejecting due process challenge to an audit in which HHS allegedly failed to meet a statutory deadline). A statutory violation "does not automatically mean a lack of due process; the Constitution, not statutes, determine the minimum procedures that due process requires." *Id.* As discussed above, due process requires only "the opportunity to be heard 'at a meaningful time and in a meaningful manner,'" and MedEnvios received that opportunity several times over. *Mathews*, 424 U.S. at 333. Regardless, as the district court held, MedEnvios's arguments fail on their own terms as well. Doc. 84, at 4-6, App. 442-44.

**1. Excluding Zero-Paid Claims Complies With The Medicare Act.**

Excluding zero-paid claims from post-payment audits is fully consistent with the Medicare Act. When Congress created the Medicare Integrity Program, it authorized the Secretary to partner with contractors to "review" the activities of Medicare suppliers, including by conducting "medical and utilization review and fraud review." 42 U.S.C. § 1395ddd(b)(1). Congress thus authorized "post-payment audit[s]," *id.* § 1395ddd(f)(7), and the "[r]ecovery of overpayments" found in such audits, *id.* § 1395ddd(f). Congress left the details of these audits to the agency, directing the Secretary to "establish a standard methodology" for

contractors to use. *Id.* § 1395ddd(f)(8). The audits here complied with these provisions: They reviewed the activities of a Medicare supplier for the purpose of identifying and recovering overpayments.

MedEnvios attempts (at 46-49) to transform CMS's audit authority by invoking an inapplicable statutory provision. That provision, 42 U.S.C. § 1395ddd(h)(1), states in relevant part that the Secretary "shall enter into contracts with recovery audit contractors … for the purpose of identifying underpayments and overpayments and recouping overpayments." MedEnvios recognizes (at 48) that this section "expressly applies to 'recovery audit contractors,'" reflecting the title of the subsection, "Use of recovery audit contractors," 42 U.S.C. § 1395ddd(h)(1). The auditors in this case were ZPICs (currently known as UPICs), not RACs. *See supra* pp. 10-12. This provision thus has no application here. *See supra* p. 5 n.2 (noting distinctions between contractor types).

Regardless, this provision would not require even RACs to include zero-paid claims in their audits. It merely directs the Secretary to partner with RACs to identify underpayments and overpayments, and RACs could do so without including zero-paid claims in their audits. For example, a RAC might examine claims that were partially paid, determine that they should have been fully paid, and account for those underpayments in the final overpayment calculation. This is how the Manual directs contractors to treat underpayments that may be uncovered

in a post-payment audit. *See* MPIM § 8.4.5 ("Sampling units that are found to be underpayments, in whole or in part, are recorded as negative overpayments and shall be used in calculating the estimated overpayment."); *Steven Kalter, M.D.*, 2011 WL 7007019, at *10 (Medicare App. Council Aug. 11, 2011) ("The MPIM does not … require a contractor to actively pursue underpayments, but only to account for underpayments, that have been uncovered as the result of the audit, when calculating an overpayment."). Thus, even accepting MedEnvios's argument that 42 U.S.C. § 1395ddd(h)(1) requires all types of contractors to look for underpayments when conducting audits, the contractors here did just that. During MedEnvios's audits, they would have noted any underpayments as they reviewed the sampled claims and accounted for underpayments in the final calculations. As the ALJ explained, "only fully and partially paid claims need to be included in the initial universe," but "if some of the reviewed claims actually turn out to be underpayments," "those underpayments can then be reconciled into the calculation of a final 'net overpayment.'" AR Vol. 1, at 79 (20068), App. 250.

**2. Excluding Zero-Paid Claims Complies With The Medicare Program Integrity Manual.**

Excluding zero-paid claims likewise is fully consistent with the Manual. The Manual states that "[t]he universe shall consist of all fully and partially paid claims submitted by the provider/supplier for the period selected for review and for the sampling units to be reviewed." MPIM § 8.4.3.2.1.B. Requiring that the

universe be made up of "fully and partially paid claims" results in the exclusion of zero-paid claims. By definition, zero-paid claims are neither fully nor partially paid. As the district court recognized, it would be a "logical jump" to conclude that contractors "are *required* to include [zero-paid] claims in all of their audits," "regardless of the purpose of the audit." Doc. 84, at 6, App. 444. Excluding zero-paid claims is also "consistent with the relevant Medicare contractors' mission, which is to 'audit waste.'" *Id.* "[T]he contractor's principal concern was to audit fully and partially paid claims—not claims that the Department never paid and by definition could not have resulted in overpayment." *Id.*

