No. 25-10870

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

MEDENVIOS HEALTHCARE, INC.

*Plaintiff-Appellant,*

v.

ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

*Defendant-Appellee.*

Appeal from the United States District Court for the Southern District of Florida

No. 1:23-cv-20068-RNS

# APPELLANT'S REPLY BRIEF

Stephen D. Bittinger
Polsinelli PC
177 Meeting Street, Suite 400
Charleston, South Carolina 29401
854.223.6210
sbittinger@polsinelli.com

Bennett L. Cohen
Polsinelli PC
1401 Lawrence Street, Suite 2300
Denver, Colorado 80202
720.931.8155
bcohen@polsinelli.com

*Attorneys of Appellant*
MedEnvios Healthcare, Inc.

# TABLE OF CONTENTS


INTRODUCTION .......... 1

ARGUMENT .......... 2

I. The Secretary conflates and confuses the distinct legal issues on appeal. .......... 2

II. The Secretary does not contest that MedEnvios has a constitutionally protected property interest in Medicare reimbursements for services rendered. .......... 4

III. The Secretary incorrectly asserts that MedEnvios independently has access to the target universe of claims and thus has adequate information to meaningfully challenge the Health Integrity audit. .......... 6

IV. The Secretary fails to engage with the substance of MedEnvios's arguments as it relates to the inclusion of zero-paid claims in the sampling frames. .......... 8

A. The exclusion of zero-paid claims from the sampling frames mathematically biases the results of the statistical extrapolations in an unconstitutional manner and conflicts with statutory intent. .......... 8

B. The process for appealing individual zero-paid claims is insufficient to cure the constitutional defects caused by their exclusion from the statistical sampling and extrapolation process. .......... 11

1. The alternative appeal process for zero-paid claims does not remedy the mathematical bias in the statistical extrapolation process caused by their exclusion. .......... 12

2. The alternative appeal process for zero-paid claims is frozen for individual claims by the sampling and extrapolation process. .......... 12

C. The Court should follow *Loper Bright* in holding that the Secretary is entitled to no deference in its interpretation of 42 U.S.C. §1395ddd(h). .......... 15

V. The Secretary incorrectly asserts that the injury to MedEnvios can be adequately remedied by remand for further agency proceedings. .......... 19

VI. The Secretary does not engage with MedEnvios's arguments that the APA 'whole record' rule mandates inclusion of the target universe and recalculation worksheets in the administrative record. ....22

CONCLUSION ....27

CERTIFICATE OF COMPLIANCE ....29

CERTIFICATE OF SERVICE ....30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Now, Inc. v. Sw. Airlines Co.*,
385 F.3d 1324 (11th Cir. 2004) .......... 5

*Alpha Home Health Sols., LLC v. HHS*,
340 F.Supp.3d 1291 (M.D. Fla. 2018) .......... 5

*Bar Mk Ranches v. Yuetter*,
994 F.2d 735 (10th Cir. 1993) .......... 22

*Barwick v. Governor of Florida*,
66 F.4th 896 (11th Cir. 2023) (per curiam) .......... 20

*Carey v. Piphus*,
435 U.S. 247 (1978) .......... 21

*Cent. La. Home Health Care v. Price*,
2018 WL 7888523 (W.D. La. Dec. 28, 2018) .......... 10

*Chaves Cnty. Home Health Serv., Inc. v. Sullivan*,
931 F.2d 914 (D.C. Cir. 1991) .......... 9

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
2020 WL 2732340 (S.D. Fla. 5/26/2020) .......... 22

*D&G Holdings, LLC v. Burwell*,
156 F.Supp.3d 798 (W.D. La. 2016) .......... 20

*Elgin Nursing & Rehab. Ctr. v. Dep't of Health & Human Servs.*,
718 F.3d 488 (5th Cir. 2013) .......... 18

*Exxon Corp. v. Dep't of Energy*,
91 F.R.D. 26 (N.D. Tex. 1981) .......... 22, 24

*Fla. v. Buttigieg*,
751 F.Supp.3d 1333 (S.D. Fla. 2024) .......... 16

*Goose Creek Physical Med., LLC v. Becerra*,
No.22-cv-03932, 2024 WL 942918 (D. S.C. 3/5/2024) ....................................23

*Hammad v. Azar*,
2021 WL 1216383 (N.D. Fla. 1/15/2021) .......................................................20

*Holland v. Gee*,
677 F.3d 1047 (11th Cir. 2012) .......................................................................5

*Hopkins v. Saunders*,
199 F.3d 968 (8th Cir. 1999) ..........................................................................21

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)...................................................................................15, 17

*Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*,
297 U.S. 129 (1936).........................................................................................18

*Mastro Plastics Corp. v. NLRB*,
350 U.S. 270 (1956).........................................................................................16

*Mathews v. Eldridge*,
424 U.S. 319 (1976).......................................................................................5, 6

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
463 U.S. 29 (1983)...........................................................................................26

*Pruchniewski v. Leavitt*,
2006 WL 2331071 (M.D.Fla. Aug. 10, 2006) ..............................................9, 12

*Rock River Health Care, LLC v. Eagleson*,
14 F.4th 768 (7th Cir. 2021) .............................................................................6