MedEnvios argues (at 50) that "fully and partially paid claims" refers to claims that have been "adjudicated" and therefore includes claims that have been adjudicated to warrant zero payment. But that interpretation departs sharply from the ordinary meaning of "paid," which is "marked by the receipt of pay" or "being or having been paid." *Paid*, Merriam-Webster Dictionary Online, https://perma.cc/JH35-P6LT. MedEnvios's proposed definition is also unnatural in context, because there is no apparent reason to include "partially" adjudicated claims in a post-payment audit. And elsewhere, the Manual frequently uses the

word "paid" to convey its ordinary meaning, in contexts that involve monetary payments.[6]

MedEnvios also repeatedly invokes *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), but that decision has no relevance here. At no point did the district court defer to the agency's legal conclusions. *See* Doc. 84, at 6, App. 444 ("[T]he Court agrees with the Secretary that the language of the statute does not permit" MedEnvios's interpretation.). As just discussed, the statute is best read to permit audits that exclude zero-paid claims. To the extent MedEnvios challenges the agency's interpretation of the Manual, *Loper Bright* is likewise irrelevant. As

---

[6] *See, e.g.*, MPIM § 8.2 ("Contractors should initiate recovery of overpayments whenever it is determined that Medicare has erroneously paid."); MPIM § 8.2.1 ("After an overpayment determination is made concluding an incorrect amount of money has been paid, contractors must assess an overpayment."); MPIM § 8.2.1.1.A ("An actual overpayment is, for those claims reviewed, the sum of payments (based on the amount paid to the provider/supplier and Medicare approved amounts) made to a provider/supplier for services which were determined to be medically unnecessary or incorrectly billed."); MPIM § 8.3.1.2 (payment suspension may be initiated where "it is suspected that there may be a substantial number of additional non-covered or miscoded claims paid in the past"); MPIM § 8.3.1.4 ("In lieu of imposing a payment suspension, the [Medicare Administrative Contractor] or UPIC may deny the paid claims because the provider failed to provide the requested documentation after two attempts."); MPIM § 8.3.2.3.1.B ("The overpayment consists of all claims in a specific time period(s) determined to have been paid incorrectly."); MPIM § 8.3.2.5 (UPICs may recommend that a suspension be terminated when "[t]he basis for the payment suspension action was that an overpayment may exist or money to be paid may be incorrect, and the UPIC has determined the amount of the overpayment."); MPIM § 8.3.3.1 (noting duties of UPICs "to protect and safeguard Medicare Trust Fund dollars from being inappropriately paid"); MPIM § 8.3.3.2 (same).

another district court recognized, the Manual "is not ambiguous in the first place" because it plainly instructs contractors to form a universe that includes only "fully and partially paid claims," as the contractors here did. *Ashli Healthcare*, 2025 WL 1125127, at *7 (quoting MPIM § 8.4.3.2.1.B).

Regardless, even if the Manual generally anticipates the inclusion of zero-paid claims (which it does not), MedEnvios still has not shown that its audits are invalid. The Manual directs contractors to "follow instructions in section 8.4" of the Manual, MPIM § 8.2.2, but notes that failure to follow these instructions "does not necessarily affect the validity of the statistical sampling" or "the projection of the overpayment," MPIM § 8.4.1.1. Instead, "[a]n appeal challenging the validity of the sampling methodology must be predicated on the actual statistical validity of the sample as drawn and conducted and must demonstrate actual error in the methodology that affects the overpayment amount." *Id.* MedEnvios has not demonstrated any "actual error." MedEnvios does not dispute that the overpayment amount is correct with respect to the universe at issue in these audits. Its desire to expand that universe to include additional claims does not demonstrate that the actual calculations are incorrect.