*Ron Group, LLC v. Azar*,
2021 WL 5576616 (M.D. Ala. 11/29/2021) .......................................................5

*Sapuppo v. Allstate Floridian Ins. Co.*,
739 F.3d 678 (11th Cir. 2014) ..........................................................................5

*Thompson v. Dep't of Labor*,
885 F.2d 551 (9th Cir. 1989) ..........................................................................22

*Zen Group, Inc. v. Agency for Health Care Administration*,
80 F.4th 1319 (11th Cir. 2023) ....................................................................4

**Statutes**

5 U.S.C. § 706 ....................................................................................22

42 U.S.C. § 1395ddd ..............................................................................18

42 U.S.C. § 1395ddd(f)(2)(B) ...............................................................20

42 U.S.C. § 1395ddd(f)(8) ....................................................................17

42 U.S.C. § 1395ddd(h) ...................................................................15, 17

42 U.S.C. § 1395ddd(h)(1) ...............................................................16, 17

42 U.S.C. § 1395ff(a)(3)(C)(i) ..........................................................11, 13

**Other Authorities**

20 C.F.R. § 416.536 ..............................................................................17

42 C.F.R. § 405.904(a)(2) .....................................................................11

42 C.F.R. §405.980 ..................................................................................7

42 C.F.R. § 424.44(a)..............................................................................13

## INTRODUCTION

In his Answer Brief, Appellee Robert F. Kennedy, Jr., in his official capacity as Secretary, United States Department of Health and Human Services ("Secretary") does not meaningfully address the issues before the Court as Plaintiff-Appellant MedEnvios Healthcare, Inc. ("MedEnvios") has presented them on appeal. Rather, Appellee's Answer Brief sidesteps MedEnvios's demonstration that the district court erred in upholding two extrapolated overpayment demands that (1) were produced through biased sampling; and (2) were based on a sampling methodology and estimation of alleged overpayments that MedEnvios could not verify, due to the agency's failure to preserve and disclose the target universe in one audit, and the failure to timely disclose the recalculation worksheets for both audits. Instead of engaging with the concrete constitutional deficiencies and vital issues of law that must be determined by this Court, the Secretary incorrectly reframes them as minor procedural disputes that, at best should be disregarded, and at worst should be cured by remand for additional agency proceedings.

The Secretary's efforts to mischaracterize and confuse the legal issues to be decided should not prevail, and this Court should rule in favor of MedEnvios on the errors raised and set aside the extrapolated portions of the two overpayment demands due to these irreparable constitutional deficiencies.

# ARGUMENT

## I. The Secretary conflates and confuses the distinct legal issues on appeal.

The Secretary's Answer Brief attempts to conflate two distinct legal issues: MedEnvios's due process challenge regarding the exclusion of zero-paid claims from the sampling frames of the two underlying audits at issue, and its separate due process challenge regarding the Secretary's failure (by and through his contractors) to preserve and produce the target universe of claims for the Health Integrity audit when the same document was produced in the SafeGuard Services audit.[1] While MedEnvios's zero-paid claims argument is an issue of bias and statutory interpretation, MedEnvios's argument that the Secretary's contractor failed to preserve and produce the target universe in the Health Integrity matter is an issue of failure to provide proper notice and a meaningful opportunity to be heard. Answer Brief at 39.

The distinction is not abstract. It is grounded in concrete, specific differences between the two underlying audits at issue here. In the SafeGuard audit, although zero-paid claims were excluded from the sampling frame (which MedEnvios

[1] MedEnvios originally filed two separate complaints challenging two separate audits: an audit conducted by SafeGuard Services LLC ("the SafeGuard audit"), originally assigned Case No. 23-20065, and an audit conducted by Health Integrity, LLC "the Health Integrity audit"), assigned Case No. 23-20068. On May 12, 2023, the district court consolidated the cases and closed the SafeGuard docket. App. 5-8.

maintains was an error), the Secretary's contractor produced the target universe file which corresponded to the data set it actually used. That allowed MedEnvios to verify SafeGuard's sampling frame against the stated criteria and subsequently challenge the representativeness of the sample, which is the zero-paid claims bias argument. In contrast, in the Health Integrity audit, the Secretary's contractor only produced the filtered sampling frame file, not the target universe from which the sampling frame was drawn. As MedEnvios argues, that omission left it unable to recreate the sampling frame or sampling process to determine if it was performed correctly, thereby depriving MedEnvios of the foundational dataset required to verify the validity of the extrapolation.

These factual differences between the audits help clarify the legal errors. The zero-paid claims due process challenge concerns the objectivity and scientific compliance with the sampling and extrapolation process and the Secretary's interpretation of statutory compliance of the same. The target universe due process challenge, by contrast, concerns what the contractor produced, specifically, whether it preserved and provided the actual dataset used to generate the sample frame and extrapolated overpayment so that MedEnvios could verify the validity of the extrapolated overpayment, which due process requires. In the SafeGuard audit, the contractor working on behalf of the Secretary and the Centers of Medicare and Medicaid Services ("CMS") produced a copy of the target universe; in the Health

Integrity audit, a different contractor, also acting on behalf of the Secretary and CMS, failed to do so. This failure to produce the target universe raises a different constitutional interest than the failure to include zero-paid claims, specifically: the right to be heard "at a meaningful time and in a meaningful manner" by being given the evidence necessary to test CMS's methodology.