Furthermore, MedEnvios has not shown that including zero-paid claims would even affect its ultimate liability. It is hypothetical that MedEnvios's total projected overpayment would change, and it could very well increase. To see why,

consider the SafeGuard audit, and two critical steps that the contractor took. *See supra* pp. 10-12. *First*, the contractor selected a sample of 45 beneficiaries from a universe of 2,444 beneficiaries. Even if the 243 beneficiaries with zero-paid claims were added to the universe, it is possible that none would be randomly selected from the thousands of total claims. In that event, the sample would not include any zero-paid claims and the average overpayment would not change. *Second*, the contractor multiplied the average overpayment by the total number of beneficiaries in the universe to calculate the total projected overpayment. Adding zero-paid claims to the universe thus would increase the size of the universe. And if the same average overpayment is multiplied by a larger number, MedEnvios's total projected overpayment would increase.

To be sure, it is more likely that four beneficiaries with zero-paid claims would be randomly selected as part of the sample, because about one in 11 (243 out of 2,687 total) were zero-paid. But in that event, MedEnvios's total projected overpayment *still* likely would increase, because of the countervailing effect of increasing the size of the universe. While the average overpayment might decrease, that number must be multiplied by the total size of the universe, which is larger when zero-paid claims are added. The following tables illustrate how these

calculations could play out, with a hypothetical universe that includes 243 beneficiaries with zero-paid claims and four zero-paid claims in the sample.[7]

| SafeGuard Audit: Average Overpayment in Actual Sample v. Hypothetical Sample with Zero-Paid Claims | | | | | |
|---|---|---|---|---|---|
| | Overpayment Amount | | Sample Size | | Average Overpayment |
| Actual Sample (without zero-paid claims) | $40,868.09 | ÷ | 45 | = | $908.18 |
| Hypothetical Sample (with four zero-paid claims) | $37,769.97 | ÷ | 45 | = | $839.33 |

| SafeGuard Audit: Total Overpayment in Actual Universe v. Hypothetical Universe with Zero-Paid Claims | | | | | |
|---|---|---|---|---|---|
| | Average Overpayment | | Universe Size | | Total Projected Overpayment |
| Actual Universe (without zero-paid claims) | $908.18 | x | 2,444 | = | $2,219,591.38 |
| Hypothetical Universe (with 243 zero-paid beneficiaries) | $839.33 | x | 2,687 | = | $2,225,286.88 |

The same is true for the Health Integrity audit. There, as discussed, the contractor divided the universe into two groups and reviewed them separately. *See*

[7] The hypothetical sample replaces four overpayments ($774.53) with four zero-paid claims ($0). This amount was chosen because it is the most common amount in the sample and thus would be the most likely to be replaced through random selection. *See* AR Vol. 2, at 5801 (20065), Supp. App. 5. The zero-paid claims are not given a negative value because MedEnvios offers no reason to think they would be overturned in an audit.

*supra* pp. 12-14. If the contractor were to include zero-paid claims in the first group, the total projected overpayment may stay the same or increase, for the same reasons as with the SafeGuard audit. Alternatively, the contractor could create a third group for zero-paid claims. In that event, the contractor would randomly select claims from each group, review the selected claims, and calculate a per-claim average overpayment for each group. The contractor then would multiply the average overpayment per claim in the sample by the total number of claims in the universe that fall into the same group. The contractor next would add together the total for each group to calculate the total projected overpayment for the universe. Adding zero-paid claims in this way would change nothing about MedEnvios's bottom line unless those claims were found to be improperly denied. MedEnvios offers no reason to think they would be, having presented no evidence that they were improperly denied and having chosen not to appeal their denial. The following tables illustrate this method, assuming the same hypothetical sample size and universe of zero-paid claims as before:

| Health Integrity Audit: Average Overpayment in Hypothetical Sample with Zero-Paid Claims | | | | | |
|---|---|---|---|---|---|
| | Overpayment Amount | | Sample Size | | Average Overpayment |
| Hypothetical Group 0 (zero-paid claims) | $0 | ÷ | 4 | = | $0 |
| Group 1 (between $0 and $1,600) | $18,441.85 | ÷ | 35 | = | $526.91 |

| Health Integrity Audit: Total Overpayment in Hypothetical Universe with Zero-Paid Claims | | | | | |
|---|---|---|---|---|---|
| | Average Overpayment | | Universe Size | | Total Projected Overpayment |
| Hypothetical Group 0 (zero-paid claims) | $0 | x | 243 | = | $0 |
| Group 1 (between $0 and $1,600) | $526.91 | x | 2,033 | = | $1,071,208 |
| Group 2 (more than $1,600) | | | | + | $2,402.11 |
| Total | | | | = | $1,073,610.11 |

These mechanics illustrate that MedEnvios has not identified a violation of the Manual, but they also underscore the fundamental shortcomings of its due process claim. It is MedEnvios's burden to demonstrate a due process violation, and it cannot do so based on mere conjecture that including zero-paid claims in the audit would affect its ultimate liability (or, in other words, decrease its risk of erroneous deprivation).