The Secretary's continued conflation of these distinct due process challenges confuses the legal issues and fails to adequately distinguish between the two separate audits being challenged in this appeal. While MedEnvios only raises the zero-paid claims issue in this appeal of the SafeGuard audit, it raises both the zero-paid claims issue and the independent failure to produce the target universe issue in its appeal of the Health Integrity audit. The Secretary's arguments sidestep this distinction entirely, to avoid having to defend the Secretary's failure to produce the target universe, which is a fatal flaw of the Health Integrity audit. Answer Brief at 39.

## II. The Secretary does not contest that MedEnvios has a constitutionally protected property interest in Medicare reimbursements for services rendered.

As MedEnvios noted in its Opening Brief, following this Court's decision in *Zen Group, Inc. v. Agency for Health Care Administration*, 80 F.4th 1319, 1326 (11th Cir. 2023), the district court correctly held that MedEnvios has "a protected property interest in the funds subject to the extrapolated overpayment demands." Doc. 84, at 4. Once such a property interest has been established, courts generally

apply the balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976), to determine whether a procedural due process violation has occurred.

In his Answer Brief, the Secretary effectively concedes that MedEnvios has a protected property interest in the extrapolated portion of the demand and proceeds with an argument applying the three factors outlined in the *Mathews* test instead. *See* Answer Brief at 29-30 fn. 5.

Thus, the Secretary has abandoned this issue as an alternative manner of resolving the due process issues under the meaning of *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014), and may not seek to revive it later. *See, Holland v. Gee*, 677 F.3d 1047, 1066 (11th Cir. 2012) (citing *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 13307 (11th Cir. 2004)).

Additionally, the Secretary does not respond to MedEnvios's request that this Court rule squarely on whether Medicare suppliers have a protected property interest in Medicare reimbursements for services rendered to Medicare beneficiaries. As set forth in MedEnvios's Opening Brief, district courts in the Eleventh Circuit are divided on this issue. *Compare Alpha Home Health Sols., LLC v. HHS*, 340 F.Supp.3d 1291, 1301 (M.D. Fla. 2018) (holding that Medicare suppliers do not have a property interest in Medicare payment), *with Ron Group, LLC v. Azar*, 2021 WL 5576616 at *3 (M.D. Ala. 11/29/2021) (holding that suppliers have a protected property interest in receiving full reimbursements for services rendered). However,

other circuits have held, as MedEnvios asks this Court to, that health suppliers have a property interest in reimbursement at the rate established by law. *See Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 774-76 (7th Cir. 2021). Accordingly, MedEnvios reiterates that, for the reasons stated here and as further discussed in its Opening Brief, this Court should resolve the split among the district courts in this Circuit and find that MedEnvios has a cognizable property interest in reimbursement for services provided, in addition to its property interest in the extrapolated portion of the demand.

## III. The Secretary incorrectly asserts that MedEnvios independently has access to the target universe of claims and thus has adequate information to meaningfully challenge the Health Integrity audit.

The *Mathews* Court set forth two elements that a plaintiff must show to succeed on a procedural due process claim: (1) a cognizable liberty or property interest and; (2) that the administrative procedures provided to the plaintiff violated mandatory procedural safeguards or were otherwise constitutionally inadequate. *Mathews*, 424 U.S. at 332-35. In assessing the second element, courts generally consider three factors: (1) the private interest affected by the state action; (2) the risk of an erroneous deprivation of that interest given the procedures used, as well as the probable value of additional or substitute safeguards; and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id*. at 335 (the "*Mathews*" test).

In its analysis of the second factor of the *Mathews* test, the Secretary asserts that the failure to provide the target universe of claims creates only a slight risk of erroneous deprivation because "MedEnvios has records of its own Medicare claims[.]" Answer Brief at 38. However, the suggestion that MedEnvios somehow independently had access to the target universe that was used to create the sampling frame in the Health Integrity audit is factually incorrect. Medicare claims data is not a static data set but rather is in constant flux as new claims continue to be submitted, contractors continue to deny and approve those individual claims, and adjudicated claims are re-reviewed during either the appeals process or through various contractor audits and reopenings. *See, e.g.,* 42 C.F.R. §405.980; MPIM §3.5.2. The claims for the periods of review were a live-stream of adjudication actions on individual claims, and the target universes were snapshots that pulled sets of claims data from this live-stream and froze the claims in their adjudicative state when they were pulled. MedEnvios has no way to replicate those snapshots in time and must rely on the data sets CMS pulled and provided to the contract auditors. If the Secretary, through his Medicare contractors, fails to preserve the target universe before creating the sampling frame, the data set will change before a provider or supplier even has knowledge that this data has been pulled. Accordingly, without the preserved target universe that the contractor actually relied upon and which forms the foundational evidence necessary to recreate and verify the sampling frame,

MedEnvios cannot meaningfully validate the methodology or determine whether the agency's overpayment determination was reached through a fair and legally proper process.