## II. MedEnvios's Remaining Challenges Likewise Fail.

### A. The Administrative Record Is Complete.

**1.** MedEnvios first argues (at 24) that the record is incomplete because it does not include information about the zero-paid claims excluded from the Health Integrity audit. The district court correctly held that the record is complete without this information. Doc. 79, at 4-7, App. 434-37. For claims arising under the Medicare Act, 42 U.S.C. § 405(g) provides "the sole avenue for judicial review." *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1309 (11th Cir. 2016) (quoting *Heckler v. Ringer*, 466 U.S. 602, 615 (1984)); *see* 42 U.S.C. § 1395ff(b)(1) (incorporating 42 U.S.C. § 405(g)). A reviewing court must uphold the agency's findings "if supported by substantial evidence," based on "the record including the evidence upon which the findings and decision complained of are based." 42 U.S.C. § 405(g). Here, the agency's findings are not "based" on evidence concerning MedEnvios's zero-paid claims. Because that information was "never even part of the universe of evidence offered to the ALJ," it does "not need to be included in the record for it to be considered complete." Doc. 79, at 6, App. 436.

MedEnvios resists this conclusion (at 24-32) by invoking general Administrative Procedure Act (APA) principles, but those principles only underscore that the record is complete. The record in ordinary APA cases excludes material that was never "directly or indirectly considered by the agency," *Bar MK*

*Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993), and that did not "influence[] the agency's decision," *Bethlehem Steel v. EPA*, 638 F.2d 994, 1000 (7th Cir. 1980). Here, it is undisputed that the challenged audits did not incorporate zero-paid claims. MedEnvios argues that the audits *should have* incorporated those claims, but that is an argument about the merits, not the adequacy of the record. MedEnvios urges that the record includes all evidence that was before the contractors (rather than only before the ALJs), but the agency did not consider zero-paid claims at *any* level of proceedings—the contractors excluded zero-paid claims from their analysis at the very beginning, when they defined the universe of claims to be audited.

Finally, MedEnvios highlights (at 31) the fact that it received information about the zero-paid claims excluded from the SafeGuard audit, asserting that the record includes the same "foundational evidence and data" excluded from the Health Integrity audit. But the fact that an agency or its contractor had information in its possession—or provided that information to someone else—does not establish that the information is properly part of the administrative record, where once again, it was not part of the agency's analysis. Nor may a litigant use a motion to complete the administrative record as a method of obtaining discovery against an agency. *See* Doc. 79, at 6, App. 436 (explaining that MedEnvios's approach would "sanction a phishing expedition").

**2.** MedEnvios also argues (at 32) that the record includes certain recalculation worksheets, but MedEnvios now has them. *See* Doc. 129, at 2, App. 494; Opening Br. 32 (acknowledging that the government "produced them to MedEnvios"). It is unclear what remaining harm MedEnvios seeks to remedy with its request to include these documents in the record, when it now has and can use them to challenge the agency's recalculations. *Cf. Shinseki v. Sanders*, 556 U.S. 396, 406 (2009) (explaining that "courts ordinarily apply" a "harmless-error" rule in civil cases, including those under the APA).

Regardless, the district court correctly held that these worksheets are not part of the record because the agency decisions on review did not rely on them. *See United States v. Guthrie*, 50 F.3d 936, 944 (11th Cir. 1995) ("When directly reviewing an agency decision or regulation, a court does not consider any evidence that was not in the record before the agency at the time that it made the decision or promulgated the regulation."). MedEnvios's ultimate liability was recalculated *after* the ALJ decisions on review. Thus, the worksheets showing those recalculations were not part of the administrative process that it has challenged, which culminated with the ALJ's decision. *See Wright & Filippis*, 2011 WL 7145309, *1 (Medicare App. Council Sept. 29, 2011) ("The ALJ lacks jurisdiction over the way the contractor effectuated the reconsideration."); Doc. 60, at 25-26,

30, App. 423-24, 428; Doc. 59, at 2-3, App. 393-94. The worksheets therefore are not part of the administrative record supporting that decision.