## IV. The Secretary fails to engage with the substance of MedEnvios's arguments as it relates to the inclusion of zero-paid claims in the sampling frames.

As discussed further below and more extensively in MedEnvios's Opening Brief, there are significant constitutional errors that result from the exclusion of zero-paid claims from the sampling frame for both underlying audits. *See* Opening Brief at 44-52. The Secretary does not meaningfully engage with these arguments in his Answer Brief and instead focuses on collateral issues, such as the existence of alleged alternative appeals pathways for some zero-paid claims. Answer Brief at 33. These arguments do not rebut MedEnvios's core claim that exclusion of the zero-paid claims unconstitutionally biases the statistical extrapolations, and do not otherwise cure the due process violation that results from the exclusion of these potentially underpaid claims.

### A. The exclusion of zero-paid claims from the sampling frames mathematically biases the results of the statistical extrapolations in an unconstitutional manner and conflicts with statutory intent.

Fundamental principles of due process and statistical science both require that an extrapolated overpayment be drawn from an unbiased sample to ensure that the estimated overpayment assessed against the supplier is both fair and statistically reliable. Although courts have held that the use of statistical sampling and

extrapolation to estimate Medicare reimbursement overpayments will generally meet the requirements of due process, this conclusion rests on the presumption that the "extrapolation is made from a representative sample and is statistically significant[.]" *See Pruchniewski v. Leavitt*, 2006 WL 2331071, at *9-10 (M.D.Fla. Aug. 10, 2006), quoting *Chaves Cnty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 922 (D.C. Cir. 1991). However, when a Medicare contractor fails to include zero-paid claims in the sampling frame, the contractor is conducting its statistical sampling with a non-representative sample—skewed toward only errors made by the supplier—thereby injecting bias into the process and dramatically increasing the risk of erroneous deprivation of the supplier's property, and thus depriving the supplier of its right to due process. *Id.* (finding that "the low risk of error" only exists if the extrapolation "is made from a representative sample…").

The Secretary confuses this statistical issue by analogizing to other types of restriction on the target universe of claims. Answer Brief at 31-32 (claims for particular types of service, claims for particular dates of service). The types of claims that the Secretary contemplates excluding in these hypotheticals do not create statistical bias. Instead, they change the focus of the audit entirely, the same way an audit of a different supplier might. Neither are similar to the statistically biasing effect of total exclusion of claims on the basis of whether they are likely to be an over or underpayment. When the sampling method systematically excludes portions

of the population that impact the average overpayment, which is the variable of interest when considering extrapolated overpayments, it skews the sample toward only a particular type of error and mathematically inflates the alleged overpayment.

Auditing only claims with positive payment amounts skews the sample toward only the potential errors made by the supplier. This also eliminates consideration of any potential errors by the government, including claims that would most likely have been underpayments, and mathematically inflates the alleged overpayment against the provider. *See Cent. La. Home Health Care v. Price,* 2018 WL 7888523, at *16-20 (W.D. La. Dec. 28, 2018) ("The DHHS interpretation of the MPIM regulations to exclude all [zero-paid] claims clearly results in a substantially higher overpayment calculation."). Because the extrapolated overpayment is an estimate rather than an actual calculation of an overpayment, the government contractor's use of a biased sample directly affects and increases the likelihood that MedEnvios will be deprived of payment for supplies that were already provided to beneficiaries, and for which MedEnvios is legitimately owed a reimbursement.

The Secretary also argues that including zero-paid claims in the sampling frames could potentially have the effect of increasing the statistically extrapolated overpayment amounts. Answer Brief at 46-50. This argument is equally unavailing and only serves to distract from the real issue of impermissible bias in the contractors' statistical sampling methodology. The Secretary's analysis looks at one

of a huge range of possible outcomes, without using statistical principles, and ignores the possibility (indeed likelihood) that sampled zero-paid claims could be found to be underpayments. *Id.* There are a significant number of alternative sampling outcomes in which the extrapolated overpayment amount decreases as the result of the proper inclusion of zero-paid claims in the sampling frame. But most importantly, this line of argument again misconstrues the core of MedEnvios's due process claim. Due process does not require the inclusion of zero-paid claims to ensure that the statistical extrapolation process reaches a particular statistical outcome. Due process requires the inclusion of zero-paid claims because, as discussed extensively in MedEnvios's Opening Brief and again herein, the exclusion of zero-paid claims impermissibly biases the statistical extrapolation in a manner which proportionally increases the risk of the erroneous deprivation of MedEnvios's protected property interest.

**B. The process for appealing individual zero-paid claims is insufficient to cure the constitutional defects caused by their exclusion from the statistical sampling and extrapolation process.**

The Secretary extensively relies upon the alleged existence of a separate process by which suppliers may challenge zero-paid claims within 120 days of their denial. Answer Brief at 32-37; 42 U.S.C. § 1395ff(a)(3)(C)(i); 42 C.F.R. § 405.904(a)(2). The Secretary argues that the existence of this separate pathway allays MedEnvios's interest in having zero-paid claims included in the audit

sampling frame and further argues that their inclusion in the statistical extrapolation process would effectively provide a "second avenue for review." Answer Brief at 35. As explained below, this argument neither remedies the mathematical bias created by their exclusion from the sampling frame nor overcomes the functional limitations of Medicare audits once the sampling and extrapolation process has begun.