**B. MedEnvios Is Not Entitled To A Refund.**

MedEnvios also errs (at 53-58) in seeking a remedy that would limit its liability to the sampled claims, without any extrapolation to the broader universe of claims. Such a remedy is far afield from any legal violation asserted in this case.

**1.** MedEnvios first challenges (at 53) the district court's order denying MedEnvios's motion for clarification. That order, Doc. 142, App. 500, concerned the court's prior decision granting partial summary judgment to MedEnvios on its request for the recalculation worksheets, Doc. 84, at 7-8, App. 445-46. As discussed, the court held that MedEnvios had a "procedural due process right[]" to receive those worksheets because they were necessary to "recreat[e] the recalculations to verify the revised extrapolated amounts." *Id.* at 8, App. 446. The court thus vacated the ultimate overpayment demands, *id.* at 9, App. 447, to allow MedEnvios to challenge the contractor's recalculations based on the worksheets. MedEnvios asked the court to clarify that this judgment conferred far greater relief, namely, "a refund of the extrapolated amounts," such that MedEnvios would be "liable only for the actual overpayment on the sample claims." Doc. 142, at 1, App. 500.

The district court correctly rejected that request. As the court explained, MedEnvios's "injury was the inability to challenge the overpayment demands with the proper documents," and therefore "the proper remedy" for MedEnvios "is to place it in the same position as if it had the correct documentation in the first place," by allowing it "to challenge those overpayments with the proper documentation." Doc. 142, at 2, App. 501. That approach follows the ordinary rule that the government can "cure any violation" of due process "by providing constitutionally adequate process." *Barwick v. Governor of Florida*, 66 F.4th 896, 901 (11th Cir. 2023) (per curiam). "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). Thus, "the remedy for a procedural due process violation is defined by the extent of the injury that resulted from the denial of constitutionally required process." *Hopkins v. Saunders*, 199 F.3d 968, 979 (8th Cir. 1999). Here, any due process violation from withholding recalculation worksheets is fully remedied by allowing MedEnvios to raise a challenge using these worksheets, as it can now do.

MedEnvios offers no basis to overturn this sound conclusion. MedEnvios argues (at 53-54) that the district court "improperly altered and amended its prior order" because the prior order "vacated" the overpayment demands and therefore "cancelled and voided a monetary penalty." But when courts vacate agency action,

they routinely remand for further proceedings rather than compel any particular outcome. *See, e.g.*, *American Sec. Ass'n, Citadel Sec. LLC v. SEC*, 147 F.4th 1264, 1279 (11th Cir. 2025). That is what the district court did here.

**2.** MedEnvios similarly errs (at 55-58) in arguing that other asserted due process violations in this case entitle it to a refund of "any money collected in excess of the actual overpayment amounts (i.e., the extrapolated overpayment demands), plus applicable interest." MedEnvios asserts (at 56-57) that this is the proper remedy when an audit's "methodology" is "found to be invalid," but here, the methodologies of both audits were upheld at every level of review.

Regardless, even if the exclusion of zero-paid claims had violated due process in some way, MedEnvios would not be entitled to a refund. It would only be entitled to a remedy that redresses its injury, *i.e.*, "constitutionally adequate process" that recalculates its overpayment using a methodology that incorporates zero-paid claims. *Barwick*, 66 F.4th at 901. That would entail sending this case back to the Medicare contractors so they can decide, in the first instance, how to incorporate zero-paid claims into the audit. The contractors then would apply this updated methodology. While MedEnvios is correct (at 56-57) that it could only be liable "for the overpayment identified in the sample" of an invalid audit, nothing would prevent the contractor from performing a new audit, and thereafter recouping the extrapolated amount based on a revised methodology. As noted, it is

entirely possible that an audit using the procedures requested by MedEnvios would result in the same or higher liability. *See supra* pp. 46-50.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

JASON A. REDING QUIÑONES
*United States Attorney*

THOMAS PULHAM

*s/ Cynthia Barmore*
CYNTHIA BARMORE
*Attorneys, Appellate Staff*
*Civil Division, Room 7541*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*Cynthia.A.Barmore@usdoj.gov*

November 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,877 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*s/ Cynthia Barmore*
Cynthia Barmore

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

*s/ Cynthia Barmore*
Cynthia Barmore