**1. The alternative appeal process for zero-paid claims does not remedy the mathematical bias in the statistical extrapolation process caused by their exclusion.**

The Secretary's argument fails to acknowledge and address the mathematical effect that the exclusion of zero-paid claims has on the statistical extrapolation process. As discussed above in section IV.A, and extensively in MedEnvios's Opening Brief, in conducting a statistical sampling and extrapolation, a Medicare contractor cannot intentionally exclude claims that were zero-paid from the sampling process, as that renders the sample non-representative, which does not comport with due process. *Pruchniewski*, 2006 WL 2331071, at *9-10. That is a separate and distinct issue from the ability to appeal an initial claim determination.

**2. The alternative appeal process for zero-paid claims is frozen for individual claims by the sampling and extrapolation process.**

The functional limitations of Medicare audits illustrate that this "separate" appeal process does not exist for extrapolated reviews and does not absolve the Secretary from his contractor's improper removal of zero-paid claims from the

sampling process. Specifically, once a period of review is under audit and subject to extrapolation, the right to appeal these zero-paid claims is cut off. As shown in Figure 1 below, Health Integrity's December 2016 audit of MedEnvios served to reopen all of the claims in the target universe (January 28, 2013 through January 28, 2016) and cut short the time to appeal many of those claims. Additionally, in Figure 2 below, SafeGuard's August 2016 audit of MedEnvios likewise cut short the time to appeal claims in the target universe (May 1, 2014 through May 4, 2016). Regulations allow a provider to submit a claim for reimbursement up to 364 days after the date of service. 42 C.F.R. § 424.44(a). Thereafter, a provider has a 120-day window to file a request for redetermination if it is dissatisfied with an initial claim determination. 42 U.S.C. § 1395ff(a)(3)(C)(i). When an auditor, such as Health Integrity or SafeGuard, conducts a post-payment audit, it reopens *all* of the claims in the time period for review. Once those claims are reopened, a provider cannot appeal claims within that time period; the provider's ability to request a redetermination is cut off.

Based on the relevant audit dates here, for the Health Integrity audit (which began December 20, 2016), MedEnvios's appeal rights were cut short for any claims with dates of service between August 24, 2015 to the end date of the target universe – January 28, 2016; for the SafeGuard audit (which began August 31, 2016),

MedEnvios's appeal rights were cut short for any claims with dates of service between May 4, 2015 to the end date of the target universe – May 4, 2016.

**Figure 1 – Health Integrity Audit**




1. Target Universe - Consists of all claims submitted by MedEnvios within this period (1/28/2013 - 1/28/2016)
2. First date for which the right to appeal claims was cut off by Health Integrity's audit. *See* 42 C.F.R. § § 424.44(a) and 405.964.
3. Health Integrity audit begins, which reopens all claims in the target universe, and cuts off MedEnvios's right to appeal any claims in the target universe
4. Zero-paid appeal rights lost due to audit - The zero-paid claims for which the right to appeal was lost due to Health Integrity's audit. MedEnvios's right to appeal a significant amount of the zero-paid claims in the target universe was cut short due to Health Integrity's audit.

**Figure 2 – SafeGuard Audit**




1. Target Universe - Consists of all claims submitted by MedEnvios within this period (5/1/2014 - 05/4/2016)
2. First date for which the right to appeal claims was cut off by SafeGuard's audit. *See* 42 C.F.R. § § 424.44(a) and 405.964.
3. SafeGuard audit begins, which reopens all claims in the target universe, and cuts off MedEnvios's right to appeal any claims in the target universe
4. Zero-paid appeal rights lost due to audit - The zero-paid claims for which the right to appeal was lost due to SafeGuard's audit. MedEnvios's right to appeal a significant amount of the zero-paid claims in the target universe was cut short due to SafeGuard's audit.

The Secretary fails to recognize this functional limitation of reopenings in Medicare audits in its discussion of this issue. The Secretary also fails to recognize that its rationale, if correct, would create a separate due process violation by preemptively cutting off and foreclosing a provider's appellate rights for certain

zero-paid claim determinations. As shown in Figures 1 and 2 above, under this "separate redetermination process," MedEnvios lost its right to appeal claims for dates of service covering a significant portion of the target universe period for both audits, amounting to a separate deprivation of due process if they are not included in the sampling process. However, if zero-paid claims were included in the audit and sampling process, as MedEnvios contends they should be, then the potential for this separate due process violation is avoided.

### C. The Court should follow *Loper Bright* in holding that the Secretary is entitled to no deference in its interpretation of 42 U.S.C. §1395ddd(h).

*Loper Bright* requires the courts to apply "all relevant interpretive tools" in order to reach the "best" reading of a statute. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024). The plain language of 42 U.S.C. § 1395ddd(h) ("Section 1395ddd(h)"), which authorizes CMS to hire contractors to audit Medicare claims and recoup overpayments, supports MedEnvios's contention that zero-paid claims are required to be included in the sampling frames under a *Loper Bright* analysis. The best reading of Section 1395ddd(h) requires all CMS auditors to review claims **objectively and without bias**, which means including potential underpayments (including zero-paid claims) in their statistical samples and extrapolations.

The Secretary's attempts to avoid the command of *Loper Bright* in order to excuse his contractor's biased audits does not withstand scrutiny. The Secretary initially attempts to limit the scope of Section 1395ddd(h) by arguing that it applies

only to CMS's sub-regulatorily-defined recovery audit contractors ("RACs"). Answer Brief at 42. The notion that Congress would intend for one type of contractor to be objective but permit other contractors to inject bias—when all contractors are authorized by the same statute—is illogical and raises constitutional concerns. *See Fla. v. Buttigieg*, 751 F.Supp.3d 1333, 1349-50 (S.D. Fla. 2024) (noting that "one of the most notable canons of statutory construction that courts apply when reviewing agency action is to avoid, where reasonably possible, statutory constructions that raise serious constitutional concerns") (internal quotations omitted).

While Section 1395ddd(h)(1) expressly refers to "recovery audit contractors" and does not expressly mention CMS's sub-regulatorily-defined program integrity contractors (such as Zone Program Integrity contractors ("ZPICs") or Unified Program Integrity contractors ("UPICs")), it is the closest express statutory standard for how these contractors must conduct post-payment audits to support an extrapolated overpayment demand. There is no other authority suggesting that RACs, ZPICs, and UPICs should handle reviews differently. *See Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285 (1956) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.") (internal quotations omitted).

Looking to the provisions of the whole statute, it is readily apparent that Congress requires the Secretary to establish "a **standard methodology** for **medicare**

**contractors** to use in selecting a sample of claims for review in the case of an abnormal billing pattern." 42 U.S.C. § 1395ddd(f)(8) (emphasis added). While the statute does not explicitly detail the statistical or review processes that Medicare contractors should use to conduct these post-payment reviews, the statute expressly states that the purpose of these audits is to "identify underpayments and overpayments." 42 U.S.C. § 1395ddd(h)(1). This provision reflects Congress's intent that Medicare contractors be objective in conducting post-payment reviews by considering underpayments as well as overpayments. *Id*. Section 13955ddd(h)(1), when interpreted within the broader context of Section 1395ddd, reflects Congress's intent for all "**medicare contractors**" to utilize a "**standard methodology**" that includes objectivity by conducting reviews that account for underpayments. *Id.* (emphasis added).

The Secretary further argues that both audits complied with the Medicare Act because Section 1395ddd(h) "merely directs the Secretary to partner with RACs to identify underpayments and overpayments, and RACs could do so without including zero-paid claims in their audits." Answer Brief at 42-43. This notion, however, completely ignores the possibility that a zero-paid claim can be an underpayment. *See* 20 C.F.R. § 416.536 (explaining that an "underpayment" is nonpayment where payment was due or payment of less than the amount due).

Finally, MedEnvios agrees with the Secretary that *Loper Bright* is inapplicable to the Secretary's interpretation of the MPIM. Answer Brief at 45. MedEnvios has never argued otherwise. Rather, MedEnvios generally puts forth two arguments regarding the Secretary's interpretation of the MPIM: (1) the Secretary's interpretation of the MPIM conflicts with statutory mandate, and the statute must govern, *see Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936); and (2) this Court should not give any deference to the Secretary's interpretation of the MPIM pursuant to *Elgin Nursing & Rehab. Ctr. v. Dep't of Health & Human Servs.*, 718 F.3d 488, 494 (5th Cir. 2013), which declined to defer to HHS's interpretation of its own manual because deference to an agency's interpretations of its own rules "encourages the agency to enact vague rules which give it the power, in future adjudications, to do what it pleases[,]…frustrates the notice and predictability purposes of rulemaking, and promotes arbitrary government." *Id.*

Considering the plain language of 42 U.S.C. § 1395ddd, principles of statutory construction, congressional intent underlying the Medicare program, and due process requirements, this Court should not defer to the Secretary's unconstitutional interpretation of Section 1395ddd and conclude that the best statutory interpretation requires all CMS contractors to review both overpayments and underpayments,

which include zero-paid claims, when conducting their statistical sampling and extrapolation.

## V. The Secretary incorrectly asserts that the injury to MedEnvios can be adequately remedied by remand for further agency proceedings.

As to the appropriateness of the remedy for the due process violations that the district court found below, the Secretary's response is built on the premise that any harm to MedEnvios can be cured by returning the matter to the agency for further proceedings, but that premise cannot be reconciled with the nature of the injuries MedEnvios has suffered. Specifically, the Secretary asserts that MedEnvios is "not entitled to a refund" and that any procedural deficiency, whether in the creation of the statistical extrapolation, the exclusion of zero-paid claims from the sampling frames, or the failure to preserve the target universe, would entitle MedEnvios only to "constitutionally adequate process" on remand. Answer Brief at 55. According to the Secretary, once the case is returned to agency contractors, CMS may simply correct its methodology, recalculate the extrapolated overpayment amounts, and allow MedEnvios to present further objections within the administrative structure. Answer Brief at 55. This formulation assumes that the injury is merely a procedural irregularity that has not yet resulted in tangible deprivation to MedEnvios and one that further agency review could meaningfully correct.

MedEnvios's Opening Brief has already thoroughly demonstrated why this is flawed. Opening Brief at 55-58. The deprivation of MedEnvios's protected property

interest is not speculative or forward-looking but arises from completed violations that culminated in extrapolated overpayment demands that are fatally flawed and which have already resulted in the wrongful recoupment of MedEnvios's funds. Thus, the appropriate remedy is the invalidation of the extrapolated overpayment amounts and an order that MedEnvios "be held liable only for the actual overpayment amounts determined through the sample claims," along with a refund of the already recouped extrapolated amounts with regulatory interest. *Hammad v. Azar*, 2021 WL 1216383 at *2 (N.D. Fla. 1/15/2021), *report and recommendation adopted* 2021 WL 1216383 (N.D. Fla. 3/21/2016); *See also*, *D&G Holdings, LLC v. Burwell*, 156 F.Supp.3d 798, 815 (W.D. La. 2016) (holding that recouped Medicare payments must be returned to a supplier with interest if the supplier successfully appeals and overpayment determination).

Moreover, this remedy is consistent with applicable statutory authority, which dictates that if any overpayment determination "against the provider of services or supplier is later reversed, the Secretary shall provide for repayment of the amount recouped plus interest at the same rate as would apply under the previous sentence for the period in which the amount was recouped." *See* 42 U.S.C. § 1395ddd(f)(2)(B).

The array of cases that the Secretary cites in an attempt to combat this principle is unavailing. Answer Brief at 55-57. Indeed, these cases all involved

situations where any deprivation of process did not result in injury. *Barwick v. Governor of Florida*, 66 F.4th 896 (11th Cir. 2023) (per curiam) involved a prisoner seeking to enjoin his execution based on alleged defects in clemency procedures. Focusing its analysis on the particular context of that case, this Court emphasized that clemency is an act of grace and that due process protections in that context are minimal. *Id*. at 903-904. The Court did not address or restrict the remedial authority of a reviewing court when the government has already deprived a party of its protected interest through an unlawful process. *Carey v. Piphus*, 435 U.S. 247 (1978) and *Hopkins v. Saunders*, 199 F.3d 968 (8th Cir. 1999) both reject the notion of *de facto* injury deriving from insufficient process. Neither case, however, addresses an unjustified deprivation of property due to a lack of process, as occurred here. These cases instead focus their discussion on the magnitude of injury that stems *solely* from deprivation of process itself. *See Carey* at 263-64; *Hopkins* at 979 ("Where an employee would have been discharged even if he had received due process, *i.e.* was discharged for cause, his sole injury is the lack of process and only nominal damages are proper."). But MedEnvios's sole injury is not lack of process; its injury is the imposition and collection of extrapolated overpayments that resulted from a process that violated statutory, constitutional, and statistical requirements. This injury cannot now be adequately remedied by "challenging [these] overpayments with the proper documentation" (Doc. 142, at 2) almost a decade after the harm occurred.

## VI. The Secretary does not engage with MedEnvios's arguments that the APA 'whole record' rule mandates inclusion of the target universe and recalculation worksheets in the administrative record.

The Secretary asserts that the administrative record was complete because the missing target universe in the Health Integrity audit and missing recalculation worksheets for both audits were not considered by the ALJs when they made their decisions, and thus the district court was correct in confining its review to what the ALJs had before them at the time they made their decisions. Answer Brief at 51. However, the Secretary never squarely addresses MedEnvios's core APA argument: that the "whole" administrative record must include "all documents and materials directly or indirectly considered by agency decision-makers," not merely the subset of material that happened to reach the ALJs. 5 U.S.C. § 706; *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 2020 WL 2732340, at *2 (S.D. Fla. 5/26/2020) (quoting *Thompson v. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989)). The whole record includes "all evidence that was before the decision-making body" and "consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position," and therefore cannot exclude foundational data that the contractors themselves relied upon when constructing and applying the statistical methodology. *Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 32-33 (N.D. Tex. 1981); *see also, Bar Mk Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993) ("The 'whole record' in this case

consists of all documents and materials considered by the Forest Supervisor … in making his initial decision, as well as documents and materials contained in the agency appeal record as developed throughout the [three-stage] agency review process.")

The Secretary further fails to respond to MedEnvios's showing that CMS contractors are themselves "agency decision-makers" whose work falls within the scope of a complete administrative record because their calculations, data selections, and universe constructions were "directly or indirectly considered" in the decisions under review. *See Goose Creek Physical Med., LLC v. Becerra*, No.22-cv-03932, 2024 WL 942918 at *4 (D. S.C. 3/5/2024). Nor does the Secretary address MedEnvios's demonstration that the Health Integrity target universe as well as recalculation worksheets for both audits were relied upon by the contractors in creating the statistical sampling frame and recalculating the reduced demands, both of which constitute foundational evidence and data needed to evaluate the Secretary's overpayment demands. The Secretary attempts to address this point by claiming that "the contractors excluded zero-paid claims from their analysis at the very beginning, when they defined the [sampling frame] to be audited." Answer

Brief at 52.[2] But the Secretary's acknowledgement reveals the truth of the matter: the contractors "directly considered" the target universes of claims and then removed all of the zero-paid claims from that data set; but, in the SafeGuard audit, the contractor took the next step of preserving that target universe and providing it to MedEnvios, whereas Health Integrity did not. Additionally, the Secretary contends that the recalculations for both audits occurred after the ALJ decisions, but recalculations also occurred after the reconsideration decisions as demonstrated in Figure 3. Answer Brief at 53. Each recalculation necessarily required the consideration of additional statistical analysis and data, yet the agency never produced any underlying documentation despite issuing revised demands. Additionally, recalculation documents arising out of the partially favorable decisions at the ALJ level inherently could not have been before the ALJs but were still relied upon by the agency contractors in determining the total extrapolated overpayments. These documents cannot be excluded merely because they were not before the ALJs, since the APA whole record rule turns on what the agency considered, not what was selectively forwarded to the adjudicator. *Exxon*, 91 F.R.D. at 36-37.

[2] The Secretary claims that the "universe of claims" is what the contractors are defining, but this continues to confuse the sampling frame and the target universe of claims.

Finally, the Secretary never addresses a key difference between the two underlying audits, as further explained in section I above, and outlined in Figure 3 below. In the SafeGuard audit, MedEnvios received the target universe that the contractor actually used, and this production is what allowed MedEnvios to verify the sampling frame against the stated criteria and to evaluate whether the statistical methodology had been applied correctly. SafeGuard's production of the target universe thus enabled meaningful review, because MedEnvios could examine the data set from which the sampling frame had been constructed and verify the contractor's calculations. That transparency stands in sharp contrast to the Health Integrity audit, where the contractor did not provide the target universe of claims relied upon for the extrapolated overpayment, and where that foundational evidence and data was missing from the administrative record. The SafeGuard record therefore underscores why the absence of the target universe in the Health Integrity matter renders that administrative record materially incomplete.

**Figure 3 – Documentation Missing from the Administrative Record**

| | Health Integrity Audit | SafeGuard Audit |
|---|---|---|
| Target Universe of Claims | Missing from the administrative record | Present in the administrative record |
| Recalculation documents as they related to partially favorable decision at the reconsideration level | Present in the administrative record | Missing from the administrative record |
| Recalculation documents as they related to partially favorable decision at the ALJ level | Missing from the administrative record | Missing from the administrative record |

*See* Appellant's Opening Brief at 32; Doc. 59-1; App. At A022.[3]

In short, the Secretary chooses not to confront MedEnvios's central APA position: that without the Health Integrity target universe and all recalculation worksheets, the record omits the very materials that formed the basis for the agency's sampling frames and extrapolation calculations through the appeals, leaving the court unable to determine whether the agency "failed to consider an important aspect of the problem" or "explain the evidence which is available." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43, 52 (1983). The Secretary's silence on these

[3] The Secretary ultimately produced some recalculation documentation outside of the administrative records during the district court proceedings, but the administrative records nevertheless remain incomplete for both audits.

points confirms that the position expressed in the Answer Brief cannot be squared with the APA's whole record requirement or with the framework for judicial review that the statute mandates.

## CONCLUSION

The Secretary's arguments do not meaningfully confront the central defects that invalidate the extrapolated overpayment demands at issue in these consolidated audits. MedEnvios has shown that both the SafeGuard and Health Integrity audits were conducted through processes that disregarded essential constitutional and statutory safeguards, including the exclusion of zero-paid claims, in violation of the principles of neutrality that underlie valid statistical sampling; and (in the case of Health Integrity) the failure to preserve and produce the target universe of claims needed to recreate and verify the extrapolation. These defects deprived MedEnvios of the meaningful opportunity to be heard that due process requires, and they resulted in extrapolated demands that cannot be trusted and therefore cannot stand.

For the reasons set forth in MedEnvios's Opening Brief and this reply, the Court should invalidate the statistical samplings and extrapolated overpayment demands and hold that MedEnvios is liable only for the actual overpayments identified in the reviewed sample claims. The Court should also hold that MedEnvios is entitled to a refund of any amounts recouped in excess of those actual overpayments, together with applicable interest, so that MedEnvios is restored to the

position it should have occupied had the Secretary observed the procedures required by law.

Dated: December 10, 2025

Respectfully submitted,

By _*/s/ Stephen D. Bittinger*_
POLSINELLI PC
Stephen D. Bittinger, #104550
177 Meeting Street, Suite 400
Charleston, SC 29401
Telephone: (854) 223-6200
sbittinger@polsinelli.com

Bennett L. Cohen, CO #26511
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Telephone: (720) 931-8155
bcohen@polsinelli.com

Attorneys for Appellant
MedEnvios Healthcare, Inc.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. FRAP 32(a)(7)(B), because this brief contains 5,978 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of 32(a)(5) and the type-style requirements of FRAP 32(a)(6), because it has been prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally-spaced typeface.

/s/ Stephen D. Bittinger
Stephen D. Bittinger

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2025, foregoing Brief of Appellant MedEnvios Healthcare, Inc. was electronically filed with the Clerk of Court by using the appellate CM/ECF system, and a copy of the brief was served on all counsel of record by operation of the CM/ECF system on the same date.

/s/ Stephen D. Bittinger
Stephen D. Bittinger